N5UQlucH

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   UNITED STATES OF AMERICA

3              v.                              22 CR 644 (JSR)
                                           Suppression Hearing
4   STEVEN PEREZ (aka Lucha El)

5              Defendant
    ------------------------------x
6
                                           New York, N.Y.
7                                          May 30, 2023
                                           2:00 p.m.
8

9   Before:

10                   HON. JED S. RAKOFF
                                        District Judge
11

12                        APPEARANCES

13  DAMIAN WILLIAMS
         United States Attorney for the
14       Southern District of New York
    ASHLEY C. NICOLAS
15  MADISON SMYSER
    SARAH MORTAZAVI
16       Assistant United States Attorneys

17  FEDERAL DEFENDERS OF NEW YORK INC.
         Attorneys for Defendant
18  ZAWADI BAHARANYI
    AMANDA JOY MAYO
19

20  ALSO PRESENT:   JOSEPH MAGLIOCCO, Paralegal Specialist (USAO)
                    SARAH KWON, Paralegal Specialist (Fed. Def.)
21

22

23

24

25

N5UQlucH

| | |
|---|---|
| 1 | (In open court; case called) |
| 2 | THE COURT:  We are here for a suppression hearing on |
| 3 | the fruits of the search.  I don't particularly feel the need |
| 4 | for opening statements, but if anyone wanted to make one, you |
| 5 | can.  Otherwise, please call your first witness. |
| 6 | MS. NICOLAS:  Thank you, your Honor.  The government |
| 7 | is prepared to proceed without an opening statement. |
| 8 | But before the government calls their first witness, |
| 9 | just one thing for the Court's attention.  The physical |
| 10 | exhibits for the first witness are staged at the witness box |
| 11 | already.  Happy to move those back if the Court would prefer, |
| 12 | but in the interest of time, we've placed them there in |
| 13 | advance. |
| 14 | THE COURT:  That's fine.  I neglected, because my |
| 15 | courtroom deputy is out today, for counsel to identify |
| 16 | themselves for the record. |
| 17 | MS. NICOLAS:  Ashley Nicolas, Madison Smyser, and |
| 18 | Sarah Mortazavi for the government.  We are joined by Joseph |
| 19 | Magliocco, a paralegal specialist. |
| 20 | MS. BAHARANYI:  Zawadi Baharanyi for Federal |
| 21 | Defenders.  I'm here with counsel from our office, Amanda Mayo, |
| 22 | as well as paralegal specialist Sarah Kwon.  And seated to my |
| 23 | right is Lucha El. |
| 24 | THE COURT:  Go ahead, call your first witness. |
| 25 | MS. NICOLAS:  Before the government calls its first |

N5UQlucH

1  witness, I would like to offer two stipulations as well as the

2  exhibits that are the subject of those stipulations.

3          The first is Government Exhibit 1000, which stipulates

4  between the parties that Government Exhibit 100 is a disk

5  containing a true and accurate copy of a recording of a

6  telephone call made to New York City's 911 call system on

7  June 23, 2021 at approximately 9:52 p.m. from the vicinity of

8  161 East Gun Hill Road in the Bronx, New York.

9          Government Exhibit 200 is a disk containing a true and

10 accurate copy of a recording of a radio run broadcast over a

11 New York City Police Department radio system on June 23, 2021

12 at approximately 9:52 p.m.

13         The parties further stipulate and agree that the

14 exhibits marked as Government Exhibit 1000, as well as

15 Governments Exhibits 100 and 200 may be received in evidence at

16 this hearing.

17         At this time, your Honor, the government offers

18 Government Exhibits 100, and 200 and 1000.

19         THE COURT:  Received.

20         (Government's Exhibits 100, 200 and 1000 received in

21 evidence)

22         MS. NICOLAS:  At this time, your Honor, the government

23 also offers Government Exhibit 1001, as well as Government

24 Exhibit 100T and 200T, which are the subject of that

25 stipulation.

N5UQlucH

1          In this stipulation, the parties stipulate and agree

2     the Government Exhibit 100T is a true and accurate transcript

3     of Government Exhibit 100, and that Government Exhibit 200T is

4     a true and accurate transcript of Government Exhibit 200.

5          The parties further stipulate and agree that

6     Government Exhibit 1001 as well as Government Exhibits 100T and

7     200T may be received in evidence at a hearing.

8          At this time the government offers 1001, 100T and

9     200T.

10         THE COURT:  Received.

11         (Government's Exhibits 100T, 200T and 1001 received in

12     evidence)

13         MS. NICOLAS:  With that, your Honor, the government

14     calls Police Officer Jarren Smalls.

15      JARREN SMALLS,

16         called as a witness by the Government,

17         having been duly sworn, testified as follows:

18         THE COURT:  State your full name and spell it for the

19     record.

20         THE WITNESS:  My name is Jarren Smalls.  I work for

21     the New York City Police Department.  J-A-R-R-E-N.  Smalls,

22     S-M-A-L-L-S.

23         THE COURT:  Counsel.

24

25

N5UQlucH                        Smalls – Direct

1    DIRECT EXAMINATION

2    BY MS. NICOLAS:

3    Q.  Thank you, your Honor.

4            Officer Smalls, before we begin your testimony,

5    Mr. Magliocco, I would ask you to please publish what's in

6    evidence as the 911 call as Government Exhibit 100.

7            (Audio played)

8            MS. NICOLAS:  May the record reflect that the 911 call

9    marked as Government Exhibit 100 was played in full at 3

10   minutes 31 seconds.

11   Q.  Officer Smalls, good afternoon.

12   A.  Good afternoon.

13   Q.  You said you're employed by the NYPD.  How long have you

14   worked for the NYPD?

15   A.  Five years.

16   Q.  What's your current title?

17   A.  Police officer.

18   Q.  Are you assigned to a particular precinct?

19   A.  Yes, I work for Bronx Public Safety.

20   Q.  In Bronx Public Safety, do you report to a particular

21   precinct office?

22   A.  Yes.

23   Q.  What precinct is that?

24   A.  We report out of 500 Abbott Street.

25   Q.  How long have you been assigned to that precinct?

1    A.  Approximately a month and a half now.

2    Q.  Where were you assigned before that?

3    A.  The 52 precinct.

4    Q.  How long were you assigned at the 52 precinct?

5    A.  Since I've been out of the academy.

6    Q.  Which is how long?

7    A.  Four and a half years.

8    Q.  I want to focus on June of 2021.  Where were you working

9    then?

10   A.  The 25 precinct.

11   Q.  Were you assigned to a particular unit in the 25 precinct?

12   A.  Yes, I was assigned to the public safety team.

13   Q.  Can you describe some of the responsibilities that you have

14   as a member of the public safety team?

15   A.  We patrol high-crime locations within that precinct that

16   are plagued by gun violence, shootings, assaults, robberies and

17   are frequented by gang members.

18   Q.  You said high-crime areas.  Can you describe what you mean

19   by a high-crime area?

20   A.  Narcotic sales, shootings, stabbings, assaults.

21   Q.  When you're on patrol, what are some of the things you

22   might do as a public safety team member?

23   A.  We patrol those locations, proactively address those

24   conditions.

25   Q.  Do you respond to 911 calls?

N5UQlucH                    Smalls – Direct

1    A.  Yes.

2    Q.  As of June of 2021, approximately how many arrests would

3    you say you'd participated in?

4    A.  More than a hundred.

5    Q.  Of those more than a hundred or less, how many of them were

6    gun arrests?

7    A.  Approximately 50.

8    Q.  Focusing on guns, have you received firearms training as a

9    member of the NYPD?

10   A.  Yes.

11   Q.  Again, focusing on the time up to June of 2021, how many

12   hours of training would you say you've received, approximately?

13   A.  More than a hundred.

14   Q.  At a high level what are some of the topics of that

15   firearms training that you received?

16   A.  Maintaining firearms, carrying firearms, identifying

17   firearms, shooting firearms, identifying subjects that may be

18   carrying firearms.

19   Q.  I'm going to ask you to talk a little bit closer to the

20   mic.  When you say you received training on identifying

21   subjects that might be carrying firearms, can you give me some

22   more detail on that?

23   A.  Sure.  Basically taught how subjects may carry firearms,

24   how they may act when they see police officers when they're

25   carrying a firearm, locations where they may carry the firearm.

N5UQlucH                         Smalls - Direct

1    Q.  When you say locations, what do you mean?

2    A.  Locations as on their person.

3    Q.  A moment ago you testified that as of June of 2021, you

4    participated in approximately 50 gun arrests.  Of those 50 gun

5    arrests, how many were within the confines of the 52 precinct?

6    A.  All of them.

7    Q.  I want to direct your attention to the night of June 23,

8    2021.  Were you working that evening?

9    A.  Yes.

10   Q.  What was your assignment that night?

11   A.  Public safety.

12   Q.  What were some of the things you were expected to do when

13   assigned to public safety on the night of June 23, 2021?

14   A.  As I said before, to patrol the high-crime locations within

15   that precinct, precincts that are sectors that were plagued

16   with gang violence, robberies, shootings.

17   Q.  You just used the word sector.  What do you mean by sector?

18   A.  Sectors are a portion of the precinct.  The precinct is

19   divided into different sectors or different neighborhoods

20   within the precinct.

21   Q.  Were you responsible for a particular sector on June 23?

22   A.  We were responsible for the whole precinct, but at that

23   time we were in sector David.

24   Q.  On June 23, 2021, were you patrolling on foot or in a car?

25   A.  In a car.

N5UQlucH                          Smalls - Direct

1    Q.  Were you alone?

2    A.  No.

3    Q.  Who were you with?

4    A.  My partner, Officer Cotter.

5    Q.  On June 23 of 2021, were you wearing a body-worn camera?

6    A.  Yes.

7    Q.  Does your body-worn camera need to be turned on in order to

8    record?

9    A.  Yes.

10   Q.  Can you explain how that works?

11   A.  Once you activate the body-worn camera, the video starts

12   recording.  It also goes back a minute prior to you pressing

13   the button to activate the camera.

14   Q.  From the time you press the button forward, do you get

15   audio?

16   A.  No -- yes.

17   Q.  Forward?

18   A.  You get audio once you activate the camera.  The minute

19   prior that gets memorialized does not have audio.

20   Q.  But it has video?

21   A.  Yes.

22   Q.  Next to you is an item that's marked as Government Exhibit

23   300 for identification.  Do you see it?

24   A.  Yes.

25   Q.  Have you seen that before?

N5UQlucH                          Smalls - Direct

1    A.   Yes.

2    Q.   How do you recognize it?

3    A.   I put my initials on it.

4    Q.   What is that item?

5    A.   This is the -- it's a copy of body-worn camera footage.

6    Q.   Is it saved on a disk?

7    A.   Yes.

8    Q.   Did you review the contents of that disk before testifying

9    today?

10   A.   Yes.

11   Q.   Are the contents of that disk a fair and accurate depiction

12   of the events of June 23, 2021 as recorded on your body-worn

13   camera?

14   A.   Yes.

15            MS. NICOLAS:  Your Honor, at this time the government

16   offers Government Exhibit 300.

17            MS. BAHARANYI:  No objection.

18            THE COURT:  Received.

19            (Government's Exhibit 300 received in evidence)

20   Q.   We'll come back to your body-worn camera in a moment.

21            I want to turn your attention back to June 23 of 2021.

22   Did you make an arrest that evening?

23   A.   Yes.

24   Q.   Approximately what time?

25   A.   Approximately 2200 hours.

N5UQlucH                        Smalls - Direct

1   Q.  2200 hours is what time?

2   A.  10:00 p.m.

3   Q.  10:00 p.m.  Approximately where did that arrest occur?

4   A.  The center of Perry Avenue and East Gun Hill Road.

5   Q.  Who did you arrest?

6   A.  Mr. Steven Perez.

7   Q.  Do you know him by any other names?

8   A.  Lucha.

9   Q.  Do you see Steven Perez a/k/a Lucha in the courtroom?

10  A.  Yes.

11  Q.  Can you describe him by where he's sitting and an article

12  of clothing he's wearing?

13  A.  Sitting at the second table wearing a white shirt.

14          MS. NICOLAS:  Your Honor, may the record reflect that

15  the witness has identified the defendant as Steven Perez, a/k/a

16  Lucha.

17          THE COURT:  Yes.

18  Q.  You testified a moment ago that on June 23 of 2021, you

19  were patrolling in a car with Officer Cotter.  Who was driving?

20  A.  Officer Cotter.

21  Q.  Where were you sitting?

22  A.  In the passenger seat.

23  Q.  When you are seated in the passenger seat on a patrol, do

24  you have any responsibilities?

25  A.  Yes.

N5UQlucH                          Smalls - Direct

1    Q.  What are some of those responsibilities?

2    A.  Responsible to make radio transmissions, listen to the

3    radio, also to record what we do throughout the day.

4    Q.  Directing your attention to about 9:50 p.m. on June 23 of

5    2021.  Were you monitoring the radio at that time?

6    A.  Yes.

7    Q.  Did you receive a radio run?

8    A.  Yes.

9    Q.  Can you explain what a radio run is?

10   A.  A radio run is when someone calls 911 asking for

11   assistance, whether it be medical, an emergency, or a crime.

12   Q.  And what do you hear when you receive a radio run?

13   A.  I hear central, which is dispatch, putting over the

14   information to the officers.

15   Q.  So whose voices are you hearing when it comes across the

16   radio?

17   A.  I'm hearing central's voice and responding officers.

18   Q.  Do you hear the 911 caller themselves?

19   A.  No.

20   Q.  When you're receiving that radio run over the radio, the

21   audio, are you receiving that information any other way?

22   A.  Yes.

23   Q.  How are you receiving it?

24   A.  The information is also accessible on our work phones.  We

25   can pull it up and get the information through text.

1          MS. NICOLAS:  Your Honor, at this time the government

2    offers Government Exhibit 1002, which is a stipulation.

3          MS. BAHARANYI:  No objection, your Honor.

4          THE COURT:  Received.

5          (Government's Exhibit 1002 received in evidence)

6          MS. NICOLAS:  Your Honor, the government offers

7    Exhibit 1002 which stipulates between the parties that

8    Government Exhibit 101 is a true and correct copy of a Sprint

9    report maintained by the New York City Police Department

10   documenting a 911 call and law enforcement response to that

11   call on or about June 23, 2021.

12         It is a record of regularly conducted activity of the

13   NYPD that was created, kept and maintained in the ordinary

14   course of regularly conducted activities of the NYPD, made as a

15   regular practice of the activities of the NYPD, and made at or

16   near the time by or from information transmitted by someone

17   with knowledge of the information contained therein.

18         Your Honor, the government also offers Government

19   Exhibit 101 at this time.

20         THE COURT:  Received.

21         (Government's Exhibit 101 received in evidence)

22         MS. NICOLAS:  Mr. Magliocco, would you please publish

23   what's in evidence as Government Exhibit 101.

24   Q.  Officer Smalls, can you see that on the screen in front of

25   you?

