UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------- x
                                                          :

**UNITED STATES OF AMERICA**          :

- v -                                                :       22 Cr. 644 (JSR)

**LUCHA EL POR LIBERTAD**,          :

             Defendant.    :

-------------------------------------------------- x

## DEFENDANT LUCHA EL POR LIBERTAD'S
## OPPOSITION TO THE GOVERNMENT'S MOTIONS *IN LIMINE*

 

**DAVID E. PATTON, ESQ.**
Federal Defenders of New York, Inc.
Attorney for Defendant
**LUCHA EL POR LIBERTAD**
52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (212) 417-8735

**ZAWADI BAHARANYI, ESQ.**
**AMANDA MAYO, ESQ.**
<u>Of Counsel</u>

TO:    **DAMIAN WILLIAMS, ESQ**.
        United States Attorney
        Southern District of New York
        One. St. Andrew's Plaza
        New York, New York 10007
        Attn:  **ASHLEY NICOLAS, ESQ.**
                   **MADISON REDDICK SMYSER, ESQ.**
                   **SARAH MORTAZAVI, ESQ.**
              Assistant United States Attorneys

## TABLE OF CONTENTS

Page

**INTRODUCTION** ..................................................................................................................1

**ARGUMENT** .........................................................................................................................1

1. Evidence Regarding Lucha's Massachusetts Arrest Is Inadmissible. ....................1

    The Vereen-Purchased Firearm. ...............................................................................2

    Jamil Bey's Massachusetts Arrest. ...........................................................................2

    Body-worn Camera Footage......................................................................................3

    Phone Messages and Searches...................................................................................4

2. Vereen's Gun Purchases Are Inadmissible. .............................................................9

3. The Court should preclude Andrew Petersohn's proposed expert testimony
   or hold a *Daubert* hearing........................................................................................ 11

4. The Defense Does Not Intend to Argue That § 922(a)(3) Is Unconstitutional. .....14

5. The Defense Does Not Intend to Cross-Examine Officer Smalls or
   Massachusetts Officers on the Identified Topics. ............................................... 14

**CONCLUSION** ..................................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) .......................................... 11

*Loussier v. Univ. Music Grp., Inc.*, 2005 WL 5644421 (S.D.N.Y. July 14, 2005) ........................ 1

*Piaskowski v. Bett*, 256 F.3d 687 (7th Cir. 2001) ......................................................................... 6

*Roberts v. Howton*, 13 F. Supp. 3d 1077 (D. Or. 2014) .............................................................. 12

*United States v. Campos*, 763 F. App'x 97 (2d Cir. 2019) ........................................................... 7

*United States v. Cantoni,* No. 18 Cr. 562 (ENV) (E.D.N.Y. March 19, 2019) ............................ 13

*United States v. Chambers*, 800 F. App'x 43 (2d Cir. 2020) .................................................... 2, 7

*United States v. Evans*, 892 F. Supp. 2d 949 (N.D. Ill. 2012) ............................................... 12, 13

*United States v. Fama*, 2012 WL 6094135 (E.D.N.Y. Dec. 7, 2012) ............................................ 9

*United States v. Gelzer*, 50 F.3d 1133 (2d Cir. 1995) ................................................................... 8

*United States v. Gonzalez*, 110 F.3d 936 (2d Cir. 1997) .............................................................. 3

*United States v. Hernandez*, 859 F.3d 817 (9th Cir. 2017) ........................................................... 9

*United States v. Hsu*, 669 F.3d 112 (2d Cir. 2012) ....................................................................... 2

*United States v. James*, 712 F.3d 79 (2d Cir. 2013) ..................................................................... 6

*United States v. Kaplan*, 490 F.3d 110 (2d Cir. 2007) ......................................................... 4, 5, 7

*United States v. Lieberman*, 637 F.2d 95 (2d Cir. 1980) .............................................................. 6

*United States v. Pauling*, 924 F.3d 649 (2d Cir. 2019) ..................................................... 4, 5, 6, 10

*United States v. Pitre*, 960 F.2d 1112 (2d Cir. 1992) ................................................................... 8