1   A.  Yes.

2   Q.  Do you recognize this?

3   A.  Yes.

4   Q.  What is this?

5   A.  This is the CAD.  This is the job information that I was

6   looking at during the call.

7   Q.  Did you say CAD?

8   A.  Yes.

9   Q.  C-A-D?

10  A.  Yes.

11  Q.  What is a CAD?

12  A.  It's basically the job, the 911 radio run printed out into

13  text.

14  Q.  The information that appears here on the face of Government

15  Exhibit 101, did you see that information somewhere when you

16  were responding?

17  A.  Yes.

18  Q.  Where?

19  A.  On my work phone.

20  Q.  Okay.  I want to focus on 9:53 p.m., so 9:53 and 07

21  seconds.

22          Officer Smalls, at a high level, what do you learn

23  from the radio run you receive at approximately 9:53 p.m.?

24  A.  That there was a male armed with a firearm in the vicinity

25  of Gun Hill and Perry Avenue, wearing a white shirt with black

1    pants and a black-and-white turban.

2    Q.  Earlier you testified about sectors of the 52nd precinct.

3    When you received this radio run, what sector of the 52

4    precinct were you in?

5    A.  Sector David.

6    Q.  Had you patrolled Sector David before?

7    A.  Yes.

8    Q.  How many times approximately?

9    A.  Hundreds of times.

10   Q.  When you have been in Sector David in the past, what types

11   of crimes have you been responding to?

12   A.  Responding to crimes in progress, subjects with firearms,

13   assaults, robberies, aided cases.

14   Q.  What's an aided case?

15   A.  Basically a medical case.

16   Q.  Okay.  How would you characterize Sector David in June of

17   2021?  How would you describe it?

18   A.  Sector David was placed --

19            MS. BAHARANYI:  Objection, your Honor.

20            THE COURT:  Ground.

21            MS. BAHARANYI:  Your Honor, this question of how would

22   you characterize Sector David I think bears -- there's no

23   relevance to the issue here, which is the legality of the stop.

24            THE COURT:  Well, I think it's marginally relevant.

25   Overruled.  You may answer.

N5UQlucH                          Smalls – Direct

1   A.  Sector David at that time was plagued with gang violence,

2   assaults, shootings.

3   Q.  You just testified a moment ago that you've patrolled

4   Sector David hundreds of times by June of 2021.  Were any of

5   those at night?

6   A.  Yes.

7           MS. NICOLAS:  Mr. Magliocco, can you please show to

8   the witness what's been marked for identification as Government

9   Exhibit 601.

10  Q.  Is it on your screen, Officer Smalls?

11  A.  No.

12  Q.  Officer Smalls, do you recognize Government Exhibit 601?

13  A.  Yes.

14  Q.  What is this?

15  A.  This is a portion of the 25 precinct.  It's predominantly

16  showing Sector David.

17  Q.  Based on your hundreds of patrols around June of 2021, is

18  this a fair and accurate depiction of that portion of Sector

19  David as it appeared in June of 2021?

20          THE COURT:  Yes.

21          MS. NICOLAS:  Your Honor, the government offers

22  Government Exhibit 601.

23          MS. BAHARANYI:  No objection, your Honor.

24          THE COURT:  Received.

25          (Government's Exhibit 601 received in evidence)

1          MS. NICOLAS:  Mr. Magliocco, please publish Government

2     Exhibit 601.

3     Q.  Officer Smalls, just generally describe where you were in

4     Sector David at 9:53 p.m. when you received the radio run.

5     A.  In the vicinity of East Gun Hill Road and Hull Avenue.

6     Q.  I believe that screen may work if you touch where it is.

7          MS. NICOLAS:  Please let the record reflect that the

8     witness has marked a pink circle in the area near Bronx School

9     for Music on Government Exhibit 601 with a pink circle.

10         THE COURT:  Yes.

11    Q.  Mr. Magliocco, please clear the screen and pull down --

12         THE COURT:  Looks violet to me, but otherwise what you

13    said is correct.

14         MS. NICOLAS:  We'll adopt the Court's opinion there,

15    the violet circle.

16         Can you please publish what's in evidence as

17    Government Exhibit 200T?  Move to page 2, please.

18         Mr. Magliocco, I'm going to ask you to play what's in

19    evidence as Government Exhibit 200, if possible, while 200T is

20    displayed on the screen from the beginning to second 45.

21         (Audio played)

22    Q.  Officer Smalls, what did we just listen to?

23    A.  You were listening to central giving us the job and me

24    responding to central.

25    Q.  Whose voices do you recognize?

1   A.  Central's voice and my voice.

2   Q.  Who was that last voice that we heard?

3   A.  My voice.

4   Q.  Focusing on line 12 of Government Exhibit 200T that's

5   displayed on the screen, when you said "2 public safety going,"

6   what were you saying?

7   A.  That I was responding to the call.

8   Q.  What is 2 public safety a reference to?

9   A.  My unit or my job that I was doing that night.

10  Q.  So at this point based on what you've learned so far from

11  the radio run, what are you looking for?

12  A.  I was looking for a male Hispanic wearing a white T-shirt,

13  black pants with black-and-white sneakers with a

14  black-and-white turban armed with a firearm.

15  Q.  Okay.  Based on the radio run, what location did you expect

16  that individual to be at?

17  A.  To be in the vicinity of East Gun Hill Road and Perry

18  Avenue.

19          MS. NICOLAS:  Mr. Magliocco, I ask you to pull down

20  Government Exhibit 200T and publish for us what's in evidence

21  as Government Exhibit 601.

22  Q.  I believe you can use the screen here, Officer Smalls.  Can

23  you describe how you and Officer Cotter traveled from the

24  location you were at when you heard the radio run to the

25  location you believed the 911 call was reporting an individual

N5UQlucH                         Smalls - Direct

1   with a gun?

2   A.  Yes.  We traveled southbound on Hull Avenue, and we made a

3   right turn to travel west on East 209th Street and made another

4   right to travel northbound onto Perry Avenue.

5       MS. NICOLAS:  Let the record reflect that the witness

6   used a violet pen to draw a line moving down Hull Avenue,

7   taking a right at East 209th Street and another right at Perry

8   Avenue.

9   Q.  Now, as you were traveling, Officer Smalls, did you receive

10  additional information from the radio run?

11  A.  Yes.

12      MS. NICOLAS:  Mr. Magliocco, I'm going to ask you to

13  pull down Government Exhibit 601.  If we could go back to

14  Government Exhibit 200T, please.

15      Stop right there for a second, Mr. Magliocco.

16  Q.  Going back to the initial part of the radio run captured on

17  lines 3 through 11, is there any mention of footwear in those?

18  And take a second if you need to.

19  A.  No.

20  Q.  Now you said you received additional information as you

21  were traveling to the scene of the arrest.  Is that correct?

22  A.  Yes.

23      MS. NICOLAS:  Mr. Magliocco, could you please go to

24  the next page of 200T.  Thank you.  I'm going to ask that you

25  play Government Exhibit 200 beginning at 1 minute and 55

1   seconds and ending at 2 minutes and 35 seconds.

2           (Audio played)

3   Q.  At this point, what information do you know about the

4   individual you're looking for?

5   A.  That the individual is wearing black-and-white sneakers,

6   he's medium build, about five foot two, light skinned.

7   Q.  At line 16, you say "2 public safety show me rolling E4."

8   What did you mean by that?

9   A.  Showing me arriving on scene.

10  Q.  When the operator said, "CAD time 2155," what did that

11  mean?

12  A.  Basically timestamping me saying when I get there.

13          MS. NICOLAS:  Mr. Magliocco, if you could pull down

14  these two exhibits and publish what's in evidence as Government

15  Exhibit 300.

16  Q.  Officer Smalls, before I ask Mr. Magliocco to start

17  playing, could you please explain what it is that we're looking

18  at on the screen here?

19  A.  This is my body cam captured from my point of view that

20  evening.

21  Q.  In the top right corner of the screen, could you please

22  read the timestamp?

23  A.  Sure.  It's June 23, 2021 at 2155 hours.

24  Q.  How many seconds?

25  A.  54 seconds.

1    Q.  Where are you seated as this video is recording?

2    A.  The passenger seat.

3    Q.  Passenger seat of what?

4    A.  Of our unmarked RMP.

5    Q.  Where is Officer Cotter relative to you?

6    A.  He's in the driver's seat.

7            MS. NICOLAS:  Mr. Magliocco, could you please play the

8    first 15 seconds of this video.

9            (Video played)

10   Q.  Officer Smalls, why isn't there any sound in the first 15

11   seconds of Government Exhibit 10?

12   A.  I hadn't activated my body-worn camera yet.

13   Q.  What are you doing in this first 15 seconds?

14   A.  Responding to the location, I'm reading the information

15   that's being put over by -- I'm reading the 911 call, or the

16   job on my department-issued cellphone.

17   Q.  Is that the job we looked at earlier in Government Exhibit

18   101?

19   A.  Yes.

20           MS. NICOLAS:  Mr. Magliocco, could you please continue

21   playing and pause at 38 seconds.

22           (Audio played)

23           MS. NICOLAS:  Take it back about one second.  We are

24   paused at 37 seconds in the Government Exhibit 300.

25   Q.  Officer Smalls, what did we just watch happen in that clip?

A.   You watched us responding to the location; and as we made

the right turn on to Perry Avenue from East 209th Street, I

observed a subject matching that description on Perry Avenue,

and I'm pointing at him identifying him to my partner.

Q.   You're identifying the subject.  We're going to look at

Government Exhibit 601 in just a second.  Relative to you,

where is that subject?

A.   Perry Avenue.

Q.   What attracted your attention?

A.   He's matching the specific description of white T-shirt,

black pants.

          MS. NICOLAS:  Mr. Magliocco, could you put up

Government Exhibit 601, please.

Q.   Looking at Government Exhibit 601 as you turned that corner

and pointed at 37 seconds into Government Exhibit 300, can you

just indicate on the map for us where you were.

A.   I was here.

Q.   And you were making the right turn onto Perry Avenue?

A.   Correct.

Q.   Where was the subject that you were pointing at?

A.   Where this red marker is.

Q.   Where did you expect based on the radio run to see the

individual matching the description to be?

A.   Between this gray marker and this red marker.

          MS. NICOLAS:  Let the record reflect that the witness

1   has indicated that he was making a right at the corner of East

2   209th and Perry Avenue with a violet mark.  He has circled a

3   red flag along Perry Avenue as the subject he identified and

4   he's drawn a line between a flag marking the Bronx School for

5   Music and the red flag along Perry Avenue as the location where

6   he expected to see an individual with a firearm.

7           THE COURT:  If you don't like violet mark, you could

8   substitute plum, lavender, perhaps amethyst.

9           MS. NICOLAS:  I think I've become partial to violet,

10  your Honor.

11          THE COURT:  There we are.

12  Q.  From your location on Perry Avenue down to East 209th,

13  Officer Smalls, what could you see on the subject from that

14  distance?

15  A.  I could see that he was wearing some sort of headgear.  I

16  can also see that he had a bag.

17  Q.  Anything in particular about the bag?

18  A.  Yes.  It was a blue bag, and it matched the description

19  that the caller had put over.

20          MS. NICOLAS:  Mr. Magliocco, can you please pull this

21  down, and we are going to pull Government Exhibit 300 back up.

22  We left off at 37 seconds.

23  Q.  After you pointed at the defendant, Officer Smalls, what

24  did you do next?

25  A.  Me and my partner got closer to him with the vehicle.

1            MS. NICOLAS:  Mr. Magliocco, if you could, please

2      continue playing Government Exhibit 300 beginning at 37 seconds

3      and pausing it at the one minute mark.

4            (Audio played)

5      Q.  Officer Smalls, we just heard sound there at the end about

6      59 seconds.  Why did the sound begin there?

7      A.  That's when I activated by body-worn camera.

8      Q.  Can you describe for us right now what's on the screen?

9      A.  Sure.  This is what I arrived to.  I arrived to the subject

10     matching the very specific description with headgear,

11     black-and-white headgear, the white T-shirt, black pants with

12     the blue bag.

13     Q.  Before we go any further, can you just read the timestamp

14     for me in the right top corner of the screen?

15     A.  Sure.  June 23 of 2021, at 2156 hours and 55 seconds.

16     Q.  Now, as you approached the defendant, was anyone with you?

17     A.  Yes.

18     Q.  Who?

19     A.  My partner.

20     Q.  Were there any other officers on the scene at this point?

21     A.  No.

22     Q.  Now, as you approached the defendant, can you describe the

23     angle of your body relative to the angle of his body?

24     A.  Sure.  I was facing the subject.  The subject was parallel

25     to the wall, so he was perpendicular towards me.

1    Q.  As you approached him, what, if anything, did you notice

2    about his appearance?

3    A.  I noticed that he matched the very specific description

4    that was put over the radio, and I noticed the bag that was

5    affixed to his person.

6    Q.  So let's start with the appearance.  Did you notice

7    anything about his build?

8    A.  Yes, he was male Hispanic.  He was slim build and about

9    five-two.

10   Q.  As to the way he was dressed specifically, what did you

11   notice?  You testified about the headgear.  What else?

12   A.  The white T-shirt, the black pants, the black-and-white

13   sneakers, wearing the blue bag.

14   Q.  Let's talk about the bag.  What attracted your attention

15   about the way he was wearing the bag?

16   A.  The bag was across his body underneath his arm

17   perpendicular to him, so as his torso was facing the wall, the

18   bag is laying along the side of his body.

19   Q.  So as you approached him, how was the bag angled towards

20   you?

21   A.  Parallel to me.

22   Q.  What, if anything, did you notice about the way the bag was

23   on his body?

24   A.  The bag looked like it had a heavily weighted object in it.

25   It was pulling towards the ground.  The string was taught

1    across his chest.  The top portion of the bag was compressed by

2    the upper portion of his arm.  I was able to see a bulge at the

3    lower portion of the bag.

4    Q.  Can you explain to me what you mean by the top part was

5    compressed by his arm?

6    A.  The top part of his bag was compressed by his arm,

7    flattening it.

8    Q.  Flattening what?

9    A.  Flattening the top portion of the bag.

10   Q.  And what about the bottom portion?

11   A.  The bottom portion wasn't covered, so the bottom portion

12   you can see there was objects inside the bag or an object

13   inside the bag creating a bulge at the bottom.

14   Q.  What, if anything, did you notice about the way that the

15   bag moved?

16   A.  The bag moved quite tight to his body.  It didn't swing off

17   his body.  It was close to him.

18          MS. NICOLAS:  Mr. Magliocco, could you please show to

19   the witness what has been marked for identification as

20   Government Exhibits 300A and B.  Thank you.

21   Q.  Officer Smalls, do you recognize Government Exhibits 300A

22   and B?

23   A.  Yes.

24   Q.  What are they in general terms?

25   A.  These are still images of my body-worn camera footage.

1    Q.  Are they fair and accurate depictions from your body-worn

2    camera on June 23, 2021?