*United States v. Ravich*, 421 F.2d 1196 (2d Cir. 1970) ................................................................ 7

*United States v. Ray*, No. 20 Cr. 110 (LJL) (S.D.N.Y. Feb. 22, 2022) ....................................... 13

*United States v. Sepulveda*, 115 F.3d 882 (11th Cir. 1997) ........................................................ 13

*United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010) ............................................................. 10

**Statutes**

18 U.S.C. § 922(a)(3) ................................................................................................... 1, 7

**Other Authorities**

Aaron Blank, *The Limitations and Admissibility of Using Historical Cellular Site Data to Track the Location of a Cellular Phone,* 18 Rich. J.L. & Tech. 3 (Fall 2011) .......................... 12

Victoria Saxe, *Junk Evidence: A Call to Scrutinize Historical Cell Site Location Evidence*, 19 U.N.H. L. Rev. 133 (2020) ................................................................................ 12

**Rules**

Federal Rule of Evidence 402 ................................................................................... 1

Federal Rule of Evidence 403 ................................................................................ 1, 7

Federal Rule of Evidence 404 ............................................................................. 1, 6, 7

Federal Rule of Evidence Rule 801 ........................................................................... 6

**INTRODUCTION**

Defendant Lucha El Por Libertad ("Lucha") hereby responds to the government's motions *in limine* filed on August 14, 2023. For the reasons below, the government's motions should be denied.

**ARGUMENT**

**1. Evidence Regarding Lucha's Massachusetts Arrest Is Inadmissible.**

The government seeks to introduce into evidence at trial the facts and circumstances of Lucha's July 3, 2021 arrest in Wakefield, Massachusetts. As the proponent of this proffered evidence, the government bears the burden of demonstrating why it is relevant. But its motion fails to identify any relevant connection between Lucha's Massachusetts arrest and the instant charges against Lucha in the Southern District of New York. Lucha's Massachusetts arrest is nothing more than irrelevant and unduly prejudicial propensity evidence that is inadmissible under Federal Rules of Evidence 402, 403, and 404(b). The Court should not admit evidence or testimony relating to this arrest at trial.

**A. This Arrest Is Irrelevant as Direct Evidence of the Charged Crimes.**

For the same reasons discussed in the defense's motion *in limine* to exclude evidence of this incident, *see* Def. Mot., ECF No. 56 at 2–11, Lucha's Massachusetts arrest is irrelevant to Counts I and II in the superseding indictment. As the government itself describes, this case is about Lucha's alleged "receipt of firearms in his state of residence (New York) that were obtained outside New York State— specifically, in South Carolina—without the proper licenses" in violation of 18 U.S.C. § 922(a)(3), and his alleged "participation in a conspiracy to receive guns in New York State that were obtained outside of the state" in violation of the same statute. Gov't Mot., ECF No. 57, at 1, 4. In other words, this is not a case about whether Lucha allegedly possessed a firearm, but about how he allegedly received a firearm in his state of residence. Lucha's arrest for gun possession in Massachusetts is not probative of whether he received, or conspired to receive, firearms from South Carolina in New York. *See Loussier v. Univ. Music Grp., Inc.*, 2005 WL 5644421, at *4 (S.D.N.Y. July 14, 2005) (excluding website printouts as irrelevant

1

because "they would not tend to show anything about" the proposition for which they were offered).[1]

A closer look at the materials the government has proffered regarding the Massachusetts arrest only confirms the event's irrelevance to the charged conduct.