3    A.  Yes.

4            MS. NICOLAS:  Your Honor, at this time the government

5    offers Government Exhibits 300A and B.

6            MS. BAHARANYI:  No objection.

7            THE COURT:  Received.

8            (Government's Exhibits 300A and 300B received in

9    evidence)

10           MS. NICOLAS:  Mr. Magliocco, if you could please

11   publish Government Exhibit 300A.

12   Q.  Officer Smalls, while Mr. Magliocco is doing that, next to

13   you is an item that was marked as Government Exhibit 501.  Do

14   you see that?

15   A.  Yes.

16   Q.  Do you recognize it?

17   A.  Yes.

18   Q.  What was that?

19   A.  That was the bag that was affixed to the defendant.

20   Q.  How do you know that?

21   A.  I recognize it by this crocodile emblem on the bottom of

22   the bag.

23   Q.  Did you have an opportunity to view it before your

24   testimony?

25   A.  Yes.

1   Q.  Is it in substantially the same condition as when you saw

2   it on June 23 of 2021?

3   A.  Yes.

4           MS. NICOLAS:  Your Honor, at this time the government

5   offers Government Exhibit 501.

6           MS. BAHARANYI:  Your Honor, if we may take the bag and

7   inspect it briefly ourselves?

8           THE COURT:  Yes.

9           MS. BAHARANYI:  May I approach?

10          THE COURT:  Yes.

11          MS. BAHARANYI:  No objection, your Honor.

12          THE COURT:  Received.

13          (Government's Exhibit 501 received in evidence)

14          MS. NICOLAS:  For the record, Government Exhibit 501

15  is a blue fabric crossbody bag with a strap, approximately

16  eight inches wide, ten inches tall, and about an inch deep.

17          Mr. Magliocco, please show to the witness what is

18  marked as Government Exhibit 401.

19  Q.  Officer Smalls, do you recognize Government Exhibit 401?

20  A.  Yes.

21  Q.  What is that?

22  A.  It's a photograph of the bag.

23  Q.  Is that a fair and accurate depiction of the bag as it

24  appeared after it was removed from the defendant on the evening

25  of June 23, 2021?

N5UQlucH                           Smalls - Direct

1   A.  Yes.

2           MS. NICOLAS:  Your Honor, at this time the government

3   offers Government Exhibit 401.

4           MS. BAHARANYI:  No objection, your Honor.

5           THE COURT:  Received.

6           (Government's Exhibit 401 received in evidence)

7   Q.  In your time patrolling the 25 precinct, had you

8   encountered bags like this before?

9   A.  Yes.

10  Q.  Had you ever recovered firearms from bag likes this before?

11  A.  Yes.

12  Q.  Approximately how many times?

13  A.  Approximately ten times.

14  Q.  You mentioned earlier you received some firearms training

15  in the course of your employment with the NYPD.  Is that right?

16  A.  Yes.

17  Q.  In any of that training, did you learn about bags like

18  this?

19  A.  Yes.

20  Q.  What did you learn?

21  A.  The subjects carry firearms in them.  They don't have

22  holsters most of the time.

23  Q.  Now, after you approached the defendant, what did you do

24  next?

25  A.  I frisked the bag that was affixed to his person.

1    Q.  When you say you "frisked the bag," what do you mean?

2    A.  I patted down the outer portion of it and squeezed the

3    outer portion of it.

4    Q.  And what did you feel?

5    A.  At that time I felt a hard metal, L-shaped object, the

6    shape and size consistent of a firearm.

7    Q.  Have there been other occasions during your employment with

8    the NYPD that you frisked the exterior of a bag?

9    A.  Yes.

10   Q.  On other occasions, have you then recovered firearms from

11   those bags?

12   A.  Yes.

13   Q.  Was what you felt on June 23, 2021 consistent with what you

14   felt on other occasions when you've recovered a firearm from a

15   bag?

16   A.  Yes.

17            MS. NICOLAS:  Mr. Magliocco, can you please pull up

18   what's in evidence as Government Exhibit 300.  I believe we

19   left off at minute one.  I'm going to ask to play starting at

20   59 seconds to 1 minute and 12 seconds.

21            (Video played)

22   Q.  What were you doing in that clip?

23   A.  That's me frisking the outside portion of the defendant's

24   bag.

25   Q.  At the end of the clip, what did you say?

N5UQlucH                        Smalls - Direct

1   A.  I stated to my partner "92."

2   Q.  What does 92 mean?

3   A.  92 means arrest.

4   Q.  Why did you say 92?

5   A.  I wanted the defendant handcuffed because once I frisked

6   the bag, I felt an object that was consistent with a firearm,

7   so I wanted him handcuffed for our safety.

8   Q.  What did Officer Cotter do in response to you saying 92?

9   A.  He placed him in handcuffs.

10          MS. NICOLAS:  Mr. Magliocco, could you continue

11  playing the body-worn camera, which is Government Exhibit 300,

12  from one minute 12 seconds up to 1:55:00.

13          (Video played)

14          MS. NICOLAS:  Pause, Mr. Magliocco.  We're paused at

15  one minute 54 seconds.

16  Q.  Officer Smalls, what were you doing during that portion of

17  the video?

18  A.  I was removing the bag from the subject.

19  Q.  What, if anything, was he saying as you were removing the

20  bag?

21  A.  He said, "Where you going with my bag?  That's my arm.

22  That's my arm.  That's my constitutional right."

23  Q.  What did you understand that to mean?

24  A.  That that was his firearm in the bag, and it was his right

25  to carry it.

1   Q.  Why did you remove the bag from his person?

2   A.  I wanted it off his person so he couldn't retrieve it.

3   It's dangerous when people are armed with firearms.

4   Q.  Once you removed it from his person, what did you do next?

5   A.  I further inspected it.  I opened the bag to search, to see

6   if the object or if what I felt was in fact a firearm.

7          MS. NICOLAS:  Mr. Magliocco, could you please continue

8   playing Government Exhibit 300 beginning at one minute 54

9   seconds.  And I'd ask you to play it through two minutes and 20

10  seconds, two-zero.

11          (Video played)

12          MS. NICOLAS:  We are paused at two minutes 20 seconds

13  into Government Exhibit 300.

14  Q.  Officer Smalls, what were you doing in that clip?

15  A.  That's when I had opened the bag to search the bag to see

16  if the object was a firearm.  I shined my flashlight on it to

17  make sure that it was in fact real and was a gun.

18  Q.  And what did you see when you looked into the bag with your

19  flashlight?

20  A.  I saw the firearm.

21  Q.  How was it positioned?

22  A.  It was positioned with the slide on the bottom of the bag

23  with the butt of the handle facing up towards the sky.

24  Q.  At the end of the clip, what did you ask the defendant?

25  A.  I asked him if he had a permit for this firearm.

N5UQlucH                          Smalls - Direct

1   Q.  How did he respond?

2   A.  He said "No.  I don't need a permit.  It's my

3   constitutional right."

4               MS. NICOLAS:  Your Honor, may I approach the witness?

5               THE COURT:  Yes.

6   Q.  Officer Smalls, do you see an object next to you that's

7   been marked for identification marked as Government Exhibit

8   502?

9   A.  Yes.

10  Q.  Do you recognize that?

11  A.  Yes.

12  Q.  What is it?

13  A.  This is the firearm that was recovered out of the bag that

14  was affixed to the defendant.

15  Q.  How do you know that's the same gun?

16  A.  I recognize it by the light and the laser that's attached

17  to it and also the serial number.

18  Q.  You had an opportunity to review the serial number before

19  you testified?

20  A.  Yes.

21  Q.  Did you initial the firearm?

22  A.  Yes.

23  Q.  Is it the same firearm you viewed earlier?

24  A.  Yes.

25  Q.  Is that firearm in substantially the same condition as it

N5UQlucH                          Smalls - Direct

1    was on June 23 of 2021?

2    A.  No.

3    Q.  What's different?

4    A.  The firearm was loaded.  So the cartridges were inside the

5    magazine, and the magazine was inside the firearm.

6              MS. NICOLAS:  Your Honor, at this time the government

7    offers Government Exhibit 502 into evidence.

8              MS. BAHARANYI:  No objection, your Honor.

9              THE COURT:  Received.

10             (Government's Exhibit 502 received in evidence)

11   Q.  Now, while you were looking in the bag and viewing the

12   firearm, what was Officer Cotter doing?

13   A.  Officer Cotter was securing the subject and trying to

14   secure a show-up to happen.

15   Q.  You said he was trying to secure a show-up, what is a

16   show-up in general terms?

17   A.  A show-up is when we call the CV, the complainant or

18   victim, over to the scene to basically verify that we got the

19   person they were calling about, basically point them out.

20   Q.  Are there occasions when that CV or victim is the 911

21   caller?

22   A.  Yes.

23   Q.  Was there a show-up in this case?

24   A.  Yes.

25   Q.  What's the purpose of show-ups?  You just mentioned it, but

1    to be clear, why do you do a show-up?

2    A.  Just to make sure that we have the right person.

3           MS. NICOLAS:  Mr. Magliocco, could you please publish

4    what's in evidence as Government Exhibit 101.

5    Q.  Now that Government Exhibit 101 is on the screen, Officer

6    Smalls, if you could remind us what this is?

7    A.  This is the CAD or the job or the 911 call in text.

8    Q.  I want to turn your attention to the entry at 21:58 and 9

9    seconds.  What does that entry say?

10   A.  It says, "52 public safety 1 need show-up at 3318 Perry."

11   Q.  What do you understand that to mean?

12   A.  That was my partner calling for a show-up.

13          MS. NICOLAS:  Mr. Magliocco, you could pull this down

14   and publish what's in evidence as the body-worn camera at

15   Government Exhibit 300.

16          I would like to begin at timestamp 10:08.  For audio

17   purposes, let's start at 10:06.

18   Q.  Now before we play this, Officer Smalls, could you just

19   describe what's going on at the scene at 10:06 and zero

20   seconds?

21   A.  This is us waiting for the show-up.

22          MS. NICOLAS:  Mr. Magliocco, if you could play from

23   10:06 to 10:23.

24          (Video played)

25          MS. NICOLAS:  Pause at 10:25.

1  Q.  Officer Smalls, can you explain what we just watched in

2  that clip?

3  A.  We watched the show-up being conducted.  We had positive

4  results, meaning the witness CV, the victim, said that that was

5  the guy, and then we subsequently placed him under arrest.

6        MS. NICOLAS:  Mr. Magliocco, could you take us back to

7  10:06 and pause it there for a second?

8  Q.  Can you describe, Officer Smalls, where the CV, which

9  you're referring to the 911 caller, where they're located as

10 you're standing here on the sidewalk?

11 A.  They're in the street.

12 Q.  Are they visible to you?

13 A.  No.

14 Q.  Where are they on the street?

15 A.  They're in the back of an RMP.

16 Q.  How do you know that there was a positive ID?

17 A.  Usually the cops in the front window will ask the CV in the

18 back, will relay it to one another saying negative or positive

19 and giving each other thumbs up or thumbs down.

20 Q.  Did that happen in this case?

21 A.  Yes.

22 Q.  Let's watch again from 10:06 to 10:23.

23        (Video played)

24        MS. NICOLAS:  Stop it there.  That's at 10:19.

25        Mr. Magliocco, can you pull that down, please.

N5UQlucH                        Smalls - Direct

1   Q.  Officer Smalls, I want to take a step back for a second.

2   In preparing to testify today, did you have an opportunity to

3   inspect Government Exhibit 501, which is the blue fabric bag?

4   A.  Yes.

5   Q.  Did you also have an opportunity to inspect Government

6   Exhibit 502, which is the firearm?

7   A.  Yes.

8   Q.  Did you have an opportunity to view Government Exhibit 502,

9   which is the gun inside 501, which is the bag?

10  A.  Yes.

11  Q.  Once that gun was placed into the bag, did you have an

12  opportunity to view it straight on held up for you?

13  A.  Yes.

14  Q.  And when that bag is held straight up, looked at straight

15  on, what, if anything, did you notice with respect to the

16  firearm?

17  A.  I wasn't able to see that there was a firearm in the bag.

18  Q.  How was that angle straight at you held up different from

19  the way you viewed the firearm on the night -- the way you

20  viewed the bag on the night of June 23, 2021?

21  A.  Because the bag wasn't being held up straight in front of

22  me.  It was affixed to the subject's body, and the top portion

23  of the bag itself was compressed and flattened by the

24  defendant's arm.

25  Q.  Turning back to June 23, 2021 at about 10:06 p.m. after the

1  defendant was placed under arrest, what happened?

2  A.  He was brought back to the precinct basically where we

3  searched him again.  We grabbed pedigree information.  He's

4  also lodged.

5  Q.  At that point when he was placed under arrest, what

6  violations in New York Penal Law did you believe had been or

7  what sections of the New York Penal Law did you believe had

8  been violated?

9  A.  Section 265.03.01(b), as in boy, which is criminal

10 possession of a weapon second degree loaded firearm.

11 Q.  Aside from the bag and the gun, did you learn of any other

12 items being recovered from the defendant after he was searched

13 at the precinct?

14 A.  Yes.

15 Q.  What?

16 A.  I believe there was a bag of cocaine.

17 Q.  Anything else?

18 A.  Yes.

19 Q.  Anything else?

20 A.  An ID.

21 Q.  Once you got to the precinct, did you maintain possession

22 of the firearm?

23 A.  I maintained it up until we got to the precinct.  After

24 that, I transferred custody of the firearm to my partner

25 Cotter.

N5UQlucH                           Smalls - Direct

1   Q.  After the custody was transferred to Officer Cotter, what

2   happened?

3   A.  ECT was called, and ECT processed the firearm.

4   Q.  What is ECT?

5   A.  Evidence collection team.

6   Q.  What do they do?

7   A.  Basically they process evidence.  They swab it for DNA.

8   They will dust for prints.  They'll make the firearm safe.

9   Q.  What do you mean by make a firearm safe?

10  A.  So they unload it.

11  Q.  Were you present when ECT came and made safe this

12  particular firearm?

13  A.  Yes.

14  Q.  Did you learn whether or not the firearm was loaded?

15  A.  Yes.

16  Q.  Was the firearm loaded?

17  A.  Yes.

18          MS. NICOLAS:  Mr. Magliocco, showing just the witness

19  what's been marked for identification as Government Exhibits

20  402A, B and C.

21          (Photographs shown)

22          MS. NICOLAS:  B and C as well.

23          Also show the witness 403A, B and C.

24  Q.  Officer Smalls, do you recognize these photographs?

25  A.  Yes.

N5UQlucH                     Smalls - Direct

1   Q.  What are they?

2   A.  These are photographs that the evidence collection team

3   took.

4   Q.  Are these fair and accurate depictions of how the gun

5   appeared during the ECT inspection on the night of the June 23,

6   2021?

7   A.  Yes.

8           MS. NICOLAS:  Your Honor, at this time the government

9   offers Government Exhibits 402A, 402B, 402C, 403A, 403B and

10  403C.