<u>The Vereen-Purchased Firearm.</u> The government intends to offer evidence at trial that a firearm purchased by Vereen was seized as part of the Massachusetts arrest. *See* Gov't Mot. at 11. But the government does not proffer any evidence that this Vereen-purchased firearm was ever transported to or received in New York. Indeed, the government's motion largely describes specific Vereen firearm purchases on specific dates and attempts to connect those firearms to four round trips by Vereen from South Carolina to the Bronx in September, October, and November 2020. *Id.* at 2, 8–9. But the Vereen-purchased firearm in Massachusetts was purchased on July 23, 2020, well before these trips supposedly occurred. *Id.* at 3. The firearm's presence in Massachusetts is thus irrelevant to Lucha's alleged "participation in a conspiracy to receive guns in New York State that were obtained outside of the state," *id.* at 4, and it is not "inextricably intertwined" with that actual charged conduct. *United States v. Hsu*, 669 F.3d 112, 118–19 (2d Cir. 2012) (evidence of defendant's uncharged Ponzi scheme activity was relevant in campaign finance fraud trial because there was an established connection between the crimes: defendant "used his Ponzi investors as a source of campaign contributions, and used the connections to politicians to burnish his reputation for respectability so as to recruit and reassure potential investors" in his scheme).

<u>Jamil Bey's Massachusetts Arrest.</u> The government also intends to introduce evidence that Jamil Bey was arrested during the Massachusetts incident alongside Lucha because, it claims, the circumstances

---

[1] Indeed, the substantive count of the indictment only alleges that Lucha received one firearm in New York—a firearm that was recovered by the NYPD on June 23, 2021, two weeks before the Massachusetts arrest even took place. *See United States v. Chambers*, 800 F. App'x 43, 45 (2d Cir. 2020) (district court properly excluded evidence of meeting "which took place two years after the charged conduct" as irrelevant).

2

of the Massachusetts arrest "serve as key evidence" of Lucha's agreement to serve as an "intermediary" between Bey and Vereen to help "facilitate Bey's purchase of out-of-state firearms." Gov't Mot. at 11–12.

Yet all the government points to for this proposition are the trips Vereen allegedly took to New York in the Fall of 2020—conduct that is far apart in time and space from the Massachusetts arrest. *Id.* This arrest is therefore also not "necessary to complete the story" of the alleged conspiracy to transport firearms from South Carolina to New York. *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997) (in gun possession prosecution, affirming admission of evidence of uncharged burglary as relevant to "a possible motive for the defendants' possession of firearms" on that same evening, and "to provide crucial background evidence that gave coherence to the basic sequence of events that occurred on [that same] night").

Body-worn Camera Footage.    The government further claims that the facts of Lucha's Massachusetts arrest contain evidence of Lucha's "own knowledge of the source of the firearms he and others possessed at the time of the arrest." Gov't Mot. at 12. This claim is based solely on a few-seconds-long snippet of video from the Massachusetts arrest in which Lucha purportedly states "everything is clean" to Jamhal Latimer. To the government, this comment means "that the firearms were not stolen" and is "evidence of [Lucha's] involvement in a conspiracy to receive the straw-purchased firearms." *Id.* at 13; *see also* Gov't Mot. Ex. A. But this inference does not follow from what has been proffered.

Even assuming that Lucha is referring to knowledge that the firearms involved in the Massachusetts arrest are not stolen (firearms that, with the exception of a single pistol, remain unconnected to Vereen or South Carolina), that is irrelevant to whether Lucha knows *the source of the firearms* (i.e., what states they were purchased in and transported to). The government inappropriately conflates these two concepts. Accepting the government's theory of relevance here would require the jury "to draw a

3

series of inferences, unsupported by other evidence," connecting Lucha's comment to his actual transport of the firearms. *United States v. Kaplan*, 490 F.3d 110, 122 (2d Cir. 2007) (holding that admission of circumstantial evidence of defendant's knowledge was erroneous). Specifically, the jury would have to infer that (1) by referring to the firearms being clean, Lucha is stating that they are not stolen; (2) Lucha is stating this because he personally knows the provenance of the firearms; (3) the firearms were actually obtained in a state outside of New York; and (4) Lucha transported (or conspired to transport) the firearms into New York. "To conclude so much on the basis of so little amounts to impermissible speculation." *United States v. Pauling*, 924 F.3d 649, 659 (2d Cir. 2019).

<u>Phone Messages and Searches.</u>  Finally, the government claims that phone messages and internet searches found on cell phones recovered from other individuals—not Lucha—arrested during the Massachusetts incident are also "evidence of the conspiracy" to violate § 922(a)(3). Gov't Mot. at 13–14; *see* Gov't Mot. Ex. B–F. Again, the government falls short in demonstrating the relevance of this material. This material also includes inadmissible out-of-court statements not subject to any hearsay exceptions.