11          MS. BAHARANYI:  No objection, your Honor.

12          THE COURT:  Received.

13          (Government's Exhibits 402A, 402B, 402C, 403A, 403B

14  and 403C received in evidence)

15  Q.  Next to you, Officer Smalls, are two exhibits:  One marked

16  as Government Exhibit 503, and one is marked as Government

17  Exhibit 504.

18          For the record, defense counsel has inspected these

19  items.

20          Do you recognize these items, Officer Smalls?

21  A.  Yes.

22  Q.  Beginning with 503, what is that?

23  A.  This is the magazine that was inside the firearm.

24  Q.  And 504?

25  A.  Those are the cartridges that were inside the magazine

1   inside the firearm.

2   Q.  Did you have an opportunity to view those before you

3   testified today?

4   A.  Yes.

5   Q.  How do you know those are the same objects you testified

6   prior to your testimony?

7   A.  I initialed them.

8   Q.  Now, are those in substantially the same condition, both

9   the cartridges and magazine, as they were on June 23, 2021?

10  A.  No.

11  Q.  What's different?

12  A.  The cartridges were inside the magazine, and the magazine

13  was inside the firearm.

14        MS. NICOLAS:  Your Honor, at this time the government

15  offers Government Exhibits 503 and 504.

16        MS. BAHARANYI:  No objection.

17        THE COURT:  Received.

18        (Government's Exhibits 503 and 504 in evidence)

19        MS. NICOLAS:  Mr. Magliocco, can you please publish

20  what's in evidence as Government Exhibit 402A.

21  Q.  Officer Smalls, what's depicted on the screen in Government

22  Exhibit 402A?

23  A.  This is a picture of the firearm in the condition that we

24  recovered it in.

25  Q.  You were present when this photograph was taken?

N5UQlucH                          Smalls - Direct

1    A.  Yes.

2    Q.  Was this on the night of June 23, 2021 after the firearm

3    was seized?

4    A.  Yes.

5    Q.  Is there a magazine inserted in that firearm?

6    A.  Yes.

7    Q.  Was the magazine removed by ECT?

8    A.  Yes.

9          MS. NICOLAS:  Mr. Magliocco, can you please publish

10   what's in evidence as Government Exhibit 403A?

11   Q.  What's depicted on the screen now, Officer Smalls?

12   A.  This is a depiction of the firearm with the magazine

13   removed.

14         MS. NICOLAS:  Mr. Magliocco, showing Government

15   Exhibit 403B, please.

16   Q.  Officer Smalls, what are we looking at here?

17   A.  This is a picture of the firearm with the magazine removed,

18   and the cartridges are removed from the magazine.

19   Q.  You can consult Government Exhibit 403B here.  How many

20   rounds were inside that of magazine?

21   A.  12.

22   Q.  Can you say it a little bit louder?

23   A.  12.

24   Q.  Based on your training and experience handling firearms,

25   how, if at all, does a magazine and 12 cartridges affect the

N5UQlucH                          Mr. Smalls – Cross

1   weight of a firearm?

2   A.   It makes the firearm considerably heavier.

3             MS. NICOLAS:  Your Honor, may I have one moment?

4             (Pause)

5             MS. NICOLAS:  Nothing further.

6             THE COURT:  Cross-examination.

7             MS. BAHARANYI:  Yes, your Honor.  One moment, please.

8   CROSS-EXAMINATION

9   BY MS. BAHARANYI:

10  Q.   Good afternoon.

11  A.   Good afternoon.

12  Q.   Let's start with the radio run that you heard on the night

13  of June 23.  So you said that you were at that time on patrol

14  with your fellow officer, Officer Cotter.  Is that right?

15  A.   Correct.

16  Q.   And you heard the radio run specifically request assistance

17  that night, right?

18  A.   Yes.

19  Q.   And they requested units to investigate someone in

20  possession of a gun, right?

21  A.   Yes.

22  Q.   And across or on the radio run, you heard a description of

23  this person who was believed to be armed, right?

24  A.   Correct.

25  Q.   And that included his race, right?  It included his race?

1    A.  Yes.

2    Q.  His height, right?

3    A.  Mmm-hmm.

4    Q.  Included what he was wearing on top of his head.  Is that

5    right?

6    A.  Yes.

7    Q.  You heard a description for a Hispanic male wearing a

8    black-and-white turban, right?

9    A.  Correct.

10   Q.  You also heard that this person went by the name of Lucha,

11   correct?

12   A.  Correct.

13   Q.  Based on this radio run, you believed you were looking for

14   an armed suspect, right?

15   A.  Yes.

16   Q.  And you believed this person had a bag in his possession,

17   right?

18   A.  Yes.

19   Q.  And you believed that this person had a firearm inside of

20   this bag.  Is that right?

21   A.  Correct.

22   Q.  Other than the radio run and the text description of the

23   radio run, was there any other information you were relying on

24   this evening before engaging in a stop?

25   A.  No.

N5UQlucH                        Mr. Smalls - Cross

1   Q.  So, Officer, on this radio run, let me clarify, the

2   dispatch did not mention any assault in progress, right?

3   A.  Correct.

4   Q.  No shooting, right?

5   A.  Correct.

6   Q.  No mention of any gang activity or gang involvement

7   whatsoever?

8   A.  No.

9   Q.  And dispatch did not mention that the gun had been

10  displayed, right?

11  A.  No.

12  Q.  You testified on direct about what you know about bags,

13  right?

14  A.  Correct.

15  Q.  And I believe you said on direct that you're quite familiar

16  with certain types of bags, right?

17  A.  Yes.

18  Q.  On direct, you mentioned -- you talked about crossbody

19  bags.  Is that right?

20  A.  Yes.

21  Q.  And you mentioned that sometimes crossbody bags have

22  contraband in them, right?

23  A.  Correct.

24  Q.  Is it fair to say sometimes these bags don't have

25  contraband, right?

N5UQlucH                              Mr. Smalls - Cross

 1    A.  Yes.

 2    Q.  That these crossbody bags are often used for fashion?

 3    A.  Yes.

 4    Q.  For function, right?

 5    A.  Yes.

 6    Q.  So for carrying things like a cellphone, right?

 7    A.  Yes.

 8    Q.  Or a wallet, right?

 9           But this evening you were looking for someone in

10    possession of a bag, right?

11    A.  Yes.

12    Q.  And that you -- and you believed that this bag, this

13    particular bag would contain a firearm, right?

14    A.  Through the description and what the caller stated, yes.

15    Q.  So based on the information you had from the radio run, you

16    were looking for someone in possession of a bag, and you

17    believed that bag contained a firearm?

18    A.  Correct.

19    Q.  Now, after receiving this information from the radio run,

20    you and Officer Cotter then started canvassing, right?

21    A.  Correct.

22    Q.  And canvassing just means you are looking for someone who

23    matches the description you heard on the radio run, right?

24    A.  Yes.

25    Q.  And you began looking for this person in the vicinity of

N5UQlucH                        Mr. Smalls - Cross

1   Gun Hill Road and 209th Street, right?

2   A.  Yes.

3   Q.  And you actually traveled from where you were -- let me

4   back up a bit.

5           You received this call while you were on Hull Street.

6   Is that correct?

7   A.  Yes.

8   Q.  Based on this call, you traveled in the direction of Perry

9   Avenue, right?

10  A.  Correct.

11  Q.  And you were going in this direction in order to find the

12  person who matched this description, right?

13  A.  Correct.

14  Q.  Now, your plan, if you saw this person who matched this

15  description, was to conduct a stop, right?

16  A.  Yes, to engage the individual.

17  Q.  To engage this individual, meaning to stop this individual,

18  right?

19  A.  Yes, to engage him.

20  Q.  Officer Smalls, you were under the impression that the

21  person you were looking for was armed with a firearm, right?

22  A.  Yes.

23  Q.  And you were concerned about firearms on the streets,

24  right?

25  A.  Correct.

1   Q.  So your intent upon seeing someone who matched this

2   description was to engage this individual, right?

3   A.  Yes.

4   Q.  And not to let them walk away, right?

5   A.  Well, by -- after I engaged them, depending on where that

6   investigation and encounter went, would deem if they were free

7   to walk away.

8   Q.  Well, let's talk a bit about how you engaged Lucha in this

9   case.  So you did in fact stop someone who matched the

10  description you heard on the radio run, right?

11  A.  Correct.

12  Q.  And, in fact, you said someone who matched the very

13  description that you heard on the radio run?

14  A.  Correct.

15  Q.  And this person was Lucha, who's seated here today, right?

16  A.  Yes.

17  Q.  So when you first saw -- when you first saw Lucha, you were

18  at the intersection of Perry Avenue and 209th Street.  Is that

19  right?

20  A.  Yes.

21        MS. BAHARANYI:  And so -- actually, at this point,

22  Sarah, would you show the witness only what we've marked as

23  Defendant's Exhibit D.

24  Q.  Officer Smalls, I'm showing you an aerial view of Perry and

25  209th Street.  Does this in fact look like an aerial view of

N5UQlucH                       Mr. Smalls – Cross

1   the intersection of Perry Avenue and 209th Street?

2   A.  Yes.

3   Q.  Is this a picture of this intersection an accurate

4   representation of that area?

5   A.  Yes.

6   Q.  An accurate depiction of that area?

7   A.  Yes.

8           MS. BAHARANYI:  At this time we'd like to admit

9   Defendant's Exhibit 3.

10          MS. NICOLAS:  No objection.

11          THE COURT:  Received.

12          (Defendant's Exhibit D received in evidence)

13          MS. BAHARANYI:  And publish as well.

14  Q.  So now, Officer Smalls, on this photo you can see Perry

15  Avenue and 209th Street.  I'm going to have a marker placed at

16  the intersection of Perry Avenue and 209th.  Do you see a red

17  arrow?

18  A.  Yes, I do.

19  Q.  That's precisely at the first time you saw Lucha, right?

20  A.  Yes.

21  Q.  Now, at this point Lucha was not also at that intersection

22  of Perry Avenue and 209th Street, right?

23  A.  No.

24  Q.  At the point where you saw him, he was actually farther

25  down the block.  Is that right?

N5UQlucH                        Mr. Smalls - Cross

1    A.  Yes, he was up the block.

2    Q.  There's a red marker on the screen, and that represents

3    near or near where Lucha was standing at the time that you saw

4    him, right?

5    A.  I'm not sure because I can't see the rest of Perry, so I

6    don't know.  Actually, no, the building, yes, I see it by the

7    number.

8    Q.  At the point which you saw Lucha for the very first time,

9    he was at least a couple buildings away from you, right?

10   A.  Yes.

11   Q.  And at this point, you did not get out of the car, right?

12   A.  No.

13   Q.  You did not decide to walk down the sidewalk to approach.

14   Is that right?

15   A.  Yes.

16   Q.  You stayed in the car, right?

17   A.  Yes.

18   Q.  And rode down Perry Avenue inside of the squad car.  Is that

19   right?

20   A.  Yes.

21   Q.  And Officer Cotter drove both of you down Perry Avenue,

22   right?

23   A.  Correct.

24   Q.  And you were seated in the passenger seat, right?

25   A.  Correct.

1   Q.   And you drove down Perry Avenue until you reached the area

2   where Lucha was standing, right?

3   A.   Yes.

4   Q.   This evening on Perry Avenue, there were a number of cars

5   parked on the street, right?

6   A.   Mmm-hmm.

7          THE COURT:   Sorry.   You can't answer mmm-hmm.   You

8   have to say yes or no.

9   A.   Oh, yes.

10  Q.   When I say parked on the street, I mean in the street

11  parking area next to the sidewalk, there were cars parked next

12  to the sidewalk?

13  A.   Yes.

14  Q.   And Perry Avenue is a one-way street, right?

15  A.   Yes.

16  Q.   In order to travel down Perry Avenue, you were traveling

17  one way with cars to your right, right?

18  A.   Yes.

19  Q.   And you were looking through your window trying to see what

20  you could see as you're traveling down Perry Avenue, right?

21  A.   Yes.

22  Q.   But what was the closest to you were certainly the parked

23  cars on Perry Avenue, right?

24  A.   Yes.

25  Q.   Now, Officer Smalls, on direct you stated you saw Lucha's

1    bag as you approached him from your car.  Is that correct?

2    A.  No.

3    Q.  Well, let me back up.

4         So, Officer Smalls, as you're riding down Perry

5    Avenue, you weren't able to see Lucha, right?

6    A.  Yes, as we were going down Perry Avenue, I was able to see

7    Lucha.

8    Q.  Your testimony is that as you were riding in your car or as

9    you were riding in the passenger seat down Perry Avenue, you're

10   able to see onto the sidewalk. Is that right?

11   A.  Correct.

12        MS. BAHARANYI:  Sarah, would you mind pulling up

13   Government Exhibit 300.  If you can start it at 2:25.  Just

14   start it there and publish that.

15   Q.  Officer Smalls, you recognize this scene from the night of

16   the arrest, right?

17   A.  Yes.

18   Q.  And this is from your body-worn camera footage, right?

19   A.  Correct.

20   Q.  You can see from your body-worn camera footage cars parked

21   alongside the sidewalk.  Is that right?

22   A.  Yes.

23   Q.  You can see a silver Jeep parked alongside the sidewalk,

24   right?

25   A.  Mmm-hmm.  Yes.  Sorry.

1   Q.  And a white van behind that Jeep, right?

2   A.  Yes.

3   Q.  Behind that, there's a sedan, right?  And a faint hint of

4   another car behind that, right?

5   A.  Yes.

6   Q.  And these cars were all parked between you -- these cars

7   were all located between you in your squad car and the

8   sidewalk, right?

9   A.  Yes.

10  Q.  And the sidewalk was where Lucha was standing that evening,

11  right?

12  A.  Correct.

13  Q.  So your testimony today is that you were driving as you're

14  riding down Perry Avenue, you were able to see across these

15  cars.  Is that right?

16  A.  I could see through the gaps between cars.

17  Q.  Officer Smalls, the first point at which you see any

18  details in Lucha's bag is as you actually were approaching him

19  in the car.  Is that right?

20  A.  When I was approaching him on foot, that's when I made the

21  observation of the bag.

22  Q.  And by approaching on foot, this means you've exited your

23  car, right?

24  A.  Right.

25  Q.  And you are able to see these details as you're walking

1    from the car to Lucha on the sidewalk.  Is that right?

2    A.  Correct.

3    Q.  If I recall from your direct, during this approach, you are

4    able to see a heavy weighted object in this bag.  Is that

5    right?

6    A.  Yes.

7    Q.  And the bag pulling down towards the ground.  Is that

8    right?

9    A.  Correct.

10   Q.  And the bag taut across Lucha's chest.  Is that right?

11   A.  Yes.

12   Q.  As well as a bulge in the bag.  Is that right?

13   A.  Yes.

14   Q.  Officer Smalls, let's actually look at Government Exhibit

15   300 beginning at 52 seconds --

16        MS. BAHARANYI:  Sarah, if you mind playing that now

17   from 52 seconds to one minute and 3 seconds.