The government first mischaracterizes the "group text" it focuses on in attempting to make this material seem relevant to Lucha and specific to the individuals involved in the Massachusetts arrest. This "group text," excerpts of which are attached as Exhibits B through D to the government's motion, includes *forty-eight* participants. The full context of the messages makes clear that, while some of these 48 people were planning to attend the Maine training in July 2021, this was not a closed conversation between only those who attended. Instead, the chat functioned as a message board, where many people across the country were simply looking for advice or encouragement from a group of like-minded individuals. *See* Ex. G (chat participants in Las Vegas exchanging messages regarding apparent child custody issue).

This material is also entirely disconnected from Lucha, the only defendant in this trial. As the

4

government concedes, Lucha "was not participating in the text thread" from which the government quotes liberally. Gov't Mot. at 13. Lucha did not perform the internet searches or write the note identified as being on a phone owned by Jamhal Latimer. *Id.* [2] The government points to messages that were exchanged about Lucha's arrest in June 2021 among the participants in the group chat, but that hardly explains Lucha's "connection" to others in a conspiracy to transport firearms into New York. *Id.* As one participant writes, "Ty for sharing the great news about Luca I don't know the brother but I'm relieved to know my brother is free." Ex. H. Far from explaining any "connection" between Lucha and anyone else, this material shows a discussion *about* Lucha with a large group of people (including those who did not know him), some of whom would go to the Maine training and many of whom would not.

Critically, the government proffers no messages or other materials from these phones discussing or planning to "receive guns in New York State that were obtained outside of the state." Gov't Mot. at 4. To be sure, the group text thread the government heavily relies on does discuss firearms and describe military training involving firearms. But in these materials, there is no discussion of what states to get those firearms from or where to transport them, let alone to obtain them from Vereen or from outside of New York more generally. "[O]nly surmise and guesswork" could connect any of these messages to an agreement to transport firearms into New York without the requisite federal license to do so. *Pauling*, 924 F.3d at 662 (affirming district court's grant of motion to set aside defendant's conviction because jury's verdict could only have been based on "impermissible speculation" considering facts in evidence).

This material is inadmissible for another reason not addressed by the government in its motion; these messages are inadmissible hearsay not subject to any applicable exceptions. More specifically, the

---

[2] And any evidence of Latimer's knowledge from these searches or notes, if it even could be somehow relevant, is particularly irrelevant without evidence of that information being communicated to Lucha (of which there is none). *See Kaplan*, 490 F.3d at 121 ("In the absence of" evidence that others' knowledge "was communicated to Kaplan, or that Kaplan had been exposed to the same sources from which these others derived their knowledge," "the relevance of others' knowledge was at best minimal in proving Kaplan's knowledge.").

messages are not subject to Rule 801(d)(2)(E)'s exception for statements "offered against an opposing party and . . . made by the party's coconspirator during and in furtherance of the conspiracy." This exception can only apply if the Court finds "(a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy." *United States v. James*, 712 F.3d 79, 105 (2d Cir. 2013) (citation omitted). Even if the government could establish a conspiracy between Lucha and any of the authors of the messages found on these Massachusetts-recovered phones (which it cannot), this "idle chatter" about firearms could not be construed as "in furtherance of" a conspiracy to transport firearms without the requisite licenses. *United States v. Lieberman*, 637 F.2d 95, 103 (2d Cir. 1980).

\*   \*   \*

None of the government's proffered evidence of the Massachusetts arrest is relevant direct evidence of the charged conduct here. And this is not a circumstance where the proffered evidence, viewed as a whole, is more than the sum of its parts. The government seeks to introduce details about the Massachusetts arrest and then ask the jury to use these details to make inference after inference unsupported by actual evidence connected to the crimes that are charged. While "a jury may infer facts from other facts that are established by inference, each link in the chain of inferences must be sufficiently strong to avoid a lapse into speculation." *Pauling*, 924 F.3d at 659 (quoting *Piaskowski v. Bett*, 256 F.3d 687, 693 (7th Cir. 2001)). The Massachusetts arrest can only be connected to the charged conduct through impermissible speculation; it is irrelevant as direct evidence and should be excluded at trial.