18        (Video played)

19   Q.  Officer Smalls, that is your approach to Lucha, right?

20   A.  Correct.

21   Q.  That's the entirety of your walking up to Lucha, right?

22   A.  Yes.

23   Q.  And from the video that we just watched, we can see you

24   getting out of the police car, right?

25   A.  Yes.

N5UQlucH                        Mr. Smalls - Cross

1   Q.  And we can see you walking through two cars in order to

2   approach the sidewalk.  Is that right?

3   A.  Yes.

4   Q.  Specifically, those cars were a Jeep and a van too, right?

5   A.  Yes.

6   Q.  At that point of you getting out of the car, Lucha was not

7   in the middle of the Jeep or van.  Is that right?

8   A.  No.

9   Q.  He was not in front of 318 Perry Avenue either, right?

10  A.  I can't tell from the video.

11  Q.  Let's go back to 52 seconds here in Government Exhibit 300,

12  and play it.  I will let you know when to pause.

13          (Video played)

14  Q.  You can pause there, actually.

15          This is the front of 318 Perry Avenue, right?

16  A.  Mmm-hmm.

17  Q.  Lucha is not standing in front of the door there, correct?

18  A.  Correct.

19  Q.  He's not located on the sidewalk in front of that address,

20  right?

21  A.  Correct.

22  Q.  The only person there is another -- I'm assuming another

23  unrelated individual walking by, right?

24  A.  Yes.

25  Q.  Prior to your reaching the sidewalk, so where you are now,

N5UQlucH                          Mr. Smalls - Cross

1    you were blocked by two cars, right?

2    A.   Yes.

3    Q.   So your opportunity to see Lucha began once you were on the

4    sidewalk with him, right?

5    A.   No, I could see him as I turned the corner, I saw him on

6    Perry Avenue.

7    Q.   Officer Smalls, let me clarify.  So you were able to see

8    Lucha from far away at Perry Avenue and 209th Street, right?

9    A.   Yes.

10   Q.   That's when you first saw him, right?

11   A.   Yes.

12   Q.   So then when you were approaching him to observe these

13   details about Lucha, this is when you were approaching him on

14   the sidewalk on foot, right?

15   A.   Correct.

16   Q.   So the amount of time that you were actually on foot and

17   able to observe Lucha, I guess closer, was a matter of seconds,

18   right?

19   A.   Correct.

20   Q.   In fact, there are only five seconds of you on the sidewalk

21   with Lucha before you physically grabbed him, right?

22   A.   I am not sure how many seconds specifically it was.

23        MS. BAHARANYI:  Sarah, actually play from this point

24   at Government Exhibit 300.  And for the record, that's at 56

25   seconds --

N5UQlucH                         Mr. Smalls - Cross

1  Q.  Actually, before we begin, Officer Smalls, this is you as

2  you're about to walk up to the sidewalk, correct?

3  A.  Yes.

4          MS. BAHARANYI:  Let's begin at 56 seconds.

5          (Video played)

6          MS. BAHARANYI:  Stop there.

7  Q.  So where I paused it, Officer Smalls, you've already now

8  touched Lucha, right?

9  A.  I touched the -- or I grabbed his bag that was across his

10  body.

11  Q.  We'll watch another footage of this as well.  But, Officer

12  Smalls, you've certainly now physically approached Lucha,

13  right?

14  A.  Yes.

15  Q.  And the minute marker is at one minute and two seconds,

16  right?

17  A.  Mmm-hmm.

18  Q.  So it's just about six seconds that had passed from you

19  walking on the sidewalk and approaching Lucha, right?

20  A.  Yes.

21  Q.  And in those six seconds of your approaching Lucha, you

22  certainly, I imagine you were paying attention to your

23  surroundings generally, right?

24  A.  Yes.

25  Q.  You were aware that there were other individuals present

1   and by Lucha, right?

2   A.  Yes.

3   Q.  Two women, actually, right?

4   A.  Yes.

5   Q.  And there were also other passersby, one other passerby in

6   that area, right?

7   A.  Correct.

8   Q.  And in this time you have a sense of what your surroundings

9   are, right?

10  A.  Yes.

11  Q.  And that's what you're trained to do, right?

12  A.  Yes.

13  Q.  In this six-second window, it is nighttime, right?

14  A.  Yes.

15  Q.  At this point, it's almost 10:00 at night, right?

16  A.  Correct.

17  Q.  The sun has already set, right?

18  A.  Correct.

19  Q.  And there is no natural light at this point, right?

20  A.  No.

21  Q.  And as you were walking up to Lucha, you didn't ask him for

22  his name, right?

23  A.  No.

24  Q.  And you did not command him not to run, right, or give him

25  any commands, right?

N5UQlucH                          Mr. Smalls - Cross

1    A.   I think I told him hold on for a minute before I activated

2    my body-worn camera, before I pressed the button.

3    Q.   So as you're approaching Lucha, you told him to hold on,

4    right?

5    A.   Yes.

6    Q.   Meaning, don't go anywhere, right?

7    A.   Correct.

8    Q.   And Lucha did not go anywhere.  Is that right?

9    A.   Correct.  He stayed there.

10   Q.   He stayed where he was, right?

11   A.   Yes.

12   Q.   He did not try to run at this point, right?

13   A.   No.

14   Q.   Or at any point this evening, right?

15   A.   No.

16   Q.   You didn't ask him for any sort of identification as you

17   were approaching him, right?

18   A.   No.

19   Q.   You did not ask him for -- you didn't ask him whether he

20   had a permit to carry the firearm as you approached him?

21   A.   No.

22   Q.   And you are aware that there are individuals who can

23   legally carry firearms in New York, right?

24   A.   Yes.

25   Q.   And individuals who can legally carry concealed weapons in

N5UQlucH                         Mr. Smalls - Cross

1    New York, right?

2    A.  Yes.

3    Q.  But you did not ask Lucha if he was one of those

4    individuals, right?

5    A.  No, I didn't.

6    Q.  So you approached Lucha in these six seconds, right?  You

7    approached Lucha in the six seconds it took you?

8    A.  Correct.

9    Q.  And once you reached Lucha, you did immediately touch

10   Lucha, right?

11   A.  I remember touching his bag.

12   Q.  Actually --

13          MS. BAHARANYI:  So, Sarah, if you would pull up

14   Government Exhibits 301 and publish that.

15          MS. NICOLAS:  Objection.  This is not in evidence,

16   your Honor.

17          MS. BAHARANYI:  Apologies.  Actually, can you please

18   just show the witness only Government Exhibit 301.

19   Q.  I'm going to play a small portion of this exhibit for

20   purposes of you identifying it only, Officer Smalls.

21          MS. BAHARANYI:  If you could please play from 58

22   seconds to one minute and four seconds.

23          (Audio played).

24   Q.  Officer Smalls, Government Exhibit 301 is body-worn camera

25   footage, right?

N5UQlucH                         Mr. Smalls - Cross

1   A.  Correct.

2   Q.  It's not your body-worn camera footage, correct?

3   A.  Correct.

4   Q.  It's from your partner, Officer Cotter, right?

5   A.  Yes.

6   Q.  This footage does show you, right?

7   A.  Yes.

8   Q.  You can see yourself on this body-worn camera footage?

9   A.  Yes.

10  Q.  In the process of interacting with Lucha, right?

11  A.  Correct.

12  Q.  This is a fair and accurate representation of you the

13  evening of this arrest, right?

14  A.  Yes.

15  Q.  And a fair and accurate representation of you engaging with

16  Lucha the evening of this arrest?

17  A.  Yes.

18          MS. BAHARANYI:  At this time, your Honor, we would

19  admit Government Exhibits 301.  Your Honor, I don't think we

20  need to admit it as a defense exhibit.

21          THE COURT:  No.  What's the number again?

22          MS. BAHARANYI:  It's 301.

23          THE COURT:  301.

24          MS. BAHARANYI:  Yes.

25          THE COURT:  Any objection?

1            MS. NICOLAS:  No, your Honor.

2            THE COURT:  Received.

3            (Government's Exhibit 301 received in evidence)

4            MS. BAHARANYI:  Sarah, let's publish that if it's not

5    already published.  I'm going to have it played one more time

6    as we watch it for purposes of identification, but I want you

7    to also review it for the next questions I'm going to ask you.

8    So beginning at 58 seconds to one minute and five seconds.

9            (Video played)

10           MS. BAHARANYI:  Sarah, can you back up to 58 seconds,

11   and I'll tell you exactly where to pause.

12           (Video played)

13           MS. BAHARANYI:  Pause right there.

14   Q.  At this point, Officer Smalls, you are able to see yourself

15   on the body-worn camera footage, right?

16   A.  Yes.

17   Q.  At this point you are touching Lucha's side, correct?

18   A.  Yes, I am.

19   Q.  The left side of his body, right?

20   A.  Yes.

21           MS. BAHARANYI:  And if you play for just a couple more

22   seconds here.

23           (Video played)

24           MS. BAHARANYI:  Pause there.

25   Q.  Now, you had touched Lucha's side before you actually

1    touched the firearm -- excuse me -- touched the bag, right?

2    A.  Correct.

3    Q.  And you did not pause in between -- there was no pause

4    between you walking up to Lucha and touching the side of his

5    body, right?

6    A.  No.

7    Q.  So, Officer Smalls, we talked a lot about the bag in this

8    case, so let's take a closer look.  I understand that you were

9    responsible for holding the bag at issue in this case while at

10   the scene of the arrest, right?

11   A.  Correct.

12   Q.  And while you were at the scene of the arrest, you held the

13   bag with the firearm still inside of it, right?

14   A.  Yes.

15          MS. BAHARANYI:  Sarah, if you could please show the

16   witness only what's been marked as Defendant's Exhibit 1, and

17   that's at 35 seconds and pause.

18          (Video played)

19   Q.  Officer Smalls, I'm showing you some additional body-worn

20   camera footage, right?

21   A.  Yes.

22   Q.  You can see yourself in this body-worn camera footage,

23   right?

24   A.  Yes.

25   Q.  Along with Lucha, right?

N5UQlucH                          Mr. Smalls – Cross

1    A.  Yes.

2    Q.  And Officer Smalls?

3    A.  And Officer Cotter.

4    Q.  Excuse me, and Officer Cotter.  So Officer Cotter is

5    standing with his hand on Lucha's chest, right?

6    A.  Correct.

7    Q.  Now, this is a video of you after stopping Lucha and after

8    frisking the bag, correct?

9    A.  Yes.

10   Q.  From June 23, right, from that same evening?

11   A.  Yes.

12   Q.  And you're holding the bag that was seized that was taken

13   from Lucha, right?

14   A.  Yes.

15   Q.  This is a fair and accurate depiction of you holding this

16   bag on the evening of June 23, right?

17            MS. BAHARANYI:  At this time, we would ask to admit

18   this Exhibit as Defendant's Exhibit 1.

19            MS. NICOLAS:  No objection.

20            THE COURT:  What's the number?

21            MS. BAHARANYI:  Defense Exhibit 1, your Honor.

22            THE COURT:  Received.

23            (Defendant's Exhibit 1 received in evidence)

24            MS. BAHARANYI:  Sarah, if you would please play

25   Defense Exhibit 1 at 35 seconds.

N5UQlucH                         Mr. Smalls - Cross

1           (Video played)

2    Q.  Officer Smalls, in this still of the footage, you're

3    holding the bag in your right hand, right?

4    A.  Correct.

5    Q.  And as you're holding the bag, you're able to feel the

6    fabric of this bag, right?

7    A.  Yes.

8    Q.  It's a fairly thick material bag, right?

9    A.  Yes.

10   Q.  And this is the same bag that you had just taken off of

11   Lucha's body, right?

12   A.  Correct.

13   Q.  This is the same bag that you're saying was heavily

14   weighted.  Is that right?

15   A.  Yes.

16   Q.  And bulging.  Is that right?

17   A.  Yes.

18   Q.  Now, at this point on the video you haven't removed any

19   cartridges from the bag, right?

20   A.  No.

21   Q.  You didn't remove the gun from the bag, right?

22   A.  No.

23   Q.  It's exactly the way that it would have been as you

24   approached Lucha, right?

25   A.  Yes.

1  Q.  So, Officer Smalls, after Lucha's arrest --

2          MS. BAHARANYI:  Sarah, you can take down Defense

3  Exhibit 1.

4  Q.  After Lucha's arrest, you were tasked with filling out some

5  of the paperwork in connection with this case, right?

6  A.  Correct.

7  Q.  Specifically, you entered a complaint report in this case,

8  right?

9  A.  I don't recall.  I don't remember if I did.

10  Q.  Would it refresh your recollection to see a copy of the

11  complaint report issued in this case?

12  A.  Yes.

13          MS. BAHARANYI:  Sarah, if you could please show the

14  witness 3502-001, page 2.

15  Q.  Now, officer Smalls, I'm going to direct your attention to

16  the bottom of page 2 where it says "complaint report entered

17  by."  Let me know when you've had a chance to review that.

18  A.  Yes.

19  Q.  Officer Smalls, I'm also going to direct you to page 1 of

20  the same document and the narrative at the bottom of page 1.

21  Please review and let me know when you've had a chance to

22  review that.

23  A.  Yes.

24  Q.  Officer Smalls, you entered the --

25          MS. NICOLAS:  Objection.  Improper refreshing of

N5UQlucH                          Mr. Smalls – Cross

1   recollection, your Honor.

2             MS. BAHARANYI:  Excuse me?

3             THE COURT:  Are you offering this?

4             MS. BAHARANYI:  I'm not offering it.

5   Q.  Has your recollection now been refreshed, Officer Smalls?

6             THE COURT:  As to what?

7             MS. BAHARANYI:  As to authoring a complaint report in

8   this case.

9   A.  I really don't remember if I'm the one who typed it or it

10  was just logged in.  I don't remember.

11  Q.  So, Officer Smalls, you have now had a chance to look at

12  the complaint report, right?

13  A.  Correct.

14  Q.  And you do recall filling out paperwork in connection to

15  this case, correct?

16  A.  Correct.

17  Q.  And complaint reports are part of the types of paperwork

18  that must be filled out in connection with an arrest, right?

19  A.  Correct.

20  Q.  So, Officer Smalls, as per the complaint report in this

21  particular case, you do recognize that your name is entered as

22  the individual who authored the report?

23  A.  Yes.

24            MS. NICOLAS:  Objection, your Honor.

25            THE COURT:  Sustained.  It's not in evidence.

1            MS. BAHARANYI:  Well, at this point -- your Honor, one

2      moment.

3            (Pause)

4    Q.  Officer Smalls, what paperwork did you fill out in

5    connection to this case?

6    A.  I don't recall.

7    Q.  Do you recall completing an activity log in connection with

8    this case?

9    A.  Yes.

10   Q.  And this activity log is something that officers have to

11   fill out when they begin, I guess, their tour of duty for the

12   day.  Is that right?

13   A.  Yes.

14   Q.  And this activity log also requires you to document what

15   happened in your duty for the day.  Is that right?