### B. This Arrest Is Inadmissible Propensity Evidence Under Rule 404(b).

The Massachusetts arrest is also inadmissible "other act" evidence under Rule 404(b) for the reasons discussed above and in the defense's motion *in limine*. *See* Def. Mot. at 10–11. As in its deficient Rule 404(b) notice, the government's motion includes a rote laundry list of possible purposes for

6

admission with only the barest of justifications for any of them. For instance, the government attempts to connect the Massachusetts arrest to an alleged "motive" for Lucha and others to purchase firearms "in order to be prepared for their military-style training." Gov't Mot. at 14. Yet this proffer of relevance collapses with the smallest scrutiny. The training the government refers to took place in July 2021. The government cannot explain why this event would serve as a motive to receive a firearm (let alone to do so from outside of New York) in the fall of 2020. *See Chambers*, 800 F. App'x at 45; *United States v. Campos*, 763 F. App'x 97, 100 (2d Cir. 2019) (district court properly excluded proposed defense witness's testimony as irrelevant because witness's participation in conspiracy post-dated defendant's participation in conspiracy). The Massachusetts arrest is no more admissible as Rule 404(b) evidence than it is as direct evidence.

### C. This Arrest Is Inadmissible Under Rule 403.

Evidence and testimony regarding the Massachusetts arrest is also inadmissible under Rule 403 because of its unduly prejudicial effect and potential to mislead the jury, which substantially outweighs any possible probative value it could have. *See Kaplan*, 490 F.3d at 122 ("The length of the chain of inferences necessary to connect the evidence with the ultimate fact to be proved necessarily lessens the probative value of the evidence, and may therefore render it more susceptible to exclusion as unduly confusing, prejudicial, or time-consuming." (quoting *United States v. Ravich*, 421 F.2d 1196, 1204 n.10 (2d Cir. 1970) (Friendly, J.)).

Evidence of the circumstances of the Massachusetts arrest is highly inflammatory and could lead a jury to conclude that Lucha should be punished for his conduct during that offense even without proof he violated § 922(a)(3). As the government acknowledges, the Second Circuit considers whether conduct is "more sensational or disturbing than the crimes with which [the defendant was] charged" in assessing whether evidence should be excluded under Rule 403. Gov't Mot. at 7 (quoting *United States v. Pitre*,

7

960 F.2d 1112, 1120 (2d Cir. 1992)). The government's own motion illustrates the irrelevant details about the Massachusetts arrest that the government would seek to put before the jury—all more "sensational [and] disturbing" than transport of firearms without the requisite licenses. *See* Gov't Mot. at 3 (individuals arrested in Massachusetts "were armed and dressed in camouflage uniforms and ballistic vests," had "over ten firearms with them, including military-style rifles and handguns; over a thousand rounds of ammunition; over two dozen magazines, including a loaded, large-capacity drum magazine; and other equipment, including night vision goggles"); *id.* at 4 ("What began as a simple traffic stop turned into an hours-long standoff between the [co-conspirators] and Massachusetts law enforcement").[3]

Even the government's cited authority (*see* Gov't Mot. at 14) recognizes that such "gratuitous" detail of uncharged acts should not be admitted under Rule 403. *United States v. Gelzer*, 50 F.3d 1133, 1140 (2d Cir. 1995). In *Gelzer*, the Second Circuit affirmed the admission of circumstantial evidence about an uncharged robbery, offered to connect a defendant to possession of a gun during the charged crime. *Id.* The court cited with approval the fact that the government, in admitting this evidence, "did not set out to elicit gratuitous testimony" about the prior uncharged crime. *Id.* Instead, the evidence elicited was "the minimum required to achieve the legitimate probative ends of this evidence." *Id.*

The government shows no such restraint here. Its motion instead makes clear that the government intends to make this Southern District of New York trial almost entirely about the Massachusetts arrest, by introducing:

- Testimony from multiple Massachusetts officers about the arrest.
- Video of the scene of the arrest.