16   A.  Yes.

17   Q.  And you completed your own activity log, right?

18   A.  Correct.

19   Q.  So, Officer Smalls -- let me back up a little bit.

20            In any activity log that you complete, you do have to

21   document whether there was a stop, right?

22   A.  Yes.

23   Q.  Whether you conducted an arrest.  Is that right?

24   A.  Yes.

25   Q.  And on June 27, 2021, you completed an activity log in

N5UQlucH                         Mr. Smalls - Cross

1   connection to this case, right?

2   A.  I'm not sure when I put the entry in.

3   Q.  Would it refresh your recollection to see the activity log

4   that was entered --

5           THE COURT:  You're never going to get -- and we're

6   wasting a huge amount of time.  You're either you're going to

7   offer this, or you're not.

8           MS. BAHARANYI:  Your Honor, I'd like to offer it.

9           THE COURT:  Good.  Proceed.  What do you want to call

10  it?

11          MS. BAHARANYI:  Excuse me, your Honor?

12          THE COURT:  What number do you want to give it?

13          MS. BAHARANYI:  We can give it Defense Exhibit 4.

14          THE COURT:  Defense Exhibit 4 is received.  I'm sorry.

15  Was there an objection?

16          MS. NICOLAS:  Your Honor, may we have an opportunity

17  to review it since this wasn't --

18          THE COURT:  Yes.

19          MS. NICOLAS:  No objection, your Honor.

20          THE COURT:  Received.

21          (Defendant's Exhibit 4 received in evidence)

22          MS. BAHARANYI:  Sarah, can you please show or please

23  publish what's now been marked as Defense Exhibit 4 and go to

24  the third page of this document.

25  Q.  So, Officer Smalls, this is your activity log.  Is that

1    right?

2    A.   Yes.

3    Q.   And in an activity log you were required to -- you provided

4    a description of the stop in this case, right?

5    A.   Yes.

6    Q.   And an activity log specifically states what factors led to

7    the stop in this case.  Is that right?

8    A.   Correct.

9    Q.   And it lists those factors, right?

10   A.   Yes.

11   Q.   And the factors that are listed include the very specific

12   description of the suspect in this case, right?

13   A.   Yes.

14   Q.   And the officer's observations, correct, in making the

15   stop?

16   A.   Yes.

17   Q.   And the log states, the log states that one of -- the log

18   states that officers canvassed the area and observed male,

19   medium build, light skinned, wearing white shirt with black

20   stripes and a white turban, black pants and black-and-white

21   sneakers, subject to be in close proximity of crime, matching

22   description with a blue bag.  Officers stopped subject for

23   further investigation, right?

24   A.   Correct.

25   Q.   That log does not mention a heavily weighted bag, right?

N5UQlucH                        Mr. Smalls - Cross

1   A.  No.

2   Q.  It does not mention any sort of bulging, right?

3   A.  No.

4   Q.  It does not mention any taut straps, right?

5   A.  No.

6   Q.  I will add, Officer Smalls, there's no mention of the area

7   where Lucha was stopped being a high-crime area in this log.

8   Is that right?

9   A.  Correct.

10  Q.  Officer Smalls, you did not bring to court with you today

11  any NYPD statistics on the crime rates of this area back in

12  2021, right?

13          MS. NICOLAS:  Objection.

14          THE COURT:  Sustained.

15  Q.  Officer Smalls, you spent some time talking about your

16  subjective experience as an officer, right?  Your own personal

17  experience as an officer, right?

18  A.  Yes.

19  Q.  In Sector David, right?

20  A.  Correct.

21  Q.  And Sector David is the only sector that you were working

22  in in June 2021, right?

23  A.  No.

24  Q.  What other sectors were you working in in June 2021?

25  A.  We were responsible for the whole precinct, so we were in

N5UQlucH                         Mr. Smalls - Cross

1    the whole precinct.

2    Q.  So the 52nd precinct.  Is that right?

3    A.  Correct.

4    Q.  You were working within the 52nd precinct, but no other

5    precinct back in June 2021.  Is that right?

6    A.  Correct.

7    Q.  You don't know the crime statistics for --

8         THE COURT:  Counsel, just to move things along, you

9    know I allowed in his statement about the crime rate.  It will

10   not be material to my decision, so we don't need to spend a lot

11   of time.

12        MS. BAHARANYI:  Understood, your Honor.

13   Q.  Let's go back to the bulge.  So, Officer Smalls, you did

14   testify before a Bronx state grand jury in connection to this

15   case, right?

16        MS. NICOLAS:  Objection, your Honor.

17        THE COURT:  Ground.

18        MS. NICOLAS:  Hearsay, your Honor.

19        THE COURT:  I'm sorry, let me hear the question again.

20   Q.  Officer Smalls, you testified before a Bronx state grand

21   jury in connection to this case?

22        THE COURT:  That's not hearsay.  That's a yes-or-no

23   question.  You can answer that yes or no.

24   A.  Yes.

25   Q.  This testimony occurred in November 2021.  Is that right?

N5UQlucH                        Mr. Smalls - Cross

1   A.   Correct.

2   Q.   And this was about five months after Lucha's arrest.  Is

3   that right?

4   A.   Yes.

5   Q.   Now, Officer Smalls, while you were -- actually, one

6   moment.

7         THE COURT:  I need to move this along.  I'm sorry.  I

8   have a 4:00 matter which I will not take the 4:00 matter until

9   we complete this hearing, but did you want to offer his grand

10  jury testimony?

11        MS. BAHARANYI:  Not his testimony, not the particulars

12  of the testimony.  What I do want to ask Officer Smalls is that

13  this was the first time he mentioned a bulge was during this

14  grand jury testimony.

15        THE COURT:  I'll allow that.

16  Q.   Officer Smalls, during your grand jury testimony was the

17  first time you mentioned a bulge?

18        THE COURT:  Mentioned to whom?

19        MS. BAHARANYI:  Mentioned to anyone a bulge in this

20  case.

21        THE COURT:  Mentioned to anyone?  All right.  I'll

22  allow that question.

23        MS. BAHARANYI:  Actually, let me back up, your Honor.

24  Q.   Officer Smalls, you did not describe a bulge in paperwork

25  that you completed in connection with this case?

N5UQlucH                              Mr. Smalls - Cross

1          THE COURT:  Asked and answered.  I get that point.

2     A.  Not in my activity log, no.

3     Q.  Right.  And there's no other paperwork that you recall

4     describing this bulge, right?

5     A.  Not that I recall.

6     Q.  Now, the first time you ever mentioned seeing a bulge under

7     oath was at the grand jury testimony in connection to Lucha's

8     arrest, right -- in connection to this criminal case, right?

9     A.  Can you repeat your question?

10    Q.  The first time you ever recalled or the first time you ever

11    mentioned a bulge, seeing a bulge in the bag was -- strike

12    that.

13         The first time that you ever mentioned a bulge in a

14    bag while under oath was in connection to your testimony as

15    part of your grand jury testimony in the Bronx state case, is

16    that right, while under oath, correct?

17    Q.  And the timing of this was a few months after this arrest,

18    about five months after his arrest, right?

19    A.  Yes.

20    Q.  Now, you gave -- you have previously given testimony in

21    other cases, right?

22    A.  Yes.

23    Q.  You've previously given grand jury testimony in other

24    cases, right?

25    A.  Yes.

N5UQlucH                          Mr. Smalls - Cross

1   Q.  And testimony in suppression hearings as well, right?

2   A.  Correct.

3   Q.  And, in fact, if I recall, Officer Smalls, you testified in

4   a suppression hearing in a completely separate Bronx case

5   People v. James Adams.  Is that right?

6           MS. NICOLAS:  Objection, your Honor.  Relevance.

7           MS. BAHARANYI:  The relevance here, your Honor, is

8   that the testimony in that case is that --

9           THE COURT:  I can't tell yet, so he can answer the

10   question.  But we'll see what the next question is, so the

11   question was you gave testimony --

12   Q.  In a suppression hearing in a People v. Adams case.  Is

13   that right?

14   A.  Correct.

15   Q.  And that case also involved the stop of someone suspected

16   being in possession of a gun, right?

17   A.  Correct.

18   Q.  And in your testimony in that case you can did not testify

19   to seeing a bulge, right?

20   A.  Correct.

21           MS. NICOLAS:  Objection, your Honor.

22           MS. BAHARANYI:  I have two more questions, your Honor,

23   which --

24           THE COURT:  Well, I have doubts about the relevance of

25   the last question, but I will allow for the moment.  Let's see

1    what your other questions are.

2              MS. BAHARANYI:  Very good, your Honor.  Thank you.

3    Q.  Officer Smalls, you provided that testimony in the Smalls

4    case, right?

5    A.  In the Adams case?

6    Q.  In the Adams case, excuse me.

7    A.  Yes.

8    Q.  And in the Adams case, you were informed by the district

9    attorney that the case -- the gun was suppressed in that case,

10   right?

11   A.  Correct.

12             THE COURT:  Sustained.  Sustained.  Now I see where

13   you're going.  Sustained.

14             MS. BAHARANYI:  Your Honor, if I may briefly.

15             THE COURT:  You may, but the last I'm not going to

16   change my ruling.  But if you'd like to put a new question and

17   see if you can get a new ruling out of me, that's my job and

18   your job.

19   Q.  Well, okay.  So, your Honor -- not your Honor -- Officer

20   Smalls, before your testimony in the grand jury in Lucha's

21   case, you had a conversation with the assistant district

22   attorney in connection to this other case, the Adams case,

23   right?

24   A.  Can you say that question again?

25   Q.  Sure.  Let me clarify a bit more.  So November 2021, you

1   testified in the grand jury in Lucha's case, right?

2   A.  Correct.

3   Q.  Now, prior to this date, you testified in a suppression

4   hearing in People v. Adams, right?

5   A.  Yes.

6   Q.  And you learned from the assistant --

7           MS. NICOLAS:  Objection.

8           THE COURT:  Let her finish the question.

9   Q.  You learned from the assistant district attorney the reason

10  or part of the reason why the gun was suppressed in that case

11  was because you did not testify to seeing a bulge, right?

12  A.  Correct.

13  Q.  And this happened before you testified about a bulge in

14  Lucha's case, right?

15  A.  If you could say the dates again?  I don't remember the

16  dates.

17  Q.  The suppression hearing in Adams was in August of 2021,

18  right?

19  A.  Okay.

20  Q.  Lucha's grand jury hearing was in November 2021, right?

21  A.  Okay.

22  Q.  And the Adams ruling occurred before Lucha's grand jury,

23  right?

24  A.  I mean, you're talking, I don't know when the ruling came

25  down.  I don't know the dates.  This was two years ago.

N5UQlucH                          Mr. Smalls - Cross

1    Q.  Let me ask you this:  The conversation --

2            THE COURT:  I will assume we could always look at the

3    public records and determine the dates, but I'll assume they

4    are as you represent so...

5            MS. BAHARANYI:  Actually, your Honor, at this point we

6    do actually have the Adams case we can offer for judicial

7    notice.

8            THE COURT:  I don't need that.  I'll take judicial

9    notice of the date.

10           MS. BAHARANYI:  Understood.  So we would ask the Court

11   to take judicial notice of the date of the suppression hearing

12   of August 17 and 18, 2021 in the People v. Adams case.

13           THE COURT:  Any objection?

14           MS. NICOLAS:  No.

15           THE COURT:  So noticed.

16   BY MS. BAHARANYI:

17   Q.  And this was prior to your testimony at Lucha's grand jury

18   in November 2021, right?

19   A.  Yes.

20   Q.  And this conversation that you had with the assistant

21   district attorney occurred certainly prior to your testimony

22   today, right?

23   A.  Yes.

24   Q.  One moment, your Honor.

25           (Pause)

N5UQlucH                    Smalls – Redirect

1          MS. BAHARANYI:  Your Honor, no further questions for

2    this witness.

3          THE COURT:  Redirect.

4          MS. NICOLAS:  Very briefly, your Honor.

5    REDIRECT EXAMINATION

6    BY MS. NICOLAS:

7    Q.  Officer Smalls, just two topics I want to cover.

8          First, what I believe is now marked as Defense Exhibit

9    4, 3502-14, your activity log?

10   A.  Yes.

11   Q.  An activity log, what's the purpose of an activity log?

12   A.  It's just to put down what you did that day and what

13   happened that day.

14   Q.  Does the activity log mention every detail of every

15   observation you make while on patrol?

16   A.  No.

17   Q.  The prior case, the Adams case, did you testify truthfully

18   during that case?

19   A.  Yes.

20   Q.  Did you testify truthfully in the grand jury in this case?

21   A.  Yes.

22   Q.  Did you testify truthfully today?

23   A.  Yes, I did.

24   Q.  Would you lie under oath, Officer Smalls?

25   A.  No.

N5UQlucH

```
 1              MS. NICOLAS:  Nothing further, your Honor.

 2              THE COURT:  Anything else?

 3              MS. BAHARANYI:  Nothing further, your Honor.

 4              THE COURT:  Nothing further.  You may step down.

 5              (Witness excused)

 6              THE COURT:  Anything else from the government?

 7              MS. NICOLAS:  Your Honor, Officer Cotter is prepared

 8      to testify.  We anticipate his direct to be about 20 minutes.

 9              THE COURT:  I think what I'm going to do is excuse you

10      for five minutes while I talk to the lawyers in the 4:00

11      matter, and then we will call you back.  Be prepared.  Come

12      back into the courtroom no later than, say, ten minutes from

13      now.

14              MS. NICOLAS:  Thank you, your Honor.

15              (Recess)

16              (In open court)

17              THE COURT:  Please call your next witness.

18              MS. SMYSER:  Your Honor, the government now rests.  We

19      are not going to call another witness.

20              THE COURT:  Is he here?

21              MS. SMYSER:  He is here, yes.

22              THE COURT:  Bring him in.

23              MS. SMYSER:  The government calls Officer Ryan Cotter.

24              THE COURT:  I'm going to question him.  You don't have

25      to.
```

N5UQlucH

1          MS. SMYSER:  Your Honor, I do have questions prepared.

2          THE COURT:  I bet you do.  And I'm heartbroken to

3    deprive you of that opportunity.

4          MS. SMYSER:  No problem.

5     RYAN COTTER,

6          called as a witness by the Government,

7          having been duly sworn, testified as follows:

8    BY THE COURT:

9    Q.  State your full name for the record and spell it.

10   A.  Officer Cotter.

11   Q.  Officer Cotter.  Gee, it is really interesting that your

12   mother named you Officer, but I really bet you had a different

13   first name.

14   A.  Ryan Cotter.  R-Y-A-N.  C-O-T-T-E-R.

15   Q.  So were you present at the time of the arrest of the

16   defendant who goes by the name of Lucha?

17   A.  Yes.

18   Q.  And did you have any conversation at the time with your

19   fellow officer about the basis for the arrest?