---

[3]   *See also* Gov't Mot. at 12 (referring to Lucha "wearing camouflage and body armor" "in the course of a discussion about law enforcement's attempt to convince the [co-conspirators] to surrender their firearms"); *id.* at 13 (describing texts with "packing list for Operation Fountainhead, which included firearms, ammunition, and other military equipment," "discuss[ions of] plans to engage in training modeled after the military," and statements about "us[ing] 'blank-firing-adapters for your training event in July' to 'practice firing and maneuvering against each other [and] [p]ractice ambushes, assault fighting positions etc.'").

8

- Photographs of the firearms that were seized as a result of the arrest.
- Photographs of the individuals arrested and what they were wearing.
- Clips of body-worn camera worn by Jamhal Latimer and still images from those clips.
- Phone message conversations (which do not include Lucha), notes, and internet searches recovered from the phones of individuals (other than Lucha) arrested during the Massachusetts incident.

*See* Gov't Mot. at 14. Making this trial about the Massachusetts arrest creates a serious risk that the jury will convict Lucha for conduct not tied to his receipt of a firearm in New York without proper licenses. *See United States v. Hernandez*, 859 F.3d 817, 823 (9th Cir. 2017).

Making this trial about Lucha's Massachusetts arrest also risks turning the case into a "mini-trial" on the merits of the pending Massachusetts charges that Lucha faces as a result of this arrest. *United States v. Fama*, 2012 WL 6094135, at *1 (E.D.N.Y. Dec. 7, 2012) (excluding proffered evidence as both irrelevant and inadmissible under Rule 403 because "[a]llowing [defendant] to inquire about [alleged instances of abuse] could mislead the jury and confuse the actual issues . . . and having a 'mini-trial' about the purported abuses would result in undue delay and would be a waste of time.").

Introducing such irrelevant evidence in this case would waste the jury and the Court's time. The government's motion should be denied, and evidence and testimony concerning the Massachusetts arrest should be excluded.

## 2. Vereen's Gun Purchases Are Inadmissible.

By superseding with a Conspiracy charge just over a month before trial, the government now wishes to introduce evidence at trial of 24 additional firearms purchased by Keith Vereen. Only, as detailed in the defense's motions *in limine* (at 11–13), these firearms have no connection to Lucha. Lucha did not provide money for these firearms. He did not engage in any discussion about these other firearms. He never possessed these other firearms.

The government's proffered evidence around four specific dates in 2020 only highlights the speculative nature of this evidence and why it should not be considered by the jury. The government

9

details four trips that Vereen took between South Carolina and the Bronx in 2020. Vereen purchased firearms in South Carolina prior to each trip for a total of 17 firearms purchased before his trips to New York. The government proffers no text messages, phone calls, or alleged statements by Lucha connecting him to or even revealing his knowledge of Vereen's 17 firearms beyond the single one he possessed on June 23, 2021. And the government makes no effort to explain why the Court should consider an additional 8 firearms purchased by Vereen outside of the four specific dates.

The government would again require the jury to draw a series of impermissible inferences to render the proposed evidence relevant to the charged conduct. The jury would have to infer from physical proximity and phone calls/messages with no content that Lucha and Vereen had as specific agreement to receive firearms in New York and that Lucha was aware of the nature and scope of this agreement beyond the single firearm that Lucha possessed. *See United States v. Torres*, 604 F.3d 58, 65, 70 (2d Cir. 2010). The inferential leaps required based on the produced and proffered evidence are too great. *See Pauling*, 924 F.3d at 657.

The speculative link between Lucha and Vereen's 24 other firearms nullifies the government's assertion that these firearms are "inextricably intertwined" with the conspiracy involving Lucha, or are part of the "same transaction or series of transactions," or are necessary to "complete the story" of this conspiracy. Much more evidence than what the government can provide would be necessary for these assertions to ring true. And certainly, the government has identified dozens of witnesses and hundreds of documents that it can draw on to tell the story of a single conspiracy to unlawfully receive a firearm obtained out of state into New York.