20   A.  Can you reword that?

21   Q.  Sure.  Who else was present at the arrest?

22   A.  My partner, Officer Smalls.

23   Q.  And did he give the order for the arrest?

24   A.  He stated to me that it was an arrest.

25   Q.  I'm sorry, you have to speak louder.

N5UQlucH

1  A.  He stated to me that it was an arrest.

2  Q.  And did he tell you why?

3  A.  Me and him worked together for awhile, so he stated "92"

4  and I knew it was an arrest.

5  Q.  After the arrest was effectuated, did he tell you what the

6  basis for the arrest was?

7  A.  He nodded to me after he checked the bag, so I knew it was

8  a firearm.

9  Q.  So now you were driving?

10  A.  Yes.

11  Q.  Did you observe the bag yourself or was that simply his

12  observation?

13  A.  I saw him wearing the bag, yes.

14  Q.  The defendant, you mean, Mr. Lucha?

15  A.  Yes.

16  Q.  And did you observe anything about the bag?

17  A.  I didn't -- it was on the opposite side from my approach

18  when we approached him.

19  Q.  So it was really your fellow officer who had the direct

20  view of the bag?

21  A.  Yes.

22  Q.  Now, after the arrest occurred, did you and he transport

23  the defendant to wherever you were taking him?

24  A.  He was brought back to the second precinct.

25  Q.  But brought back in what vehicle?

N5UQlucH                        Cotter - Cross

1  A.  I don't recall if it was our car.

2  Q.  Okay.  My question is, did you have any conversation with

3  your fellow officer during that period when you were

4  transporting the defendant to the precinct?

5  A.  I don't recall what we spoke about.  I just drove back to

6  the command.

7          THE COURT:  That's all I have.

8          Anything either side wants to ask this defendant

9  that's related to the scope of my direct and nothing else will

10  be allowed.

11          MS. BAHARANYI:  Not from the defense, your Honor.

12          MS. SMYSER:  Just a few questions, your Honor.

13          THE COURT:  All right.

14

15  CROSS-EXAMINATION

16  BY MS. SMYSER:

17  Q.  Officer Cotter, did you handcuff Mr. Perez?

18  A.  Yes.

19  Q.  Before you handcuffed Mr. Perez, did Officer Smalls say

20  anything to you?

21  A.  He stated "92."

22  Q.  Is 92 a code for anything?

23  A.  Yes.  It's our code for arrest.

24  Q.  Did you understand 92 to mean anything else?

25  A.  I knew it meant that it involved a firearm.

N5UQlucH                         Cotter - Cross

1    Q.  Why did you know that?

2    A.  Me and him only arrest for firearms.

3    Q.  Officer Cotter, you testified that when you approached

4    Mr. Perez, you approached on the side away from the bag.  Is

5    that correct?

6    A.  Correct.

7    Q.  Did you make any observations about the bag as you

8    approached?

9              MS. BAHARANYI:  Objection, your Honor.

10             THE COURT:  No, I'll allow that.

11   A.  I noticed that it was on his right side under his arm, and

12   it looked like it was heavily weighted due to the straps being

13   tight against his body.

14             MS. SMYSER:  May I have just one moment, your Honor?

15             THE COURT:  Yes.

16   Q.  Officer Cotter, when you saw Mr. Perez, did you notice

17   anything about the defendant's appearance as compared to what

18   you had heard over the radio run?

19   A.  He matched the description that we received perfectly.

20             MS. SMYSER:  No further questions, your Honor.

21             THE COURT:  All right.  I'll allow defense counsel if

22   she wants to follow up on that.

23             MS. BAHARANYI:  Yes, your Honor one moment.

24   CROSS-EXAMINATION

25   BY MS. MAYO:

N5UQlucH                    Cotter - Cross

1   Q.  Good afternoon, Officer Cotter.  I just have a few

2   questions.

3            You testified that you approached Lucha from the left

4   side -- excuse me -- from Lucha's left side?

5   A.  Yes.

6   Q.  Which is the opposite side of where his bag was?

7   A.  Yes.

8   Q.  So Officer Smalls was directly facing the bag?

9   A.  Correct.

10  Q.  You were not?

11  A.  Correct.

12  Q.  And you just testified that you could observe Lucha's bag

13  under his right arm?

14  A.  Yes.

15  Q.  And it looked heavily weighted to you?

16  A.  Yes.

17  Q.  This was happening at night?

18  A.  Yes.

19  Q.  The arrest happened at around 10:00 p.m.?

20  A.  Yes.

21  Q.  So it was dark outside?

22  A.  Yes.

23  Q.  And you approached Lucha from your car.  You got out of

24  your car?

25  A.  Yes.

N5UQlucH                    Cotter - Cross

1    Q.  And approached Mr. Lucha on the sidewalk?

2    A.  Yes.

3    Q.  This all happened in a matter of seconds?

4    A.  Yes.

5           MS. MAYO:  No further questions.

6           THE COURT:  Anything else?

7           MS. SMYSER:  Nothing further.

8           THE COURT:  Thank you so much.  You may step down.

9           (Witness excused)

10          THE COURT:  Does either side wish to make summation?

11          MS. SMYSER:  Your Honor, the government is prepared to

12   make a summation.  We have a presentation which we can do for,

13   your Honor, or I can make more informal remarks, whatever you

14   prefer.

15          THE COURT:  A presentation.  My gosh, this is

16   thrilling.

17          MS. SMYSER:  A small one.

18          THE COURT:  Go ahead.

19          MS. SMYSER:  May I proceed, your Honor?

20          THE COURT:  Please.

21          MS. SMYSER:  Mr. Magliocco, you can go to the first

22   slide.

23          Your Honor, the focus of this whole hearing has been

24   answering a simple question, whether there was reasonable

25   suspicion to believe that Mr. Perez may have been committing a

N5UQlucH                    Cotter - Cross

 1    crime at the time that Officer Smalls and Officer Cotter

 2    stopped him.  As your Honor well knows, the standard of proof

 3    here is a preponderance of the evidence, and we have certainly

 4    met that.  And I want to briefly outline why.

 5           There are a number of factors that support reasonable

 6    suspicion for this stop.  First, this 911 call reported gun

 7    possession in a high-crime area and --

 8           THE COURT:  I'm not sure I understand why.  I'm not

 9    saying it's irrelevant, but I don't understand why that is of

10    any materiality.  But why do you say it's material, if at all.

11           MS. SMYSER:  Your Honor, I think a high-crime area is

12    one of many factors mentioned by Court in similar contents --

13           THE COURT:  I know.  Courts will mention all sorts of

14    things, but I'm asking for a reason.

15           MS. SMYSER:  Your Honor, I think here you have an

16    officer who patrols this area daily and is familiar with the

17    types of crimes that generally take place, which includes

18    firearm possession, as he testified.

19           And so when you are in the context of a reasonable

20    cautious officer in Officer Small's position, you know that

21    people in this area often possess firearms and you're trained

22    to look for people who are carrying firearms, as he

23    testified --

24           THE COURT:  I think training and experience is

25    relevant.  I'm not sure -- are you saying, for example, that if

N5UQlucH                    Cotter - Cross

1    he was in a low-crime area but he got the same 911 call and he

2    was trained to look for bulges in bags, and he was told by the

3    person making the 911 call this person is carrying a gun, that

4    your case would be any stronger or weaker because it was a

5    low-crime area rather than a high-crime area?

6          MS. SMYSER:  Your Honor, I think in both cases it's a

7    reasonable suspicion to stop.

8          THE COURT:  That's why I don't think it's material,

9    but training and experience is relevant.  Go ahead.

10          MS. SMYSER:  On training and experience, as Officer

11   Smalls testified, he has had over a hundred hours of firearms

12   training, which include training specifically how to figure out

13   people are carrying firearms.  He's had over 50 gun arrests in

14   this particular precinct.  And as you know, what we're

15   assessing here is whether a reasonable and cautious officer in

16   his circumstances would have had reasonable suspicion to

17   conduct a brief investigatory stop.  The answer to that is yes.

18          The third thing we're going to look at here is the 911

19   call, which is Government Exhibit 100.

20          THE COURT:  So just before we get to the 911 call,

21   you're saying that if he in his experience knew that sometimes

22   firearms when carried in bags made bulges, that would be enough

23   to satisfy his stop-and-frisk and so forth?

24          MS. SMYSER:  You're saying just solely based on his

25   training and experience?

1          THE COURT:  Yes.

2          MS. SMYSER:  With nothing else?

3          THE COURT:  That's what I'm asking you.

4          MS. SMYSER:  I'm not sure if that would be enough,

5   your Honor.

6          THE COURT:  I doubt it very much.  I'm sorry I.

7   Didn't have this hearing before I had a few weeks ago a case

8   involving trademark infringement of Hermes Birkin bags, because

9   certainly a Birkin bag with a big bulge would not only be

10  suspicious but downright an antifashion statement, so...

11         Let's get on to the 911 call.

12         MS. SMYSER:  Yes.  Focusing on the 911 call -- and

13  before speaking about it specifically, I think our point here

14  is that, as your Honor knows, Fourth Amendment analyses are all

15  fact specific, and these are simply all circumstances that go

16  to the reasonable suspicion for the stop.  The 911 call is one

17  of those facts.

18         THE COURT:  So I guess what I'm getting at is this --

19  this is probably a question for your adversary.  You've got a

20  call, a highly specific call, gives a detailed description,

21  gives a flatout statement of the fact that he's got a weapon,

22  and gives his approximate location and so forth, and it's

23  not -- even though it was, in some sense, anonymous, it wasn't

24  really anonymous because the person gave a phone number and

25  also indicated her prior relationship with the person, so it

N5UQlucH                       Cotter - Cross

would be easy to determine who that was.  And then you see a

bag with a bulge.  Isn't that enough?

          MS. SMYSER:  Your Honor, our position is those two

things are enough.

          THE COURT:  Yes, I think those are the critical

questions, or that is the critical question; that it's those

two things that are either enough or not enough in the Court's

view, while conceding that all the facts and circumstances must

be taken account of.  And I'll bet there's only 5,000 opinions

saying that, but anyway, okay.

          So now when I looked at the videos right now, on the

one hand, I could see the bag was taut against his chest,

indicating that there was something heavy, and I knew that it

wasn't -- if it had been a law book, he would have been hunched

over in pain, so it was something heavy but not quite that

heavy.  So there's something heavy there, it did appear to me.

But I will need to go back and look again, but it did appear to

me that there was a bulge that was even visible to me.  But it

wasn't like a you know, a big bulge.  So I throw that out to

hear what defense counsel says about all of that.

          What about the fact that he seems not to have

mentioned the bulge in any of the paperwork or to his -- that's

why I asked to have Detective Cotter.  He didn't say anything.

Not that he was required to, but defense counsel was going to

say the reason he, you know, this is a fabrication that he had

1     it is because he was told by the DA that's what you've got to

2     do or because of another case.  What about all of that?

3             MS. SMYSER:  Well, your Honor, I think that Officer

4     Smalls testified that he -- they don't always include

5     everything in their activity log, and this is a detail that

6     wasn't included, and that doesn't seem to be material here.  An

7     activity log is to record the time they arrive and a short

8     summary of what happened.  And it is when you get into things

9     like suppression hearings or testimony before a grand jury or

10    before a Court where you really get into these details about

11    the events that occurred.  And I think it's important here to

12    note that on the suppression hearing that defense counsel noted

13    Officer Smalls testified that he testified truthfully from that

14    hearing.  He didn't see a bulge, so he said he didn't see a

15    bulge.  So he is doing the same thing.

16            THE COURT:  Supposing we had the detailed 911 call, we

17    had the heavy bag, but we didn't have a bulge.  On that

18    hypothetical scenario, would that be enough?

19            MS. SMYSER:  Your Honor, we do think that is enough,

20    and I think it's important to look at just how detailed this

21    911 call is and how, as you mentioned, it is not entirely an

22    anonymous 911 call, so the case law is often referenced about

23    these calls, we may be concerned that an anonymous tipper is

24    making something up and we can't verify the veracity of their

25    claims.  There's no way to hunt them down and hold them

N5UQlucH                          Cotter - Cross

1   accountable.

2           But that is simply not what happened here.  This 911

3   caller called in, provided a detailed description of what was

4   going on, and provided a basis for what she saw.  She said, "I

5   saw the gun."  She was an eye witness.  That's something you

6   have that is important.  She also said, your Honor, "This

7   individual is Lucha."  She named him, and said, "That's my

8   friend," so she had some intimate knowledge of Mr. Lucha.

9           THE COURT:  I think she said former friend.

10          MS. SMYSER:  Was a friend.

11          THE COURT:  Certainly after that call, it was

12  certainly a former friend, but...

13          MS. SMYSER:  Was a friend, that's correct.  And so in

14  addition for this 911 call providing a basis for what she is

15  providing, she is not also not entirely anonymous.  She leaves

16  her phone number.  She also knows that the 911 system records

17  her phone number, which shows that she is not calling in with

18  false information thinking that nothing will ever happen.

19          On top of that, she says, "I see Lucha."  So she has

20  to be in that location, and they are able to track her down

21  within ten minutes to bring her to do an identification

22  procedure, which is something you simply don't see in the cases

23  involving anonymous 911 callers where we have no clue how to

24  hunt them down per the Second Circuit in *Freeman*.

25          THE COURT:  Would you agree if you will hadn't had

N5UQlucH                       Cotter - Cross

1    that call -- now we're eliminating my hypothetical call -- you

2    would not have enough.

3            MS. NICOLAS:  So you're saying no 911 call, but you

4    see a heavy bag?

5            THE COURT:  You just see -- you're patrolling, you're

6    canvassing the area, and you see someone with a not very

7    stylish blue bag that looks like it's very heavy and it has a

8    bulge.  Would that be enough?

9            MS. SMYSER:  That's tough, your Honor.  I'm not sure

10   it would be enough.

11           THE COURT:  I'm very skeptical that would be enough.

12           Was there anything else you wanted to say?

13           MS. SMYSER:  No, your Honor.

14           The only last point I want to mention, just because

15   something had come up in oral argument about this, is just what

16   these officers had reasonable suspicion to believe what laws

17   Mr. Perez was violating.  I just want to point out at this time

18   in June 2021, as the Court, knows, this was pre-*Bruen* and the

19   Court had extensive --

20           THE COURT:  Who could imagine that even this Supreme

21   Court would be so neglectful of the safety of American citizens

22   that it would decide *Bruen*.  But I am bound by *Bruen*

23   nevertheless, but it was not the law at the time of this event.

24           MS. SMYSER:  Correct.  And there were numerous laws

25   under the New York Penal Code including the one cited 265.01 --

N5UQlucH                        Cotter - Cross

1   265.031(b) cited by Officer Smalls which are focused on gun

2   possession outside of the home with a permit, which Mr. Lucha

3   said he did not need and he did not have.

4          And so, your Honor, it's for all of these reasons that

5   we've been talking through, the totality of the circumstances

6   in this Fourth Amendment analysis that we believe that there's

7   reasonable suspicion just to engage in that brief investigatory

8   stop, which is what's at issue here.