Finally, the danger in admitting two dozen firearms purchased by Vereen with only a speculative connection to Lucha is that the jury will be blinded by Vereen's repeated and unrelated bad conduct and convict Lucha for the conduct of someone he knows instead of his conduct as proven by the Government

10

through probative facts. Because the risk of undue prejudice far outweighs any potential probative value of the proposed evidence of 24 guns, this evidence must be precluded.

3. **The Court should preclude Andrew Petersohn's proposed expert testimony or hold a *Daubert* hearing.**

On July 28, the government noticed its intent to call Andrew Petersohn as an expert in cell site location data, to opine on the "likely approximate location" of Lucha's phone and the phone of other individuals the government claims are part of the conspiracy charged in Count I. On August 4, the defense requested additional information concerning Mr. Petersohn's proposed testimony, specifically the "draft maps and other reports" that would support his testimony. On August 16, after the initial *motions in limine* deadline had passed, the Government responded to this request with a proposed PowerPoint and maps further clarifying Mr. Petersohn's anticipated testimony—and the serious problems with it. Mr. Petersohn's proposed testimony is necessarily based on unvalidated information and methodologies and runs afoul of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and his proposed visual aids will only serve to mislead the jury. This Court, as the gatekeeper for scientific evidence, must exclude this testimony or risk the jury basing their decision on conjecture dressed up as science.

A. **Historical Cell Site Location Information is Not Reliable**

A trial judge must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. "Additionally, in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error … and the existence and maintenance of standards controlling the technique's operation." *Id.* at 594 (citations omitted). Any *Daubert* assessment "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595.

With these principles in mind, the government seeks to elicit testimony from Mr. Petersohn on the

11

"likely approximate location" of various cellphones at various points in time based on historical cell site location information (HCSLI) showing which cell sites or towers were used at a particular time. This information is contained in call detail reports (CDRs) gathered by cellular companies. While Mr. Petersohn's background in engineering would allow him to appropriately opine on some subject matters, he should not be permitted to opine on the location of anyone based on the information in CDRs because he cannot reasonably rely on the information in these reports.

Cellular companies never gathered the information in CDRs with the expectation that this information would later be used for precise location information or for law enforcement purposes. Perhaps for these reasons "[n]either cellular carriers nor the Federal Communications Commission (FCC), … has documented error rates or validation methodologies for CDR or CSLI records." *See* Victoria Saxe, *Junk Evidence: A Call to Scrutinize Historical Cell Site Location Evidence*, 19 U.N.H. L. Rev. 133, at *142 (2020). For example, CDRs are not standardized or otherwise monitored for accuracy. Any change in a cell tower to which a cellphone connects during any given call is not necessarily included in the CDR. Maps using CDR are based on the assumption that cell phones register to the nearest tower, which is just not true. Rather, "multiple factors can affect the signal strength of a tower" such as network traffic, the weather, or topography. *See United States v. Evans*, 892 F. Supp. 2d 949, 952 (N.D. Ill. 2012); *See also Roberts v. Howton*, 13 F. Supp. 3d 1077 (D. Or. 2014). *See* Aaron Blank, *The Limitations and Admissibility of Using Historical Cellular Site Data to Track the Location of a Cellular Phone,* 18 Rich. J.L. & Tech. 3, at *7 (Fall 2011) (listing factors like tower location, geography, and terrain that can affect signal strength).

Simply put, there is no way to reliably use a cell phone's interaction with a specific cell tower to accurately determine or approximate the cell phone user's location. Despite these limitations, juries may be inclined to view HCSLI in a similar category as Global Positioning System (GPS) data, which is and

12

was designed to be a reliable indicator of location. Given the unreliability of the data on which Mr. Petersohn's testimony would be based, this Court should preclude his testimony. *See Evans*, 892 F. Supp. 2d at 955-57 (precluding expert from testifying about granulization theory because the method was unreliable and based on the inaccurate assumption that cellphones connect to the towers closes to them). *See also United States v. Sepulveda*, 115 F.3d 882, 891 (11th Cir. 1997) (rejecting expert testimony that "bouncing occurred primarily during rush hours totaling approximately four hours per day. The evidence provided no basis from which to estimate the proportion of the calls that occurred within those times and no basis from which to determine which sector was busier and thus more likely to divert calls to the other").