9          THE COURT:  Let me hear from defense counsel.

10         MS. BAHARANYI:  Your Honor, I'll get straight to the

11  point here.  This was a anonymous tip.  This was an anonymous

12  call.  How do we know it was anonymous?  It's because the

13  person did not provide her name.  Did not provide any

14  identifying information.

15         THE COURT:  Well, she gave phone number.

16         MS. BAHARANYI:  The phone number is something that was

17  already part of the 911 system, so the 911 operator even says,

18  "I have your phone number.  I need confirmation."

19         How do we know that this still falls within the

20  umbrella of an anonymous tip is looking at these other 911 call

21  cases.  So one of the cases I think we talked about in our

22  argument maybe two months ago at this point, your Honor, was

23  United States v. Gonzalez.  This is a case that was heard by

24  your colleague, Judge Engelmayer.  And in that particular case,

25  again, we have a 911 caller calling in with very specific

N5UQlucH                          Cotter - Cross

1    information about someone --

2              THE COURT:  A great judge, although a kid, but...

3              MS. BAHARANYI:  But someone I know your Honor respects

4    as well.

5              THE COURT:  I do.

6              MS. BAHARANYI:  This 911 caller calling in, trace

7    calls, the 911 system has been traced for a very long time, but

8    who refuses to provide any identifying information and who

9    provides a report about someone in possession of a firearm,

10   provides their race, their build, a description of how they

11   look, and where they're located.  And in the *Gonzalez* case,

12   which I can provide a cite to in a moment, your Honor,

13   111 F.3d -- the Federal Supplemental 3d. 2015 what's critical

14   or where Judge Engelmayer starts the analysis is this tip by

15   itself would not be sufficient.  Something more is necessary.

16             And here, we're in a similar situation.  We have this

17   tip by itself, a call by someone who claims to be a friend, who

18   claims to have some knowledge of Lucha, but who truly the

19   officers don't know this person whatsoever, don't know the

20   veracity of this person, don't know if this person has a

21   reputation for honesty when they are acting on her information.

22   So this person squarely falls within this realm of an anonymous

23   tipster and squarely falls within the realm of the type of

24   concerning calls that the Supreme Court, the Second Circuit,

25   and courts in this district have been concerned about.  What we

N5UQlucH                    Cotter - Cross

1    don't want is individuals being able to use 911, call in on

2    their former friends or call in on enemies just because they

3    know they see them in public, they can describe them very well,

4    send police to their location, and send police to harass this

5    person.  We don't want that to happen.  So we require more than

6    just these tips.  And the courts require more.

7           I think the real question that today's hearing was

8    about was is whether there was this something more.  And

9    Officer Smalls, who testified today, did not provide that

10   something more.  We have a tip, a tip that he was operating off

11   of about someone with a firearm located in the Perry Avenue/Gun

12   Hill Road area.  Officer Smalls sees someone very closely --

13   very specifically matching this description, and he acts.  He

14   doesn't have time to see if there's a bulge.  He doesn't

15   have -- certainly the conditions don't allow him to see if

16   there is a bulge.  It's six seconds between --

17          THE COURT:  Why do you say that because -- maybe I

18   don't understand how the lighting was on these videos that I

19   just saw, but on the video, which is his camera that he is

20   carrying, you can see the bag pretty clearly.

21          MS. BAHARANYI:  On the video, I think it's Government

22   Exhibit 300, your Honor will see those six seconds that he has

23   to see the bag.  And in those six seconds, your Honor, you

24   don't see a bulge on that video.

25          THE COURT:  No, we'll go back to that in a minute.

1  Maybe we'll play it in a minute, but I'm not so concerned about

2  the six seconds because based on the tip and based on his

3  experience, he is, you know, while he may be looking at other

4  things, as you pointed out in your cross-examination, you know,

5  he's almost certainly going to be focused, or at least in part,

6  on the bag.

7          So let's assume hypothetically -- this is not the

8  case.  Let's assume in a hypothetical that you could see the

9  outline of a gun through the bag.  Are you saying that because

10  it was only six seconds and he had to focus on other things he

11  wouldn't have seen that?

12          MS. BAHARANYI:  He certainly could not have with this

13  bag.  The Court has --

14          THE COURT:  So I think it comes down to, given what he

15  was looking for was, is there evidence of a bulge in the bag.

16  So maybe we can play those six seconds again.

17          (Video played)

18          THE COURT:  No, you got to go back slightly.  No, he

19  was closer.  For my purposes, I need to see where you see the

20  bag itself and stop it at that place.

21          (Video played)

22          MS. BAHARANYI:  Pausing here, your Honor.

23          THE COURT:  Yes, let's go a little further.  Go as

24  close as you can until the bag -- that's good.  So what you see

25  there -- and this is at, for the record, at 21:56:55.  So you

1    see a bag that is clearly taut against his chest.

2        MS. BAHARANYI:  Well, it is a crossbody bag, so it

3    does have to hang across his chest.

4        THE COURT:  But it doesn't -- there are ways it can

5    hang and ways it can hang, but I think you can fairly say it

6    its taut against his chest.

7        MS. BAHARANYI:  Your Honor, as I'm looking at this

8    video -- and this is all that Officer Smalls could see as he's

9    walking up to him at 10:00 p.m. at night, there's no pause, no

10   examination from afar giving it a beat to see what he's looking

11   at.  What I see, your Honor, is someone who has a bag,

12   certainly, strapped across his chest, certainly.  It is -- he

13   does have clothing under this bag so the clothing naturally has

14   to bunch because the bag is across his chest, and an arm that

15   also obscures what this officer could have seen when he claims

16   to have seen a bulge or whatever that --

17       THE COURT:  So on the issue of the bulge, which I

18   agree with you is, you know, open to different interpretations,

19   but it looks to me that there is some sort of slight bulge as

20   we're looking at it here in what would be the left bottom

21   corner of the bag.  Though from the wearer's standpoint, it

22   would be -- it's on his right side towards, sort of towards --

23   where the bag is no longer touching his body towards the back.

24   It's not a big bulge.  Are you saying in your -- now my

25   ophthalmologist claims I now have 20/20 corrected vision, but

N5UQlucH                        Cotter - Cross

1   what does he know?  You don't think there is a bulge there?

2               MS. BAHARANYI:  Your Honor, I do not see a bulge.  I

3   have sat with this video for a very long time, as the Court can

4   imagine.  I think what bolsters this is the additional footage

5   of Officer Smalls that we provided to the Court in Defense

6   Exhibit 1, which shows how flat that bag was that evening.

7               THE COURT:  Let's take a look at that.

8               (Video played)

9               THE COURT:  You're saying that when he reaches into

10  the bag, the bag it appears that we can't see the same -- we're

11  seeing the inside of the bag, not the outside of the bag.

12              MS. BAHARANYI:  I think he closes it up, your Honor.

13              THE COURT:  But there's nothing there that suggests a

14  bulge.

15              MS. BAHARANYI:  Exactly, your Honor.  Looking at these

16  two videos in conjunction, and the Court may also take some

17  time to look at on your own time, your Honor, if you'd like.

18              THE COURT:  I have nothing better to do.  I might as

19  well.

20              MS. BAHARANYI:  In addition to the very, very

21  convenient timing about his statements of this bulge, meaning

22  this statement of the bulge coming up only after he's now been

23  somewhat educated by this other prosecutor -- not a federal

24  prosecutor, but by another prosecutor -- on what it takes to

25  get suppression, this combination of facts make it so clear

N5UQlucH                        Cotter - Cross

1    that that evening Officer Smalls didn't see a bulge.

2            THE COURT:  So let's assume for -- I am going to go

3    back and take a look at these again, but let's assume for the

4    sake of argument no bulge.  And you're saying that the tip is

5    not enough because you think the case law says it's not enough.

6            MS. BAHARANYI:  The tip is not enough -- the case law

7    is quite clear that the tip is not enough.  We had an anonymous

8    caller.

9            THE COURT:  The case law is quite clear.  I've never

10   come across a case like that, but maybe this is the one.  You

11   know, if the law were clear, none of us would have had to go to

12   law school.  Go ahead.

13           MS. BAHARANYI:  I think every now and then you get a

14   set of circumstances that other courts have had to deal with

15   before, and this anonymous call from a 911 caller who doesn't

16   give their name, providing a specific description on the street

17   is a set of circumstances that came up in *Florida v. J. L.*, a

18   Supreme Court case, even in that case the court has to grapple

19   with a very specific description of a person, a very specific

20   description of a location where that person was going to be

21   located at this bus stop, and an allegation that this person

22   was in possession of a firearm.  It came from an anonymous

23   caller.  The Court found this was not sufficient.  Being able

24   to trace the call doesn't matter.  This was not sufficient

25   because we don't know who this tipster is.  We don't know at

N5UQlucH                          Cotter - Cross

1   the point at which the officers are using that information, if

2   they're relying on reliable information, if they're relying on

3   a truthful individual.  And all that we have is reliability of

4   assertions of where that person is located and what they look

5   like.  So we know where they are, we know what they look like,

6   which I can call 911 on any of the individuals at the front

7   table and provide a very specific description and location, but

8   that is not sufficient.

9           The reason we don't allow these anonymous tips to hold

10  the day is because there still needs to be some reliability in

11  the assertion of the illegality, like the actual unlawful

12  conduct.  If you don't have a bulge, which you don't, you don't

13  have this added corroboration, this added objective

14  corroboration, I'd say.

15          THE COURT:  All right.

16          MS. BAHARANYI:  And I don't think the high-crime area

17  crosses the mark for it, and I don't think training and

18  experience does either.  If anything, your Honor --

19          THE COURT:  I think training and experience is more

20  relevant, as I already indicated.  I don't think the high-crime

21  area means that much.

22          MS. BAHARANYI:  Here is why I have an issue with the

23  training and experience though, your Honor.  I understand

24  Officer Smalls has done many of these types of stops and

25  arrests over time, and I think that actually creates a certain

N5UQlucH                        Cotter - Cross

1    bias in his mind.  Your Honor has certainly heard this phrase:

2    To every hammer, it's a nail.  I always mess it up, I think,

3    but in his experience --

4                THE COURT:  I thought the proper cliche for this

5    particular motion was the battle of the bulge.

6                MS. BAHARANYI:  It's a missed opportunity on my part.

7                But I think what your Honor can see is someone who has

8    training and experience, but who in that moment heard a very,

9    very specific description, saw someone very clearly meeting

10   that description, and made a stop.  I'm not saying that, you

11   know, we can have our opinions on what good policing or bad

12   policing is, but we also have what the case law sets as a

13   standard for what reasonable suspicion is.

14               THE COURT:  The standard is what reasonable, of

15   course, means a reasonable police officer, but it still has to

16   be an objective standard.

17               MS. BAHARANYI:  Exactly.  And I think once your Honor

18   is able to spend additional time with the footage, considering

19   the testimony that was provided today, there simply is no

20   reason to believe that this officer actually saw a bulge,

21   actually saw something specific to Lucha that would have

22   corroborated this anonymous tip on the phone.

23               What he did see, what is kind of objective is that

24   Lucha was standing there talking to his two friends in front of

25   his own home as he was approached by officers, not engaging in

N5UQlucH                          Cotter - Cross

1    any sort of suspicious conduct, not trying to flee, hide, do

2    any of the things to blade his body, none of these actions that

3    one would suspect as corroboration of a tip or corroboration of

4    illegal conduct.  He doesn't engage in that.

5         THE COURT:  Thank you very much.  I'm sorry, was there

6    something else you wanted to say?  I didn't mean to cut you

7    off, but we are getting on until 5:00.

8         MS. BAHARANYI:  Your Honor, I think that is it.

9         THE COURT:  Okay.  Let me hear from the government in

10   rebuttal, and we will see where we are.

11        MS. SMYSER:  Just very briefly, your Honor.  First, as

12   you go back and watch the videos, which I know that you will

13   do, I think it's important to watch those in the context of

14   Officer Small's testimony which is what we are saying is

15   credible or not.  He testified today that he saw a bulge and he

16   explained what he meant by that.  That meant that the bag was

17   not flat.  He explained you can't always see that straight on,

18   but Lucha had his arm pinned to his chest, as you might expect

19   there's a gun in the bag, and the way he was angled, turned

20   away, you could see a heavy object in the bottom of that bag.

21   And I think that's important to keep in mind as you're watching

22   those videos.

23        I also think at the end of the day, whether bulge or

24   no bulge, it's also important to note that both officers

25   testified to a heavy bag.  I think in the context of this very

N5UQlucH                    Cotter - Cross

specific 911 call reporting an eye witness who saw a gun in a

bag of a same person matching that description, those two

things coupled together are sufficient to conduct this

initial --

THE COURT:  Your adversary says that the policy behind

disallowing anonymous calls is that anyone could call up and

say, "Wow, I just saw Joe Shmoe walking down the street and

he's got a big gun in his handbag."  So does that mean that

when the police see someone who matches the description of Joe

Shmoe in my hypothetical, and they're carrying a handbag, that

they now have reasonable suspicion to frisk the guy, et cetera,

et cetera.  That seems awfully extreme.

MS. SMYSER:  Your Honor, I think it depends on the 911

call.  And I will say that we have a very different view of the

911 call as our adversaries do.  And the case law that they're

citing here have very different 911 calls than the one at issue

here.  The worry and the policy concern that your Honor is

articulating here is at bottom a concern that people can call

in and make reports with false information, with no

accountability and we're going to conduct stops all over the

place.

And that's not what happened in this instance.  There

are two things that are articulated by courts that we need to

focus on when assessing 911 calls.  That's whether they're

providing a basis of knowledge, and also how anonymous is this

1    call?  Are we going to be able to track down the caller?  Even

2    In *J.L.* specifically Justice Kennedy focuses on there could

3    come a time when 911 systems could allow for recording of

4    numbers, and we could track down those people, and they could

5    be held accountable for the type of tips that they make, and

6    they know this.  But that wasn't in the record in that case.

7         But it is what we have here.  This caller is calling

8    in.  She is providing her number.  She even says, "I know that

9    you have my number," and she is in that area.  This does not

10   have the same concerns that the 911 calls in anonymous cases

11   generally have.

12        THE COURT:  I do think from both your argument and

13   defense counsel that is a central issue.  And so I want to

14   re-read some of the cases, think about it.  The alternative of

15   course would be to turn it over to a chat GBT, but I think that

16   would not be appropriate.  So I will get you at least a bottom

17   line.  There will be a full opinion, but at least a bottom

18   line, since you've got an August trial date, by at least ten

19   days from now, which would be what, the 9th, the 8th, something

20   like that, and then a full opinion hopefully maybe by then as

21   well, but certainly a full opinion to follow well before the

22   trial.

23        Anything else we need to take up today?

24        MS. SMYSER:  Nothing further from the government, your

25   Honor.

N5UQlucH                        Cotter – Cross

1           THE COURT:  Anything from the defense?

2           MS. BAHARANYI:  No, your Honor.  Thank you.

3           THE COURT:  Very good.  Thanks very much.

4           (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25