### B.  B. Mr. Petersohn's Proposed Maps Are Misleading and Confusing and Must Be Excluded

If the Court permits any testimony by Mr. Petersohn, he should not be permitted to use the maps imbedded in his proposed PowerPoint presentation, attached as Ex. I.[4] The maps have little verbal explanation of what is depicted, provide no measurements, and contain shading and arrows that would confuse and mislead the jury. For example, the map on page 16 purports to show "cell site locations" utilized on different days by Vereen and Lucha. But the map itself has shaded areas covering multiple blocks that are much larger than a single cell site location, shaded areas of various sizes without explanation, overlapping shaded areas for different devices, and arrows pointing to particular areas within each shaded area representing particular devices at particular times. The shading and arrows are misleading in that they suggest the ability of HSCLI to locate particular devices in a certain location and within a certain distance and area of the tower—a type of precision that is beyond the capabilities of HSCLI. For this reason, misleading shading in the presentation of HSCLI has been rejected by courts in this district. *United States v. Cantoni,* No. 18 Cr. 562 (ENV) (E.D.N.Y. March 19, 2019), Dkt. 47 at 2

---

[4] Maps are located on pages 10, 12, 16, 17, 21, 24, and 27.

13

(The government was directed to remove shading from its cell site trial exhibits to "avoid any confusion that [shaded sectors] might also suggest distance as well as direction"); *See* Tr., *United States v. Ray*, No. 20 Cr. 110 (LJL) (S.D.N.Y. Feb. 22, 2022); Dkt 404 at 15-18 (Court questioned the government on its misleading use of circles and directed to do more work to clarify their maps).

### 4. The Defense Does Not Intend to Argue That § 922(a)(3) Is Unconstitutional.[5]

The government seeks to preclude the defense from "calling into question the constitutionality of" § 922(a)(3). Gov't Mot. at 20; *see also id.* at 1 (government seeking to preclude "[a]rgument that the defendant's receipt of firearms was not, or should not have been, unlawful under the Second Amendment."). The defense does not intend to argue to the jury that § 922(a)(3) is unconstitutional or that actions that violate § 922(a)(3) should be legal.[6] The defense also certainly does not intend to encourage jury nullification. *See* Gov't Mot. at 21. The government's motion *in limine* should therefore be denied as moot.

### 5. The Defense Does Not Intend to Cross-Examine Officer Smalls or Massachusetts Officers on the Identified Topics.

Finally, the government "seeks to preclude cross-examination regarding (1) Officer Small's prior testimony in a suppression hearing" in an earlier case and "(2) the defendant's lawsuit accusing officers who participated in the Massachusetts Arrest of color-of-law violations." Gov't Mot. at 15. The defense does not intend to cross-examine Officer Smalls or any Massachusetts officers permitted to testify on these identified topics. This motion *in limine* from the government should therefore also be denied as moot.

---

[5] While the defense will not argue that 922(a)(3) is unconstitutional under the Second Amendment, Lucha's good faith belief regarding the Second Amendment is nonetheless relevant to whether the government can prove beyond a reasonable doubt that he "willfully" violated the statute.

[6] The defense rejects the government's characterization of these arguments as "meritless," however. Gov't Mot. at 20. Further, as described in the defense's motion *in limine*, *see* Def. Mot. at 14, if the Court permits the government to present evidence of New York's licensing scheme, the Court should allow the defense to discuss the constitutional challenges to New York's licensing scheme that resulted in the Supreme Court invalidating that licensing scheme in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

14

**CONCLUSION**

For the above-stated reasons, the government's motions *in limine* should be denied.

Dated: August 21, 2023        Respectfully submitted,
       New York, New York

                                            /s/

                                      Zawadi Baharanyi, Esq.
                                      Amanda Mayo, Esq.
                                      Federal Defenders of New York
                                      52 Duane Street, 10th Floor
                                      New York, NY 10038
                                      (917) 612-2753