N8UAAPER1                         Jury Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                            S1 22 CR 644 (JSR)

5    STEVEN PEREZ, A/K/A "LUCHA,",

6              Defendant.

7    ------------------------------x

8                                        New York, N.Y.
                                         August 30, 2023
9                                        10:00 a.m.

10

11   Before:

12              HON. JED S. RAKOFF,

13                                       District Judge

14                         APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     ASHLEY NICHOLAS
17   MADISON SMYSER
     SARAH MORTAZAVI
18        Assistant United States Attorneys

19   FEDERAL DEFENDERS OF NEW YORK
          Attorneys for Defendant Perez
20   ZAWADI BAHARANYI
     AMANDA MAYO
21
22   ALSO PRESENT:  ANANYA SANKAR, Paralegal, U.S. Attorney's Office
          ARJUN AHUJA, Paralegal, U.S. Attorney's Office
          SARAH KWON, Paralegal, Federal Defenders of New York
23

24

25

1          (Trial resumed; Jury not present)

2          THE COURT:  Please be seated.

3          Let me ask defense counsel, we only need one defense

4    counsel, what's the story?

5          MS. MAYO:  Your Honor, we separated so we could bring

6    our materials in.  I think they might be delayed in security

7    while the defendant answered his phone.  We can check to see

8    where they are.

9          THE COURT:  Okay.  I'm a little disappointed because

10   we're starting at 10:00 and I asked everyone to be here at

11   9:45.

12         MS. MAYO:  Yes.  I'm sorry, your Honor.  I believe

13   they the defendant is just going through security now.

14         THE COURT:  Let's get the witness on the stand and

15   bring the jury in now that defendant and counsel are now here.

16         (Jury and witness present)

17         THE COURT:  Please be seated.

18         Good morning, ladies and gentlemen.  Thank you for

19   your promptness and I also want to thank several of the ladies

20   of jury for wearing such wonderful outfits today.  Very

21   colorful.  Very useful.  The men...

22         Okay.  We're ready to proceed.

23   BY MS. SMYSER:

24   Q.  Good morning, Sergeant Jones.

25   A.  Good morning.

N8UAAPER1                    Jury Trial

1   Q.  Yesterday we left off, we had been discussing Government

2   Exhibit 531, the Glock that's in front of you.

3           Do you remember that?

4   A.  Yes, ma'am.

5   Q.  Could you now please take a look in the binder in front of

6   you for what's been marked for identification as Government

7   Exhibits 532A and 533A, which should be in the back.

8           Do you recognize those?

9   A.  Yes, ma'am.

10  Q.  What are they?

11  A.  The live ammunition and the magazine feeding device.

12  Q.  For the 22 caliber?

13  A.  Yes, ma'am.

14  Q.  Are they a fair and accurate representation of the bullets

15  and magazine?

16  A.  Yes, they are.

17          MS. SMYSER:  Your Honor, the government offers

18  Government Exhibit 532A and 533A.

19          THE COURT:  Any objection other than the ones that are

20  preserved from yesterday?

21          MS. MAYO:  None other than those, your Honor.

22          THE COURT:  Very good.  The exhibits are received.

23          (Government's Exhibits 532A and 533A received in

24  evidence)

25          MS. SMYSER:  May we publish?

1          THE COURT:  Please.

2          MS. SMYSER:  Ms. Sankar, can you please publish

3     Government Exhibits 532A around 533A side by side.

4          (Pause)

5     Q.  Sergeant Jones, what's on the left side of the screen?

6     A.  The live ammunition that I did handle myself.

7     Q.  What about on the right side?

8     A.  The magazine or feeding device that I handled myself.

9     Q.  Just remind us, could these bullets and this magazine be

10    used with Government Exhibit 531, the Glock?

11    A.  Yes.

12    Q.  Are you familiar with blank ammunition?

13    A.  Yes.

14    Q.  What is that?

15    A.  Blank ammunition is a form of ammunition just excluding the

16    projectile or bullet on the front end in place of the bullet or

17    projectile on the front end.  That area would be crimped and

18    closed.

19    Q.  Are these real bullets or blank bullets that are on the

20    screen?

21    A.  These are live bullets.

22    Q.  Sergeant Jones, could you now please look to your right for

23    what's been marked for identification Government Exhibit 532

24    and 533.

25          (Pause)

N8UAAPER1                          Jury Trial

1    Q.  Do you recognize those?

2    A.  I do.

3    Q.  What are they?

4    A.  532 has the live ammunition with my initials and my dated

5    time of handling this evidence.  533 is the magazine feeding

6    device that I did also handle, initial and date the closing of

7    it with tamper resistant tape.

8            MS. SMYSER:  Your Honor, the government offers

9    Government Exhibit 532 and 533.

10           THE COURT:  With the same qualification, they are

11   received.

12           (Government's Exhibits 532 and 533 received in

13   evidence)

14   Q.  Sergeant Jones, could you please open up 532.

15           (Pause)

16   Q.  Could you please hold one of those up for the jury?

17           (Pause)

18   Q.  Could you explain what that is?

19   A.  This is one piece of live unspent ammunition that has not

20   been fired by any type of weapon.

21   Q.  Are there more?

22   A.  Yes, they are.

23   Q.  How many?

24   A.  Nine.

25   Q.  Is that how many .22 caliber bullets were originally found?

N8UAAPER1                    Jury Trial

1    A.  No.

2    Q.  How many were there?

3    A.  One more, equaling ten.

4    Q.  How do you know that?

5    A.  The one I used as a testing device.

6    Q.  What was the result of your testing?

7    A.  That it was and functioned and manufactured as ammunition.

8    Q.  Does that mean you fired the gun using that test bullet

9    that had been seized?

10   A.  Yes.

11   Q.  Could you please set down Government Exhibit 532 and open

12   up Government Exhibit 533.

13          (Pause)

14   Q.  Hold that up for the jury and explain what it is please.

15   A.  This is a magazine or feeding device.  When I say "feeding

16   device", it's a device with the ammunition that I just showed

17   you would be pushed down and held in place by this feeding

18   device.

19          MS. SMYSER:  You can take this down off the screen.

20   Q.  Sergeant Jones, were other firearms, ammunition and

21   magazines seized on July 3rd?

22   A.  Yes.

23          MS. SMYSER:  Ms. Sankar, could you please display

24   Government Exhibits 311 through 314 together on the screen.

25          (Pause)

N8UAAPER1                    Jury Trial

1    Q.  Sergeant Jones, in brief what is pictured here?

2    A.  What's pictured here are three long guns rifles and one

3    pistol.

4    Q.  Where did these come from, generally?

5    A.  From the vehicles that we did have a search warrant for and

6    did search same for in finding those items.

7    Q.  From that van and that Honda Ridgeline that we talked about

8    yesterday.

9    A.  Yes.

10            MS. SMYSER:  Okay.  Ms. Sankar, could you please

11   display Government Exhibits 315 and 318 side by side.

12            (Pause)

13   Q.  Sergeant Jones, where did these items come from, generally?

14   A.  From the vehicles that we did have a search warrant and

15   these items were produced from the vehicles.

16   Q.  How many firearms are pictured here?

17   A.  Two.

18   Q.  Approximately, how many magazines are there?

19   A.  Approximately, 19.

20   Q.  Is there ammunition here?

21   A.  Yes.

22   Q.  Is it blank ammunition or real ammunition?

23   A.  Real ammunition.

24   Q.  Approximately, how much real ammunition?

25   A.  In excess of over a thousand live cartridges, live rounds.

N8UAAPER1                        Gutierrez – Direct

1              MS. SMYSER:  Your Honor, may I have just a moment?

2              THE COURT:  Yes.

3              (Pause)

4              MS. SMYSER:  Nothing further, your Honor.

5              THE COURT:  Cross-examination?

6              MS. MAYO:  No questions, your Honor.

7              THE COURT:  Thank you very much.  You may step down.

8              Please call your next witness.

9              MS. NICHOLAS:  Your Honor, the government calls

10   Paralegal Specialist Julia Gutierrez.

11    JULIA GUTIERREZ,

12         called as a witness by the Government,

13         having been duly sworn, testified as follows:

14              COURTROOM DEPUTY:  State your name and spell it

15   showily for the record.

16              THE WITNESS:  My name is Julia Guiterrez, J-u-l-i-a,

17   G-u-t-i-e-r-r-e-z.

18              THE COURT:  Counsel.

19              MS. NICHOLAS:  Thank you, your Honor.

20   DIRECT EXAMINATION

21   BY MS. NICHOLAS:

22   Q.  Good morning.

23   A.  Good morning.

24   Q.  Please introduce yourself to the jury.

25   A.  My name is Julia Gutierrez.  I work with the U.S.

1    Attorney's Office.  I am a paralegal.

2    Q.  Ms. GutierreZ, could you just get a bit closer to the

3    microphone and repeat your name and job for the jury.

4    A.  Sorry.  My name is Julia Gutierrez.  I am a paralegal at

5    the U.S. Attorney's Office.

6    Q.  When you said you work at the U.S. Attorney's Office, how

7    long have you worked there?

8    A.  Over a year.

9    Q.  What's your role there?

10   A.  I am a paralegal in the Criminal Division.

11   Q.  Can you explain what that means?

12   A.  I draft legal documents for the attorneys.  We handle

13   evidence in a process called discovery.  We assist with trials.

14   Also sometimes ask to give sworn testimony like I'm doing

15   today.

16   Q.  Now, Ms. GutierreZ, were you asked to undertake certain

17   tasks in preparing to testify today?

18   A.  Yes.

19   Q.  Broadly speaking, can you describe what some of those tasks

20   were?

21   A.  I was asked to create a chart based on some documents and

22   read some other documents.

23   Q.  You were asked to review documents and create a document.

24   A.  Yes.

25   Q.  Were you in any way personally involved in the

N8UAAPER1                    Gutierrez - Direct

1    investigation of Steven Perez, Lucha El?

2    A.  No.

3    Q.  Now, in preparing to testify today did you review all the

4    records in this case?

5    A.  No.

6    Q.  Did you review just a portion?

7    A.  Yes.

8    Q.  And apart from those materials to what extent are you

9    familiar with this case?

10   A.  Not very familiar at all.

11   Q.  When we're talking about the materials that you reviewed

12   for today, did you make decisions about what to review?

13   A.  No.

14   Q.  Who made those decision?

15   A.  The prosecutors on the case.

16   Q.  Okay.  Now, I want to begin your testimony by talking about

17   that chart you mentioned a second ago.

18           I'm going to show you a binder that contains what's in

19   evidence as Government Exhibits 411 through 423 and 426.  If

20   you could just flip through the tabs in there marked as 411 to

21   423 and then skip to 426.

22           (Pause)

23           MS. NICHOLAS:  When you are done look up.

24   Q.  Ms. Gutierrez, have you seen those documents before?

25   A.  Yes.

1    Q.   When did you see those?

2    A.   About a week ago -- reviewing them since about yesterday.

3    Q.   Now, have you consulted those documents in creating a

4    summary chart for this case?

5    A.   Yes.

6            MS. NICHOLAS:   Can you please show at witness only

7    what has been marked as Government Exhibit 902.

8            (Pause)

9            MS. NICHOLAS:   Your Honor, I think we're having some

10   technical difficulties.   Can you just indulge us for one

11   moment?

12           THE COURT:   All right.

13           (Pause)

14           MS. NICHOLAS:   Ms. Gutierrez, we're going to come back

15   to that in a moment.

16           With the Court's permission I would like to read part

17   of the Government Exhibit stipulations that was admitted

18   yesterday as Government Exhibit 1003.

19           THE COURT:   Okay.

20           MS. NICHOLAS:   Per the stipulation, between the

21   parties as memorialized in Government Exhibit 1003 on or about

22   June 23, 2021, law enforcement officers in the Bronx, New York

23   arrested Steven Perez, a/k/a "Lucha", the defendant, and

24   recovered from his person Government Exhibit 523, a black LG

25   cellphone used by the defendant.

N8UAAPER1                        Gutierrez – Direct

1           Government Exhibits 1101–1110 including all subparts

2      are true and accurate copies of data extracted from the

3      defendant's phone.

4           At this time, your Honor, the government offers

5      Government Exhibit 523, as well as Government Exhibits 1101, is

6      1103A, 1103B, 1104, 1105, 1106, 1107, 1108, 1109 and 1110.

7           (Pause)

8           MS. BAHARANYI:  Your Honor, we do have an objection.

9      We'd like to approach briefly.

10           THE COURT:  All right.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (side bar)

2          MS. BAHARANYI:  Regarding the first one that you

3     mentioned was just the phone itself.

4          MS. NICHOLAS:  23.

5          MS. BAHARANYI:  We don't have an objection to that.

6     The text messages though I think it would help to go in order

7     with what our objections are.  The first one that you are

8     seeking to admit is 1101.

9          MS. NICHOLAS:  The user device information.

10         MS. BAHARANYI:  That one is fine.  1102.

11         MS. NICHOLAS:  We're not seeking to admit that.  The

12    next one was 1103A.

13         MS. BAHARANYI:  So for that particular exhibit, your

14    Honor, I am going to show you what is -- one moment.

15         (Pause)

16         MS. BAHARANYI:  That particular exhibit seems to be

17    discussing other, during dates other than the June 23rd date

18    when Mr. Lucha was arrested seems to be discussing law

19    enforcement or cop activities without any sort of context.  We

20    think that that being presented to the jury, the full range of

21    those texts there are certainly more prejudice than relevant in

22    this case.  He wasn't arrested on that date which I believe is

23    the June 17th date.  That's correct.

24         THE COURT:  All right.  What's the government say?

25         MS. NICHOLAS:  Your Honor, this is a conspiracy that

1    spanned between 2020 and 2021 inclusive of this time period.

2    The defend has made clear that the cornerstone of the defense

3    here is the willfulness -- all of this is indicative of the

4    awareness of the police, awareness of his unlawful conduct,

5    awareness of where law enforcement is at all times.  I'll note

6    the person who he is talking to in those texts, we've been

7    referring to Alban El Curragh, Aaron Jiminez, one of the other

8    individuals arrested with him in Massachusetts with the

9    firearms.

10            THE COURT:  This is from that gentleman to whom?

11            MS. NICHOLAS:  To Lucha, the defendant.

12            MS. BAHARANYI:  The particular date, your Honor, has

13    no relevance to this conspiracy.  They have not raised that

14    this was a date where they believed for example he is carrying

15    a firearm.  They have not raised where this is a date where

16    they believed he was transferring or receiving a firearm.

17    There is certainly no context.  And I think to put this before

18    the jury, just conversation that people may have in the Bronx

19    about law enforcement activity in their neighborhoods which can

20    sometimes be dangerous, this leaves an impression that

21    certainly is unduly prejudicial to Lucha without context and

22    they don't have context.

23            MS. NICHOLAS:  It's June 17th, your Honor.  He is

24    arrested with a gun in the Bronx on June 23rd.  Then he is

25    arrested in Massachusetts on July 3rd.

N8UAAPER1                           Gutierrez – Direct

1           MS. BAHARANYI:  We don't object to them admitting text

2    messages about police activities on those dates, your Honor.

3           THE COURT:  The objection is sustained.

4           MS. BAHARANYI:  So the next one is you are envisioning

5    to enter --

6           MS. NICHOLAS:  1103B, everything from this series,

7    your Honor, is a conversation with the defendant from his

8    phone.

9           MS. BAHARANYI:  We don't have an objection to that.

10          MS. NICHOLAS:  1104.

11          MS. BAHARANYI:  No objection to that.

12          MS. NICHOLAS:  Next is 1105.

13          MS. BAHARANYI:  We don't have an objection to that

14    one.

15          MS. NICHOLAS:  1106.

16          MS. BAHARANYI:  No.

17          MS. NICHOLAS:  1107.

18          MS. BAHARANYI:  Nor that one.  It would be helpful to

19    show.

20          (Pause)

21          MS. BAHARANYI:  Your Honor, that one also raised in

22    the June 17 text without any context.  If you can see the first

23    part of the conversation seems to be talking about.

24          THE COURT:  Sustained.  The objection is sustained.

25          Are we going to be here much longer?

1          MS. NICHOLAS:  There's three other series of text

2    messages.  I expect that this is going to happen repeatedly.

3          THE COURT:  Well, so I think the way to do this is

4    let's get this series done.  Then if we have to have further

5    side bars we will but I don't want to keep the jury just

6    sitting there.

7          MS. NICHOLAS:  1108.

8          MS. BAHARANYI:  That's the same issue, your Honor,

9    about the June 17th date, the blue and whites.

10         MS. NICHOLAS:  He is now talking to multiple people

11   about the presence of police days before he gets arrested with

12   a gun he got illegally.

13         THE COURT:  The problem is there's no context for

14   these earlier.  If this had been a date after some of the

15   events that you've referred to, I could see the relevance.

16         MS. NICHOLAS:  It's a date after trips from -- he had

17   already had to gun.  Vereen has already been traveling to the

18   Bronx repeatedly.

19         MS. BAHARANYI:  Those are trips that would have ended

20   in November 2020.

21         THE COURT:  I think it's very hard for the jury to see

22   the relevance.  The objection is sustained.

23         MS. NICHOLAS:  1109.

24         MS. BAHARANYI:  No objection there.

25         MS. NICHOLAS:  1110.

N8UAAPER1                         Gutierrez – Direct

1          MS. BAHARANYI:  No objection.

2          MS. NICHOLAS:  Just to be clear, 1107 and then 1108.

3          THE COURT:  Okay.

4          (Continued on next page)

1           (In Open Court)

2           MS. NICHOLAS:  Ms. Sankar, if you could please publish

3     what's now in evidence as Government Exhibit 1101.

4           (Pause)

5     Q.  Ms. Gutierrez, before we continue, can you just describe

6     for the jury what's on the screen at a very high level.  Are

7     you familiar with these types of reports?

8     A.  Yes.

9     Q.  What type of report is this?

10    A.  It's a Cellebrite report.

11    Q.  What is Cellebrite?

12    A.  It's a platform we use in the office when we receive or we

13    seize a phone from somebody.  When we get the data out of the

14    phone we put it into Cellbrite because Cellbrite mikes it

15    easier for us to manage and look through the data.

16          MS. NICHOLAS:  So this information here in Government

17    Exhibit 1101 which per the stipulation is from the defendant's

18    phone.

19          Ms. Sankar, if you could please zoom in on the section

20    that says MSISDN at the top.

21    Q.  Ms. Gutierrez, if you could just read that phone number.

22    A.  It's it 16467241423.

23          MS. NICHOLAS:  Ms. Sankar, if you could zoom back out

24    and zoom in on where it says last known use.

25          (Pause)

N8UAAPER1                        Gutierrez - Direct

1    Q.  Just above where it says MSISDN for first time could you

2    please read what that says.

3    A.  May 21, 2021.

4    Q.  And the next?

5    A.  June 20, 2021.

6    Q.  And the last one?

7    A.  June 16, 2021.

8         MS. NICHOLAS:  Okay.  Ms. Sankar, if you could zoom

9    back out.

10   Q.  Now the bottom half of this screen could you read what

11   that's labeled in that second section?

12   A.  User accounts.

13   Q.  Okay.  What is listed in that section?

14   A.  Certain applications that were used.

15        MS. NICHOLAS:  Ms. Sankar, could you flip to row 186

16   and zoom-in on that row.

17        (Pause)

18   Q.  Ms. Gutierrez, what application is listed in row 186?

19   A.  Telegram.

20   Q.  Are you familiar with telegram?

21   A.  Yes.

22   Q.  How are you familiar with telegram?

23   A.  From working in the office.

24   Q.  In broad terms, what is telegrams?

25   A.  It is an encrypted messaging app.

N8UAAPER1                          Gutierrez - Direct

1            MS. NICHOLAS:  If you could zoom out and a zoom back

2     in on row 1906.

3            (Pause)

4     Q.  What application is listed in row 190?

5     A.  What's App.

6            MS. NICHOLAS:  You can zoom back out can you please

7     publish what's now in evidence as Government Exhibit 1103B.

8            (Pause)

9     Q.  Ms. Gutierrez, what's depicted on the screen?

10    A.  A Cellebrite report.

11    Q.  What does the Cellebrite report show in general terms?

12    A.  Messages.

13    Q.  Now at the top who is the user listed as one of the

14    participants in the conversation?

15    A.  The contact name is Alban El Curragh.

16            MS. NICHOLAS:  If you could zoom-in on that actually.

17            (Pause)

18    Q.  Ms. Gutierrez, could you read that phone number into the

19    record, please?

20    A.  3475028867.

21            MS. NICHOLAS:  Okay.  Now, in this conversation

22    Ms. Sankar could you actually go to the next page for us page

23    two.  There are two different color bubbles.

24    Q.  Can you explain to the jury who's speaking in each of the

25    bubbles?

1   A.  So it's like an iPhone.  The owner of the phone is on the

2   right and the other party is on the left.

3   Q.  So, green is the owner of the phone?

4   A.  Green is the owner of the phone and on the left in blue is

5   Alban El Curragh.

6           MS. NICHOLAS:  Per the stipulation, the owner of phone

7   is the defendant going back at first page of 1103, Ms. Sankar.

8   Q.  Ms. Gutierrez, before you begin reading can you please read

9   the date stamp that's listed in that first message?

10  A.  June 21, 2021.

11  Q.  I am going to ask you to read what's in the blue bubbles

12  and I will read what's in the green bubbles.

13  "A.  Do you need a day pack/military bag?  I might order one.

14  "Q.  I got a bag already.  Same backpack.  Got more.

15  "A.  I need that then.  So I'll order mine.

16          MS. NICHOLAS:  Ms. Sankar, you can pull this down.

17          If you could please publish what's in evidence as

18  1104.

19          (Pause)

20  Q.  Okay.  Ms. Gutierrez, can you describe what's on the

21  screen?

22  A.  It's a picture of a phone with text messages.

23  Q.  Are these messages being sent in any particular

24  application?

25  A.  Yes, Signal.

1   Q.  How can you tell that?

2   A.  At the bottom and at the top it says "signal".

3   Q.  Are you familiar with, signal?

4   A.  I am.

5   Q.  What is Signal?

6   A.  It is an encrypted messaging app.

7   Q.  Looking at what's on the screen in Government Exhibit 1104,

8   similar to what you explained with the prior report can you

9   just explain what the messages on the screen mean in terms of

10  who is sending them?

11  A.  So the owner of the phone would be on the right and then

12  the other person, the other party is on the left in the purple.

13  Q.  Now, the other party in 1104, can you read that other

14  party's name?

15  A.  It's Jamil R. Bey.

16  Q.  Can you read the number associated with that name?

17  A.  6469738605.

18  Q.  Can you just read the date and time of the message on that

19  particular message?

20  A.  June 19, 2021 at 1:09 p.m.

21       MS. NICHOLAS:  Can you please publish what's in

22  evidence as Government Exhibit 1105.

23  Q.  Ms. Gutierrez, again explain what we're seeing on the

24  screen here?

25  A.  It's another picture of the phone with text messages pulled

1   up.

2   Q.  What application are these messages in?

3   A.  Signal.

4   Q.  Now here there are two individuals, it appears, discussing,

5   can you describe how you know which individual is speaking?

6   A.  On their right is the owner of the phone in the gray text

7   message or the gray signal messages and on the left is the

8   other party which according to the photo is someone that goes

9   by "Divine Bey Justice" or that's the contact name.

10  Q.  The other party, what color are their messages in?

11  A.  Blue.

12  Q.  The gray message here is the owner of the phone, as per the

13  stipulation, is the defendant and the blue messages are the

14  other contact?

15  A.  Yes.

16  Q.  I am going to direct your attention to the bottom of this

17  photograph.  Can you read what begins with "you"?

18  "A.  You should come to the three day train.

19  Q.  Do you notice anything about that particular message?

20          MS. NICHOLAS:  Ms. Sankar, I'm going to ask you to

21  pull the highlight off of that.

22  A.  Well, "should" is spelled incorrectly, "train" it's like

23  cut off.  I don't know if's supposed to be "train" or

24  "training".  It says "cone" instead of "come" actually.

25  Q.  Is that in the message.

1   A.  It is not.

2   Q.  How do you know that?

3   A.  Because it's still in the little text bar.

4          MS. NICHOLAS:  Ms. Sankar, pull that down and please

5   publish what's in evidence as Government Exhibit 1106.

6          (Pause)

7   Q.  Okay.  So on this one I don't want to read any of the

8   messages.  I just want to focus on who is participating in the

9   conversation here.  Can you please read the name of the contact

10  in the Signal message?

11  A.  Alban El Curragh.

12  Q.  What's number associated with that use?

13  A.  3475028867.

14         MS. NICHOLAS:  You can it pull that down.  We are

15  going to move to 1109.  And publish that please.

16         (Pause)

17  Q.  Can you explain what we're looking at on the screen here?

18  A.  That's a picture of a phone.

19  Q.  Is there any particular application open?

20  A.  Signal.

21  Q.  What is depicted inside the Signal app on this particular

22  screen shot?

23  A.  It shows that there's missed calls between the parties.

24  Also, that the owner of the phone called this person a couple

25  times.

1    Q.  Can you read the name of the contact?

2    A.  Will El Musa.

3    Q.  And the phone number?

4    A.  9176895444.

5         MS. NICHOLAS:  We can pull that down.  If we can

6    please publish what's in evidence as Government Exhibit 1110.

7         (Pause)

8    Q.  We're shifting gears a bit here.

9         What's depicted on the screen in Government Exhibit

10   1110?

11   A.  Cellebrite report.

12   Q.  If you could just remind us what is the Cellebrite report?

13   A.  It's a report that we get from that application called

14   Cellebrite which extracts data from the phone.

15   Q.  Okay.  Now at the top just above this section, what does

16   the header say?

17   A.  Instant messages.

18        MS. NICHOLAS:  Okay.  Could you just zoom-in on the

19   first row.

20        (Pause)

21   Q.  I want to begin with the timestamp.  Can you please read

22   the timestamp for this message?

23   A.  May 10, 2021 at 4:30 p.m.

24   Q.  Okay.  And under content, the direction, can you read that?

25   A.  Incoming.

1   Q.  The body of the message?

2   A.  And third through the seventh.

3   Q.  Moving down a couple rows within this, can you read the

4   status?

5   A.  It says status read.

6   Q.  Staying here in row one, can you read the contact name.

7          MS. NICHOLAS:  Excuse me.  If we could zoom out and

8   capture that header as well.

9          (Pause)

10  Q.  Who is this message from?

11  A.  Jamil.

12  Q.  What is the phone number associated with Jamil?

13  A.  16469738605.

14         MS. NICHOLAS:  Zoom back out.

15         (Pause)

16  Q.  Going to the messages below that number two, row two.  Is

17  this message also from Jamil?

18  A.  Yes.

19  Q.  Can you just read the body of that message?

20  A.  Moor, we got training in July.

21  Q.  What's the status of that message?

22  A.  Read.

23         MS. NICHOLAS:  You can zoom back out.  You can pull

24  this down.

25         (Pause)

1   Q.  Ms. Gutierrez, I want to shift gears for a moment and go

2   back to talking about the chart that you made.

3           Earlier you testified that you reviewed some documents

4   and records to put together a chart; is that right?

5   A.  Yes.

6   Q.  And those documents and records were in the binder 411 to

7   422 and 426?

8   A.  Yes.

9           MS. NICHOLAS:  Okay.  Can you we publish for the

10  witness Government Exhibit 902.

11          (Pause)

12  Q.  Ms. Gutierrez, do you recognize this document?

13  A.  Yes.

14  Q.  Broadly speaking, what is this?

15  A.  The chart.

16  Q.  Did you create this chart?

17  A.  Yes.

18  Q.  Now in creating this chart did you review information

19  contained in other documents in evidence in this case?

20  A.  Yes.

21  Q.  Specifically, to create the chart did you review Government

22  Exhibits 411 to 422 and 426?

23  A.  Yes.

24  Q.  Based on your review of those underlying documents, is the

25  information contained in Government Exhibit 902 a true and

N8UAAPER1                    Gutierrez - Direct

1    accurate summary of the information associated with guns

2    purchased in this case?

3    A.  Yes.

4              MS. NICHOLAS:  Your Honor, the government offers

5    Government Exhibit 902.

6              MS. BAHARANYI:  Objection, your Honor.

7              THE COURT:  Received.

8              (Government's Exhibit 902 received in evidence)

9              MS. BAHARANYI:  I said "objection", your Honor, but I

10   think --

11             THE COURT:  No.  I heard you.  Received.

12             MS. NICHOLAS:  If you could publish 902.

13             (Pause)

14   Q.  So before we begin talking about content I want to take a

15   second orient the jury to what's in this chart.  Before we talk

16   about any specific columns, can your just explain what this

17   chart is in very general terms?

18   A.  It is a chart that reflects some documents that record

19   firearms transactions.

20   Q.  Now, when is the last time -- let me back up.  Did you

21   revise this chart at any point in preparing to testify?

22   A.  Yes.

23   Q.  When is the last time you revised it?

24   A.  Yesterday.

25   Q.  Were those revisions to reflect evidence that actually had

N8UAAPER1                    Gutierrez - Direct

1    been admitted at this trial?

2    A.  Yes.

3         MS. NICHOLAS:  So let's just go over what the

4    information is in the chart and then we'll get into substance,

5    okay.  Before we dig in, I'm going to have you zoom-in on this

6    very top row, the darker blue.

7         (Pause)

8    Q.  So, Ms. Gutierrez, what I want to do is walk from left to

9    right and talk about the type of information in each of these

10   columns.  So beginning on the far left, that column header says

11   N-O number.

12        What is in that column?

13   A.  That's just the number of the transaction for our

14   reference.

15   Q.  Does that come from any form?

16   A.  No.

17   Q.  That's just used for ease of reference?

18   A.  Yes.

19   Q.  The next column date of transfer box 37, 36 first date of

20   transfer, where did you get that information from?

21   A.  From the form.

22   Q.  Okay.  And what does box 37 and 36 refer to?

23   A.  So there are two versions of the form in the ATF.  One is

24   the older version and one is the new version.  They reflect the

25   same information but they're just different box numbers.  So,

1    box 37 is the box that had date of transfer in the old form and

2    box 36 is the box it had date of transfer in the new form.

3    Q.   Okay.  Next column is labeled "FFL name".  Where did that

4    information come from?

5    A.   Box 33 in both of forms, that would state the same.

6    Q.   Next column?

7    A.   It's the buyer's full name.

8    Q.   Where does that come from?

9    A.   Box one on the old form and box nine on the new form.

10   Q.   Okay.  Next column?

11   A.   It's the manufacturer and caliber of the gun.  The

12   manufacturer portion that comes from box 24 on the old form and

13   box one on the new form.  And then for the caliber portion that

14   comes from box 28 on the old form and box five on the new form.

15   Q.   Okay.  Serial number?

16   A.   That comes from box 26 on the old form and box three in the

17   new form.

18   Q.   Then the furthest all the way is labeled "GX"?

19   A.   That's Government Exhibit number.  It's stamped on the

20   bottom of the exhibits that I looked at.

21   Q.   Does the government exhibit number correspond with the

22   information from the form?

23   A.   Yes.

24         MS. NICHOLAS:  Okay.  So if you could zoom out and

25   just zoom in on the header line as well as row one.

1           (Pause)

2   Q.  If the jury wanted to look for an underlying documents

3   associated with this transaction, what government exhibit would

4   they go to?

5   A.  411.

6           MS. NICHOLAS:  Okay.  You can pull that down.

7           (Pause)

8           MS. NICHOLAS:  I want to talk about two of these guns

9   specifically.  Could you please zoom-in on row five.

10          (Pause)

11  Q.  Ms. Gutierrez, I am just going to ask you to read from the

12  furthest left column to the furthest right.  If you could just

13  remind us of the column header as you go.

14  A.  So this is transaction number five in this chart.  The date

15  it was transferred is July 23, 2020.  The FFL name is Elite

16  firearms.  The buyer's full name is Keith Anthony Vereen.  The

17  manufacturer of the weapon is a Glocl or it's a Glock.  And the

18  caliber is .22 LR.  The serial number is AELY222 and the

19  underlying document is Government Exhibit 413.

20          MS. NICHOLAS:  We can pull that down and whereas

21  zoom-in next ON row 14.

22          (Pause)

23  Q.  I am going to ask you to DO THE same thing.  Just walking

24  us from left to right with the column headers, if you could

25  read row 14?

N8UAAPER1                    Gutierrez – Direct

1    A.  So, in this chart it is transaction number 14.  The date of

2    transfer is October 1, 2020.  The FFL was Dick's Pawn Shop

3    West.  The buyer's full name is Keith Anthony Vereen.  The

4    manufacturer of firearm is Canik and the caliber is .9

5    millimeter.  Serial number is 20CB25810.  And the underlying

6    record is Government Exhibit 418.

7    Q.  Ms. Gutierrez, again, did you make any decisions about what

8    information should be in this chart?

9    A.  No.

10   Q.  Who did?

11   A.  The prosecutors.

12              MS. NICHOLAS:  You can pull this down.

13              Your Honor, may we briefly approach?

14              THE COURT:  All right.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              (side bar)

2              MS. NICHOLAS:  Your Honor, at this point I plan to

3    transfer to talking about takes messages from phones used by

4    other people in Massachusetts.  I expect there'll be objections

5    to nearly every document.  This may be a time for a midmorning

6    break and perhaps a longer discussion.  I think this would

7    likely be a lengthy conversation.

8              THE COURT:  All right.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In Open Court)

2              THE COURT:  So, ladies and gentlemen, the counsel has

3    informed me that there's a legal issue regarding the next piece

4    of evidence that will probably take 15 minutes to resolve.  So

5    we are going to give you your morning break.  He was going to

6    do it, since we'd only started a 10:00, I was going to wait a

7    little later but I think we'll do it now.  So we'll take a

8    15-minute break at this time.

9              (Jury not present)

10             THE COURT:  You can step down.  I'll see you in 15

11   minutes.

12             (Witness not present)

13             MS. NICHOLAS:  Your Honor, the next series of exhibits

14   the government is going to offer come from a phone seized from

15   Jamal Latimer, who your Honor may recall was the leader of the

16   group during the stop in Massachusetts.  I am happy to, maybe

17   the easiest way to do this is to list the exhibits planned to

18   admit.

19             THE COURT:  OK.

20             MS. NICHOLAS:  So we plan to offer 1201, 1202A, 1202B,

21   1202B-1, 1202B-3, 1202B-2, 1202C, "D", "E", "F"; 1202I, 1202J,

22   1204, 1207A and 1208.

23             MS. BAHARANYI:  Your Honor, if we may have one moment

24   to review?

25             THE COURT:  Yes.  Go ahead.

N8UBPER2                    Gutierrez - Direct

1          MS. BAHARANYI:  Thank you for that moment, your Honor.

2     We understand that the government seeks to admit certain

3     excerpts of a text message chain.  We don't have objection to

4     those certain excerpts, so long as the entire chain is actually

5     admitted to the jury, pursuant to the rule of completeness and

6     to make sure that the text messages are placed in their proper

7     context.

8          So that's what we've explained to the government.  I

9     believe they have an objection to that.

10          THE COURT:  Okay.

11          MS. NICHOLAS:  Your Honor, for context purposes, 1202

12     is a group chat between -- I believe there are 51 participants

13     in the chat, all of whom have some affiliation with this Rise

14     of the Moors group to varying extents.  Some people are present

15     in the chat.  Some are participating.  There are members of

16     that chat who are subsequently arrested in Massachusetts with

17     the defendant.  That is a very lengthy group chat that meanders

18     into other areas of more ideology.  There's parts talking about

19     kind of the background of the trip that's not -- it's simply

20     not relevant.  It's distracting.  It's confusing.

21          What we've done is call out the for portions that are

22     relevant to the case, and that are standalone explainable on

23     their face.  The rule of completeness is all about being able

24     to understand on its face what's happening in a way that's not

25     misleading, which is precisely what these excerpts do.  They

N8UBPER2                    Gutierrez - Direct

1    are listed A through I, I believe. We've excerpted out portions

2    relevant to the defendant, relevant to that arrest in

3    Massachusetts, leaving aside all the other things. We're

4    talking about a group chat --

5           THE COURT: I get your point. Anything defense

6    counsel want to say?

7           MS. BAHARANYI: Yes, your Honor. They're seeking to

8    admit a number of excerpts or clips from this overall chain

9    which removes the context for the chain, which means it leaves

10   the jury with a certain impression that this chain is only

11   about militia training or firearm training. When in fact --

12   and I'm sure maybe that's what the government wants to leave

13   the jury with the impression with -- but for fairness to Lucha,

14   the jury should see that this is not some group chain that's

15   talking about firearms and militia and that's what it's about.

16          This group chain talks about -- it's almost like it

17   functions as a message board for the members of this group.

18   And I think if we only show these portions that the government

19   considers relevant, what we're doing in fact is just making

20   these messages even more prejudicial without the proper

21   context.

22          THE COURT: All right. So I think this turns on the

23   interpretation of the rule of completeness which has been

24   assessed in numerous cases in the past. It is not a rule that

25   says that if one party offers a specific snippet of evidence

N8UBPER2                        Gutierrez - Direct

that the entire context is opened up for the jury's

consideration.  So to give an analogy, if one party sought to

introduce half of a sentence, the other side could demand that

the full sentence be admitted, but couldn't use that as a

device to admit the entire letter that this sentence came from.

       And I don't really understand the force of the

defense's argument in another respect which is that supposing

you had a chat room, and over a course of -- in my

hypothetical -- ten days several people on the chat room with

the acquiescence of the others spelled out how they were going

to rob a bank, but the rest of the chat was all about their

social lives, their favorite movies, their plans for future

happiness or whatever.  The fact that all that other stuff was

there would not, under the rule of completeness, be, admissible

so the objection is overruled and the chats will be received.

       MS. BAHARANYI:  Your Honor, on that point, I do think

this is closer to the analogy of your sentence where you excise

certain portions of a sentence, it changes the meaning of that

sentence.  Here if we're excising certain portions of this

chat, it changes the meaning and the tone.

       THE COURT:  That wasn't your request.  Your request

was to put in the whole thing, that's what you specifically

asked for.  That's what I'm denying.  Now if you think there's

a particular chat where the exact context is not being

faithfully presented because another sentence that follows

N8UBPER2                        Gutierrez - Direct

1   immediately is left out or something like that, that's a

2   different story, but that wasn't your argument.

3           MS. BAHARANYI:  Your Honor, my comment about the

4   sentence was just to analogize the entire chat.

5           THE COURT:  I understand you're arguing for the entire

6   chat.  And for the reasons I just said, I'm not persuaded.

7           MS. BAHARANYI:  This is a conspiracy case, and the

8   government is alleging that these conversations between these

9   individuals are conversations in furtherance and related to

10  this conspiracy.  What they're failing to do is provide the

11  full context so that the conversations could be fully

12  understood.

13          THE COURT:  I go come back to what I said before.

14  Supposing you had a conspiracy to rob a bank and to help

15  someone get the best dinner.  The conspiracy to help the other

16  person help get the best dinner would not be chargeable as a

17  crime, but there's no reason why that would be at all relevant

18  to the portion of the chat that talked about how the

19  conspirators are going to rob a bank.  So I am unpersuaded and

20  the objection is overruled.  So we'll take a five-minute break

21  in case anyone needs it.

22          MS. NICHOLAS:  Your Honor, if I may.  That's only one

23  of the three series.

24          MS. BAHARANYI:  In light of that, your Honor, then we

25  do have objections to the specific text that are going to be

N8UBPER2                    Gutierrez – Direct

1    admitted without any context, so I think we should review

2    those.

3                THE COURT:  Okay.

4                (Pause)

5                MS. BAHARANYI:  Your Honor, there's one particular

6    text message that we believe the government is seeking to admit

7    1202J which I think we can pull up.  The text itself is on the

8    last page of that.

9                THE COURT:  I have to pull it up.

10               MS. BAHARANYI:  This is an example of a text with

11   absolutely no context.

12               THE COURT:  So the text just for the record says --

13   this is from Mr. Jahmal Abdullah Bey, How far is that from

14   Brooklyn or the Bronx?  We have Moors in both areas.  So I

15   guess my question to government counsel is, what's the

16   relevance of this?

17               MS. NICHOLAS:  It establishes that there's members of

18   this conspiracy, the Moors, in both Brooklyn and the Bronx.

19               THE COURT:  When have you -- maybe I missed it.  When

20   has there been any reference up to now to the Moors?

21               MS. NICHOLAS:  I think we had our first direct Moors

22   reference during one of the earlier text messages.  I do think

23   it's now been made clear, and will be certainly by the end, by

24   the end of the text messages it will be clear that these people

25   in Massachusetts called themselves the Moors.  If you also

N8UBPER2                          Gutierrez - Direct

recall, your Honor, in the first body worn camera when the

defendant is approached in the Bronx, his first statement to

the police is, I'm a Moor.  I'm a Moor.  Don't touch that.  I'm

a Moor.

THE COURT:  The point is -- forgive the bad pun

without more -- that would have been meaningless to the jury at

the time it was said.  He might have been analogizing himself

to Othello, so we need greater detail before the jury can

appreciate what is meant by Moors there.

MS. NICHOLAS:  I think one of the concerns, your

Honor, is in their opening defense counsel alluded to I think

they use trace, right.  You can't trace the guns in

Massachusetts back to New York, and part of the government's

theory here is that --

THE COURT:  You've answered it.  I think it is

relevant now that I know what will be in the other messages

about the Moors.  That was really what gave me pause on this.

MS. BAHARANYI:  Your Honor, we're certainly not

contesting that Lucha is in New York City.  This in our view is

cumulative.  We're not quite sure what additional value it adds

to the evidence that's in.

THE COURT:  It shows that the conspirators include

someone in Brooklyn or the Bronx, and of course that is

relevant to establishing that -- with other evidence -- that

the defendant is part of the conspiracy.

N8UBPER2                          Gutierrez - Direct

1    MS. BAHARANYI:  The government hasn't put forth any
2    evidence that the conspiracy -- I guess the size of the
3    conspiracy overlaps with the size of Moors, the Moorish
4    community.  There seems to be a conflation of the two here.
5    THE COURT:  No, I think Moors here -- that's why I
6    raised the question I did before.  Moors is a term of art in
7    this case, and it refers to a particular group; namely, the
8    group that's putting all these messages out.  This is not a
9    reference to their place of origin or anything like that.  It's
10   a term of art.
11   MS. BAHARANYI:  That applies to a group broader, much
12   broader, than what the government -- the conspirators in this
13   case, or the alleged co-conspirators.  It's a term of art that
14   applies to thousands across the nation.  I think what's
15   misleading about this is where -- I think the government is
16   seeking to introduce this as evidence that we have these other
17   alleged co-conspirators in this area, in both areas, and
18   there's no basis or context for them to say that when this text
19   message on its face just refers to Moors, not Rise of the
20   Moors, not our Moorish militia, Moors generally.
21       It's as if saying, we have Americans in this area, now
22   we're assuming it applies to all these people instead of a
23   particular subset that we're looking at.  It's an identifier
24   for individuals.
25   MS. NICHOLAS:  Context is important here, your Honor.

N8UBPER2                         Gutierrez - Direct

1   This is Jahmal Abdullah Bey, the self-appointed leader of the

2   group who introduces the group in a video in evidence refers to

3   the men in that convoy as "My men."

4           And here he is saying "We have Moors in both areas."

5   Not, there are Moors in both areas.  There are Moors all over

6   the country.  We, the members of this group that is planning

7   this trip in this chat have Moors in both areas.

8           MS. BAHARANYI:  In a chat that we can't even get the

9   whole text message in.

10          THE COURT:  I understand the defense's objection, but

11  I think this passes the modest requirements of relevance

12  based -- as the government I think correctly pointed out --

13  that the words "We Have" coming from this particular person

14  could reasonably be inferred to be a reference to the

15  conspirators, so the objection is overruled.  Can we bring the

16  jury in or does anyone need a break?

17          MS. NICHOLAS:  I think we still have two phones to go,

18  your Honor.  They're much smaller.  I'm not sure if there are

19  other 1200 series objections?

20          MS. BAHARANYI:  No, we've raised them.

21          MS. NICHOLAS:  So the 1300 series, your Honor.  This

22  is a phone belonging to Quinn Cumberlander who is another

23  individual arrested in Massachusetts.  We're offering

24  Government Exhibit 1301.

25          THE COURT:  Before we go any further, because

N8UBPER2                         Gutierrez - Direct

1    yesterday the defendant had a need for frequent breaks.  I

2    don't want to have him not take a break now and tell me 15

3    minutes later that he needs a break.  So if he needs a break,

4    take it now.

5          MS. BAHARANYI:  We took our break, right when we

6    started our argument.

7          THE COURT:  I see.  Okay.  Very good.  Thank you.  Go

8    ahead.

9          MS. NICHOLAS:  For the 1300 series, which is the Quinn

10   Cumberlander phone, is 1301, 1302A, 1303A, 1303B and 1303C.

11   And from the 1400 series which is the Tarrif Bey phone, I

12   believe we're just offering 1402A.

13         THE COURT:  Okay.  Objections?

14         MS. BAHARANYI:  Your Honor, we're just taking a look

15   at the specific exhibits.

16         THE COURT:  Take your time.

17         (Pause)

18         MS. BAHARANYI:  Your Honor, thank you for bearing with

19   us just sorting through different excerpts and clips.  The two

20   objections that we have to the proposed government exhibits are

21   for 1302A and 1402A, which I think we can pull up on the screen

22   for your Honor.

23         MS. NICHOLAS:  Your Honor, we may be able to short

24   circuit this.  I think the government's primarily interested

25   here in admitting the contact list in these two exhibits.  And

N8UBPER2                        Gutierrez - Direct

1    if you could bear with us for a few moments, your Honor, I

2    would be happy to redact the messages if that satisfies defense

3    counsel.

4              MS. BAHARANYI:  That would be fine for us.

5              THE COURT:  Okay.  Great.  Anything else?

6              MS. BAHARANYI:  Not on our part.

7              THE COURT:  Let's bring in the jury.

8              MS. NICHOLAS:  Your Honor, may we have a moment to

9    redact those exhibits before we admit that?

10             THE COURT:  Do that now and tell me when you're ready.

11             (Pause)

12             MS. NICHOLAS:  Your Honor, I believe the parties are

13   prepared to proceed.

14             THE COURT:  Okay.  Let's get the witness, and let's

15   bring in the jury.

16             THE DEPUTY CLERK:  Jury entering the courtroom.

17             (Jury present)

18             THE COURT:  Please be seated.  Please continue.

19             MS. NICHOLAS:  Thank you, your Honor.  Welcome back.

20             Briefly we're going to set aside the defendant's

21   phone, and I want to turn briefly to Government Exhibit 1003,

22   which again is a stipulation.

23             In that stipulation Government Exhibits 1201 through

24   1210, including all subparts, are true and accurate copies of

25   data extracted from the Latimer iPhone 8.

N8UBPER2                        Gutierrez – Direct

1        per paragraph three, On July 3rd of 2021, law

2   enforcement officers arrested, among other people, Jahmal

3   Latimer, aka, Jahmal Abdullah Bey.

4   BY MS. NICHOLAS:

5   Q.  I'm going to turn to that manila folder the Redweld there

6   that has a sticker on it that says 1200 series.

7        Do you see that?

8   A.  Yes.

9        MS. NICHOLAS:  At this time, your Honor, the

10  government offers 1201, 1202A, 1202B, 1202B1, 1202B2, 1202B3,

11  1202C, 1202D, 1202E, 1202F, 1202I, 1202J, 1204, 1207A, and

12  1208.

13       THE COURT:  So all the objections made outside the

14  presence of the jury are preserved but overruled and the

15  exhibits are received.

16       (Government's Exhibits 1201, 1202A, 1202B, 1202B1,

17  1202B2, 1202B3, 1202C, 1202D, 1202E, 1202F, 1202I, 1202J, 1204,

18  1207A, and 1208 received in evidence)

19  BY MS. NICHOLAS:

20  Q.  Mr. Ahuja, if you can please publish what's now in evidence

21  as Government Exhibit 1201.  If you could please zoom in on the

22  row begins with Apple ID.

23       Ms. Gutierrez, if you could just read for us what it

24  says for Apple ID?

25  A.  Latimer, L-A-T-I-M-E-R, 417@gmail.com.

N8UBPER2                        Gutierrez - Direct

Q.  Zooming out, Mr. Ahuja, and zooming back in on last hotspot

activity.

        And, Ms. Gutierrez, if you could read that date stamp

please?

A.  It says July 3, 2021 at 6:53 p.m.

Q.  Thank you.  Mr. Ahuja, we're going to publish what's now in

evidence as Government Exhibit 1202A.

        Ms. Gutierrez, you have a hard copy of these in front

of you as well if that's easier to reference.

        Now, 1202A in general terms, can you describe what

1202A?

A.  It's a Cellebrite report.

Q.  What type of information does this particular Cellebrite

report capture?

A.  Participants in a group chat.

Q.  You said a group chat, are you familiar with group chats?

A.  I am.

Q.  What's a group chat in plain terms?

A.  it's hard to describe without calling it a group chat.  You

can text a bunch of people in one group setting.

Q.  So going through, Mr. Ahuja, if you could, the first three

pages.

        What type of information is captured in the first

three pages of this exhibit?

A.  Contacts.

N8UBPER2                        Gutierrez - Direct

1   Q.  Are those the participants in this particular chat?

2   A.  Yes.

3   Q.  And then after that, Mr. Ahuja, if you could flip through

4   the next three pages.

5       What type of information is contained in those pages?

6   A.  They're messages.

7   Q.  Before we get into the substance of the message, Mr. Ahuja,

8   if you could go back to the previous page.

9       Ms. Gutierrez, if you could orient the jury, how can

10  you tell who's speaking?

11  A.  At the top it says from Jahmal Abdullah Bey, owner.  That's

12  who's speaking.  It's also the owner of a phone on the right in

13  green.

14  Q.  Mr. Ahuja if you could zoom in where it says "from" there

15  at the top.  That's how you know who sent that message?

16  A.  Yes.

17  Q.  And then is it same for the blue boxes?

18  A.  Yes.

19  Q.  You could zoom in there, and zoom back out.

20      And again just to orient without getting into the

21  substance, how can you tell when these messages were sent?

22  A.  There's data at the bottom of the message that says the

23  date and time.

24  Q.  And, Mr. Ahuja, if you could please zoom in on just below

25  the message where it says source info, that section.

N8UBPER2                          Gutierrez - Direct

1       Based on this information, are you able to tell what

2   application these messages were exchanged in?

3   A.  Yes.

4   Q.  How can you tell?

5   A.  It says Telegram data, so it would be from the Telegram

6   messaging app.

7   Q.  Mr. Ahuja, let's go back to the first message in this

8   exhibit Government Exhibit 1202A.  If you can zoom in on that

9   whole box.  Make it a little bit bigger.  Thank you.

10      I'm going to ask you to just read through this,

11  Ms. Gutierrez, if you can start just by reading who this

12  message is from?

13  A.  It's from Jahmal Abdullah Bey.

14  Q.  What's the phone number associated or the Telegram number

15  associated?

16  A.  It's 1608832021.

17  Q.  And just below that I'm going to have you mean the content

18  of that message beginning with operation?

19  A.  Operation Fountainhead.

20      July 3rd through 7th, 2021, Packing List.

21      Firearm, ammunition, 4-30-round magazines, rifle

22  cleaning kit, plate carrier with level III plus SAPIs; IFAK is

23  divide all first aid kit, kevlar, boots, tent, daypack,

24  sleeping bag, Isomat, sleeping pad, hygiene wipes and toilet

25  paper, toothbrush, toothpaste, E-tool, small shovel, Woodland

N8UBPER2                    Gutierrez – Direct

1    BDUs, camelback hydration backpack, socks, underwear, BAOFENG,

2    UV, 5R twoway radio, minimum of 320 ounces of potable water,

3    compass, 3.5 days worth of food, fire starters, fire

4    extinguishers, a fire watch list needs to be created.  A

5    personnel list needs to be created.  FIAT will need to be

6    collected for gas.

7           What we need volunteers for:  Two drivers, two RSOs,

8    range safety officer, designated medic and cooks.

9    Q.  Mr. Ahuja, if you could zoom out and go to the next page,

10   and I want to zoom in on that blue message at the bottom.

11          Here I just want to have you read beginning below

12   Salaam.  It starts with East Coast, if you could read from

13   there?

14   A.  East Coast operation Fountainhead; training dates July 3rd

15   through July 7.  Checklist provided, meeting point NAHIGANSETT

16   territory, C.O.O, Commander of operation, BRATHA, Talib,

17   Jamhal.

18   Q.  We can stop right there. Can you read the time and date

19   stamp for this message?

20   A.  6/22/2021 at 9:08 p.m.

21   Q.  Mr. Ahuja, if you can zoom out and go to the next page

22   please.

23          Ms. Gutierrez, does this look familiar?

24   A.  Yes.

25   Q.  What does this appear to be?

N8UBPER2                    Gutierrez - Direct

1   A.  The same message I read previously with the packing list.

2   Q.  And what's the date and time on this message?

3   A.  June 28, 2021 at 7:13 a.m.

4   Q.  Mr. Ahuja, you can pull this one down.  I'd like now to go

5   to what's in evidence as Government Exhibit 1202B.

6          Before we talk about the content of 1202B, have you

7   reviewed 1202B?

8   A.  Yes.

9   Q.  Mr. Ahuja, if you could flip through the first three pages

10  of 1202B.

11         Were you able to compare 1202A to 1202B as well as the

12  rest of the 1202 series?

13  A.  Yes.

14  Q.  What did you notice?

15  A.  It's the same group chat, but with different contact names.

16  Q.  Well, let's back up.  Going back to 1202A for a moment,

17  halfway down the slide, Mr. Ahuja.

18         Do you see where it says owner.  Per the stipulation,

19  1202A comes from Latimer's phone.

20         Mr. Ahuja, then if we could go to 1202B, halfway down

21  if you could zoom there.  Listing Jahmal Abdullah Bey as in the

22  stipulation as the owner of this phone.  Is 1202B a

23  continuation of 1202A?

24  A.  Yes.

25  Q.  Going back to the chat.  Mr. Ahuja, if you could please go

N8UBPER2                        Gutierrez – Direct

1    to the first set of messages in this chat.

2              Ms. Gutierrez, are those large enough for you to be

3    able to read?

4    A.   Yes.

5    Q.   Who sent each of these messages?

6    A.   The owner of the phone.

7    Q.   Can I have you read that first message, and then we'll stop

8    for a second.

9              So the time and date stamp on that first message?

10   A.   June 12, 2021 at 9:41 a.m.

11   Q.   If you could read that message.

12   A.   The mission of the marine corps rifle squad is to locate,

13   close with and destroy the enemy by fire and maneuver or to

14   repel the enemies assault by fire and close combat.

15   Q.   The next two messages, what do those contain?

16   A.   They're links.

17   Q.   Can you tell to what webpage?

18   A.   It is to Wikipedia for a page called Fire and Movement.

19   Q.   Mr. Ahuja, you can go to what's marked as page seven of

20   this document.  If you can make the top set of messages just a

21   little larger so they're easier to read.

22             Ms. Gutierrez, if you could again clarify who's

23   sending these three messages?

24   A.   The owner of the phone.

25   Q.   And who is that?

N8UBPER2                        Gutierrez - Direct

1   A.   Jahmal Abdullah Bey.

2   Q.   Can you read the two text messages?

3   A.   We could have five platoons with the same amount of people

4   in this group.  That's damn near a company.  A company is a

5   military unit typically consisting of 80 to 250 soldiers and

6   usually commanded by a major or a captain.

7        Most companies are formed of three to six platoons,

8   although the exact number may vary by country, unit, type and

9   structure.

10  Q.   What's in the message sent at 10:01 a.m.?

11  A.   I think emoji.

12  Q.   What's an emoji?

13  A.   Little pictures that you text with.

14  Q.   Mr. Ahuja, if you could zoom out and zoom in on the bottom

15  half of the page.

16       What's the name of the individual who responds?

17  A.   In the blue?

18  Q.   In the first blue box, the message at 10:01:32 a.m., who's

19  that from?

20  A.   Quinn.

21  Q.   And then the message received at 10:01 a.m.?

22  A.   Tariff.

23  Q.   And the last name?

24  A.   Bey.

25  Q.   And then the text sent from Jahmal Abdullah Bey at

N8UBPER2                        Gutierrez - Direct

1    10:03:07, what does that say?

2    A.   This Could Be Us.

3    Q.   And what follows that?

4    A.   A link to YouTube.

5    Q.   Ms. Gutierrez, did you review this chat before testifying

6    today?

7    A.   Yes.

8    Q.   And did you have an opportunity to visit that link?

9    A.   I did.

10   Q.   Mr. Ahuja, if you could please publish what's in evidence

11   as Government Exhibit 1202B-1.

12          Ms. Gutierrez, what is Government Exhibit 1202B-1?

13   A.   It's a screenshot.

14   Q.   Are you familiar with the screenshot?

15   A.   Yes.

16   Q.   Why?

17   A.   Because I took it.

18   Q.   Where did the screenshot come from?

19   A.   The screenshot of the page that appears when you type in

20   that link from the messages that we just talked about.

21   Q.   So you visited the link in the message, it directed you to

22   this page?

23   A.   Yes.

24   Q.   Can you read the title of the video?

25   A.   U.S. marines military tactics, fire and movement.

N8UBPER2                        Gutierrez – Direct

1    Q.  Mr. Ahuja, if we could go back to Government Exhibit 1202B.

2    I'm going to move to page ten of this document.

3           Ms. Gutierrez, as this conversation continues, are

4    there additional links that are sent?

5    A.  There are.

6    Q.  Mr. Ahuja, if you can zoom in on the bottom half, the green

7    messages, those three.

8           Did you have a chance to review these links before

9    testifying today?

10   A.  Yes.

11   Q.  The first link, what time was that message sent?

12   A.  7:04 p.m. on June 12, 2021.

13   Q.  Mr. Ahuja, could you please publish what's in evidence as

14   Government Exhibit 1202B-2.

15          Ms. Gutierrez, do you recognize this?

16   A.  I do.

17   Q.  What is this?

18   A.  It's a screenshot of the webpage that -- the link that we

19   just discussed brings you to when you type it into Google.

20   Q.  Mr. Ahuja, could you please return to Government Exhibit

21   1202B, and right back to where we were on page ten.

22          Did you also have an opportunity to visit the link at

23   the bottom of the screen?

24   A.  I did.

25   Q.  That was sent at 7:08:05 p.m.?

N8UBPER2                        Gutierrez - Direct

1    A.  Yes.

2    Q.  Mr. Ahuja, could you please publish what's in evidence as

3    Government Exhibit 1202B-3.

4            Ms. Gutierrez, do you recognize this?

5    A.  I do.

6    Q.  What's the name of the website in the top left-hand corner?

7    A.  Army property.com store.

8    Q.  What's shown in the slide?

9            What's the header in the slide?

10   A.  Do you mean the M23?

11   Q.  If you can begin reading at M23.

12   A.  M23 blank firing adapter BFA, yellow, NSN, 1005-01-361-8208

13   for M4/M4A1 rifle.

14   Q.  Do you see where it says product description?

15   A.  Yes.

16   Q.  Can you begin reading where it says fits over?

17   A.  Fits over the muzzle of the weapon and capture gas to make

18   the weapon function and cycle with blank ammunition.  Easy to

19   install and does not alter the weapon.

20   Q.  Mr. Ahuja, if we could return to 1202B, go to page 11.

21           If you could, Mr. Ahuja, if you could just zoom in on

22   those top two green messages.  Make them a bit easier to reed

23           Ms. Gutierrez, can you read those two messages sent by

24   Jahmal Abdullah Bey?

25   A.  If any Moors would like to coordinate to order blanks and

N8UBPER2                          Gutierrez – Direct

the blank firing adapter for your training event in July that

would be great.

Q.  And the next message?

A.  With those we can practice firing and maneuvering against

each other, practice ambushes, assault fighting positions, etc.

Q.  Zoom out.  And, Mr. Ahuja, just zooming in on the last

message on that screen.

        The message received at 8:10:55 p.m. on 6/12/2021, Ms.

Gutierrez, could you please read that.

A.  We may need more than 1,000 blanks though.

Q.  Mr. Ahuja, if you could zoom out.  We're next going to move

to Government Exhibit 1202C, which per the stipulation is still

from the Latimer phone.

        Ms. Gutierrez, is this a continuation of the same

group chat?

A.  Yes.

Q.  Mr. Ahuja, if we could go to page four, please, and just

zoom in on the whole top half of the screen.

        Before we read the content, I just want to clarify

who's participating in this conversation.  So that blue message

on the left side of the screen, who is that from?

A.  Jamil Rasul Bey.

Q.  Can you read the phone number associated with that name?

A.  1586131769.

Q.  And the green message?

N8UBPER2                           Gutierrez – Direct

1   A.  Is from Jahmal Abdullah Bey, and the number is 1608832021.

2   Q.  If you could please read that blue message?

3   A.  Lucha has been abducted on "weapon charges" not sure what

4   was the PC on why they even stopped him.

5   Q.  And then down to the message sent at 6:58:23 a.m., who's

6   that from?

7   A.  It's from Jahmal Abdullah Bey.

8   Q.  What does that message say?

9   A.  There's an PDF attachment.

10  Q.  And then the next message?

11  A.  When is his date?  Is he held without bail?  How much is

12  the bail.

13  Q.  Mr. Ahuja, if you could pull that off and move to 1202D,

14  page four, please.

15          Ms. Gutierrez, this is a continuation of the same

16  group chat?

17  A.  Yes.

18  Q.  And again, before we get into content, these four blue

19  messages, who were those sent by?

20          Mr. Ahuja, if you could zoom in on the "from."

21  A.  The contact name is AJ.

22  Q.  And the phone number?

23  A.  910443941.

24  Q.  Who were those sent to?

25  A.  Jahmal Abdullah Bey.

N8UBPER2                              Gutierrez - Direct

1   Q.  If you could read the blue.  I will read the green

2   beginning with the message on June 24, 2021 at 9:49:09 a.m.

3   A.  "We are currently waiting for him to let us know.  They're

4   trying to hit him with weapons charges though and appreciate

5   it.  Of course the pigs won't tell us what he was arrested for.

6   Q.  "Of course not.  War is deception.

7   A.  "Facts.  We will keep you updated as soon as we get some

8   more info."

9   Q.  Mr. Ahuja, you can pull that down.

10          Mr. Ahuja, if you want to pull up 1202E, moving to

11  page four.  Again on the right the owner of the phone is listed

12  as who?

13  A.  On the right it's Jahmal Abdullah Bey.

14  Q.  The first two blue messages here, who are those from.

15  A.  Jamil Rasul Bey.

16  Q.  And the phone number?

17  A.  1586131769.

18  Q.  You can pull that down.  Going to the next page, Mr. Ahuja.

19          The first message, who's that from?

20  A.  Jahmal Abdullah Bey.

21  Q.  And what does that message read?

22  A.  Y'all need to be in RI.  It's less of a threat.

23  Q.  You can zoom back out, and zoom in on the response, the

24  last two in the blue.

25          Before you read the messages, who's the first one

N8UBPER2                    Gutierrez - Direct

1   from?

2   A.   Jamil Rasul Bey.

3   Q.   Can you read that message?

4   A.   Salaam.  GS.  You are right.  By September I would be out

5   there.

6   Q.   You can pull that down, please.

7            Mr. Ahuja, if you can publish what's in evidence as

8   1202J, and go to page four, please.

9            Who's this message from?

10  A.   Jahmal Abdullah Bey.

11  Q.   Can you just read the message, please?

12  A.   How far is that from Brooklyn or the Bronx.  We have Moors

13  in both areas.

14  Q.   Pull that down.

15           MS. NICHOLAS:  Your Honor, may I have one moment?

16           THE COURT:  Yes.

17  Q.   Mr. Ahuja, if you could publish what's in evidence as

18  Government Exhibit 1208.

19           Ms. Gutierrez, what are we looking at in 1208?

20  A.   It's a Cellebrite report.

21  Q.   And just above the information there's a header that says

22  notes.  What does that mean?

23  A.   It comes from a notes app.

24  Q.   Let's begin by talking about when this was created.

25           Mr. Ahuja, if you could please zoom in on the

1    information in the column labeled time.

2              When was that note created?

3    A.  June 22, 2021, at 2:39 p.m.

4    Q.  You can zoom back out, please.  And zoom in on the notes

5    column.  What's the title of this note?

6    A.  Operation Fountain Head.

7    Q.  After summary, what does it say?

8    A.  Plan of execution.

9    Q.  After source?

10   A.  Notes.

11   Q.  And then beginning where it says, "body," if you could just

12   read that first line?

13   A.  Operation Fountain Head, 7/3 to 7/7.

14   Q.  And then I'm going to have you read the section beginning

15   with plan of execution, and ending with 2345 hours.

16   A.  Plan of execution.

17             Gear check, noon on Friday at the field, load vehicles

18   at 1500 hours, stage vehicles between 1530 and 1630, establish

19   drivers and A-drivers, go over safety brief for if we are

20   pulled over.  Leave at 2345 hours.

21             (Continued on next page)

22

23

24

25

N8UAAPER3                    Gutierrez – Direct

1    BY MS. NICHOLAS:

2    Q.  Then the next section, we'll start at upon arrival and end

3    at --

4    A.  Upon arrival ETA 5:45 hours, establish birthing area,

5    establish designated hygiene area, establish designated head

6    area, unload the vehicles, camouflage the vehicles and burning

7    area, establish chain of command, establish two-man fire wash

8    list, establish designated cooks, establish a range safety

9    officer and establish armor.

10   Q.  The next section beginning with "safety briefs" and ending

11   with "hospital".

12   A.  Safety brief, weapon safety rule, pick a battle buddy and

13   stay with them at all times, establish a designated person who

14   in the case of emergency will take the injured person to a

15   hospital.

16           MS. NICHOLAS:  Pull that down.

17           (Pause)

18   Q.  Ms. Gutierrez, a few moments ago we talked about Government

19   Exhibits 1202B1, B2 and B3.  Do you see those in front of you?

20   A.  Yes.

21   Q.  Were those screen shots of what pages you personally

22   visited?

23   A.  Of the --

24   Q.  Take a look the 1202B1, B2 and B3.

25   A.  Yes.  Yes.

1   Q.  Did the links from those web pages come from the chat

2   messages that you reviewed?

3   A.  They did.

4   Q.  Did you personally create those screen shots?

5   A.  I did.

6   Q.  Setting aside those 100 series, I want move to the folder

7   that has 1300 series on it.  Do you see that?

8   A.  Yes.

9   Q.  Returning to the stipulation briefly that's Government

10  Exhibit 1003.  In Paragraph Three, on or about July 3 of 2021

11  law enforcement officers arrested, among other people, Quinn

12  Cumberlander, a/k/a "Quinn Khabir".  On page two, Paragraph

13  Seven, Government Exhibits 1301, 1304 including all subparts

14  are true and accurate copies of data extracted from the

15  Cumberlander phone.

16          MS. NICHOLAS:  Turning now to 1302A already in

17  evidence -- If I can please publish Government Exhibit 1302A.

18          (Pause)

19  Q.  Did you have an opportunity to review this report?  And

20  again, you do have the hard copies if you want to take a closer

21  look?

22  A.  I did.

23          MS. NICHOLAS:  Your Honor, apologies.

24          Pull this down.

25          The government offers 1301, 1302A, 1303A, 1303B and

N8UAAPER3                    Gutierrez - Direct

1    1303C.

2              THE COURT:  Yes, subject to the previous rulings on

3    the objections, those are received.

4              (Government's Exhibits 1301, 1302A, 1303A, 1303B and

5    1303C received in evidence)

6              MS. NICHOLAS:  Go back to 1302A.

7    Q.  A moment ago you testified that you had a chance to review

8    this particular government exhibit.

9    A.  Yes.

10             MS. NICHOLAS:  Could you place this side by side with

11   what's in evidence as Government Exhibit 1202A.

12             (Pause)

13   Q.  Did you have an opportunity to compare these two Government

14   Exhibits 1202A from the Latimer phone and 1302A from the

15   Cumberlander phone?

16   A.  Yes.

17   Q.  What is you notice?

18   A.  They're the same group chat.

19   Q.  Did you notice any differences?

20   A.  No.

21   Q.  Did you notice any differences as to the contacts?

22   A.  Oh, sorry.  The contacts are named differently but they're

23   the same numbers that are in the group chat.

24   Q.  We are going to come back to that in a moment.

25             MS. NICHOLAS:  If you could please publish what's in

1    evidence as Government Exhibit 1303C.

2            (Pause)

3            MS. NICHOLAS:  If you could begin by zooming in on the

4    participant section at the top of this report.

5    Q.  Ms. Gutierrez, if you could read who is participating in

6    this chat?

7    A.  AJ Moore and BROX and Quinn Khabir El.

8            MS. NICHOLAS:  If you could zoom out and then zoom-in

9    on the messages please.

10   Q.  The first blue message, can you read who it's from?

11   A.  AJ.

12   Q.  Read the whole line please beginning with "nine"?

13   A.  910443941 and it's AJ Moore BROX.

14   Q.  What's the time and date that message is received?

15   A.  June 29, 2021.

16   Q.  And the time?

17   A.  12:26 a.m.

18   Q.  Can you read the whole thing please?

19   A.  6292021, 12:26:31 a.m. UPC minus four.

20   Q.  What does that message say?

21   A.  Yo, downward signal.

22   Q.  The next message?

23   A.  Salam.

24   Q.  The message that follows?

25   A.  More private.

1        MS. NICHOLAS:  If you could please pull up Government

2   Exhibit 1303A.

3        (Pause)

4   Q.  Before we get into the messages focusing on the participant

5   section just read the names of two people participating in this

6   chat?

7   A.  AJ Moore BROX and Quinn Khabir El.

8        MS. NICHOLAS:  Okay.  Going to page three of this

9   chat, like start with the first green message and highlight

10  that whole section of the page.

11       (Pause)

12  Q.  I would like you to read the green messages from Quinn

13  Khabir El and I will read the blue from AJ Moor BROX, the

14  firsts message at 11:13:23 a.m.?

15  "A.  Lucha?

16  "Q.  Yeah, they abducted him, bro.

17  "A.  WTF.

18       MS. NICHOLAS:  You can pull that one down.

19       (Pause)

20  Q.  I'm going to ask you to set that set of documents to the

21  side.  I want to have you find the folder that's labeled "1400

22  series".

23       (Pause)

24  Q.  Did you find that?

25  A.  Yes.

N8UAAPER3                    Gutierrez - Direct

1   Q.   Returning briefly to stipulation which is Government

2   Exhibit 1003 in Paragraph 3 on or about July 3rd, 2021 law

3   enforcement officers arrested, among other people, Aaron Lamont

4   Johnson, a/k/a?

5   A.   Tarrif Bey.  On page two, Paragraph 8 Government Exhibits

6   1401, 1403, including all subparts true and accurate copies of

7   data extracted from the Johnson phone.

8           MS. NICHOLAS:  You can pull that down.

9           At this time, your Honor, the government offers

10  Government Exhibit 1402A.

11          THE COURT:  Subject to the previous rulings, received.

12          (Government's Exhibit 1402A received in evidence)

13  Q.   Did you have an opportunity to review this Cellebrite

14  report?

15  A.   I did.

16          MS. NICHOLAS:  Can you place this side by side with

17  Government Exhibit 1302A.

18          (Pause)

19  Q.   A moment ago you testified that 1202A and 1302A were from

20  the same group chat.  Did you also have the opportunity to

21  compare 1302A and 1402A?

22  A.   Yes.

23  Q.   What did you notice?

24  A.   Again, it's the same group chat but with different contact

25  names.

N8UAAPER3                         Gutierrez - Direct

1          MS. NICHOLAS:  So, I want to go back to comparing

2    1202A and 1302A and then we'll bring back 1402A.  So, if we can

3    to start by displace 1202A and 1302A on the right.

4          (Pause)

5          MS. NICHOLAS:  In 1202A if you could please highlight

6    the phone number that ends in 1769 it may help to zoom-in on

7    this particular number as well on the first page please.

8          (Pause)

9    Q.  How is 1769 can you read the full phone number the name

10   please?

11   A.  1586131769.

12   Q.  And the name?

13   A.  Jamil Rasul Bey.

14         MS. NICHOLAS:  Zoom back out.  Turning to 1302 A page

15   two, the number ending in 1769.

16         (Pause)

17   Q.  Is that the same number where you just write in 1202A?

18   A.  Yes.

19   Q.  1202A was saved as Jamil Rasul Bay.  Can you read how it is

20   saved in 1302A?

21   A.  Jamil BROX Moor.

22         MS. NICHOLAS:  Like to move 1302A to the left and

23   place 1302A on the right.  Stick with that same phone number

24   for a moment.

25         (Pause)

1            MS. NICHOLAS:  Sticking to that same number ending

2    1769 in 1302A saved as Jamil BROX Moors.  In 1402 you could

3    zoom out.

4    Q.  Can you read that phone number please?

5    A.  1586131769.

6    Q.  How is it saved in the 1402A phone?

7    A.  Just "Jamil".

8            MS. NICHOLAS:  I want to do the same thing for one

9    other phone number.  Going back to 1202A and 1302A.

10           (Pause)

11   Q.  On the left side of the screen 1202A is from Jamal Latimer

12   on the right side of the screen is 1302A is from Quinn

13   Cumberlander.  Focusing first on 1202A to focus on the phone

14   number ending in 3941, if could you read that number as well as

15   the contact name?

16   A.  It's 910443941 and the name is AJ.

17           MS. NICHOLAS:  Zoom back out.  Same number ending in

18   3941 in Government Exhibit 1302A.

19           (Pause)

20   Q.  In this phone belonging to Quinn Cumberlander, how is that

21   number saved?

22   A.  AJ Moor BROX.

23           MS. NICHOLAS:  Okay.  We're going to move 1302A to the

24   left and if you could please pull up 1402A on the right.

25   Q.  1302A on page two, that number ending in 3941 you read as

N8UAAPER3                    Gutierrez – Direct

1   AJ Moor BROX.  Turning to 1402 A, if you could find the number

2   that ends in 3941?  I believe it is a on page two.

3           Is this the same phone number we just looked at in

4   1302?

5   A.  Yes.

6   Q.  How is it saved in 1402?

7   A.  "Alban El".

8           MS. NICHOLAS:  Can you pull those down.

9           Your Honor, if I may have a moment?

10          THE COURT:  Yes.

11          (Pause)

12          MS. NICHOLAS:  Nothing further, your Honor.

13          THE COURT:  Cross-examination?

14  CROSS-EXAMINATION

15  BY MS. BAHARANYI:

16  Q.  I think it's good afternoon, Ms. Gutierrez?

17  A.  Good afternoon.

18  Q.  You testified about reviewing certain messages on direct,

19  right?

20  A.  Yes.

21  Q.  And you testified that you reviewed messages that were

22  provided to you by the prosecutor's office?

23  A.  Yes.

24  Q.  And in the context specific of the Signal app, you reviewed

25  certain Signal messages that have been provided to you by the

N8UAAPER3                    Gutierrez – Direct

1  prosecutor's office?

2  A.  Yes.

3  Q.  Ms. Gutierrez, you didn't review all the text messages that

4  were sent from the devices you were testifying about today,

5  right?

6  A.  I only reviewed what I reviewed.  I don't know what else is

7  out there.

8  Q.  You didn't analyze the device yourself, right?

9  A.  I did not.

10  Q.  Or review any other messaging -- actually, withdrawn.

11        So your testimony is today is based off of only what

12  has been provided to you by the prosecutor sitting here?

13  A.  Yes.

14        MS. BAHARANYI:  One moment.

15        (Pause)

16        MS. BAHARANYI:  Nothing further.

17        THE COURT:  Anything else?

18        MS. NICHOLAS:  No.  Thank you, your Honor.

19        THE COURT:  Thank you very much.  You may step down.

20        Anything else from the government?

21        MS. SMYSER:  Your Honor, we just wanted to raise one

22  thing.  We believe yesterday we offered Government Exhibit

23  1008, which was a transcript stipulation between the parties.

24  Out of an abundance of caution, we just wanted to make sure

25  that that was received.

N8UAAPER3                        Gutierrez – Direct

1          THE COURT:  Any objection?

2          MS. BAHARANYI:  Your Honor, give us one moment.

3          (Pause)

4          MS. BAHARANYI:  No objection, your Honor.

5          THE COURT:  Received.

6          (Government's Exhibit 1008 received in evidence)

7          All right.  Does the government rest.

8          MS. NICHOLAS:  Your Honor, the government rests.

9          THE COURT:  All right.  Come to the side bar please.

10         (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Side bar)

2          THE COURT:  Okay.  Any motions from the defense?

3          MS. BAHARANYI:  Yes.  Two, your Honor.  So at this

4     time we would move for a mistrial.  This is based off of the

5     volume of evidence from the Massachusetts incident that has

6     been admitted, has been discussed, evidence that we did move to

7     limit, move to exclude in our motions in limine.  And the

8     reason being that at this point we believe the evidence that

9     the guns, the types of guns, the ammunition, the nature of this

10    interaction on the street with Trooper Casey, the nature of the

11    types of ammunition that were recovered from the vehicles in

12    this incident have certainly led to, could certainly lead the

13    jury to convict -- based on this other incident in another

14    jurisdiction, which we believe the government still hasn't

15    sufficiently tied or shown to be relevant to the charges at

16    issue here.

17         We were always concerned about the potential or mini

18    trial within a trial and I think as the Court has seen from the

19    two hours of testimony today that's largely exclusively focused

20    on the Massachusetts conduct and the hours of testimony

21    yesterday this has in fact evolved in exactly what we feared,

22    that we're taking up the Massachusetts case.  It's a

23    Massachusetts incident that has minimal relevance to the 922

24    (a)(3) charge and conspiracy charge here and is certainly in

25    danger of misleading the jury to convict on that basis instead

1    of evidence for instead of for the 922 (a)(3) charge that he is

2    charged with.

3            THE COURT:  Okay.  That motion is denied.  I think

4    we've really covered this in previous colloquies.  But to my

5    mind the Massachusetts evidence is clearly and highly relevant

6    to the conspiracy charge in this case and I see nothing in the

7    way it's been presented that would prejudice the defendant

8    other than in the way that is not prejudiced, which is to show

9    that he conspired to commit the conspiracy that's charged here.

10           Now you had a second motion.

11           MS. BAHARANYI:  We do, your Honor.  At this time we

12   would move under Rule 29 for a judgment of acquittal even

13   viewing the evidence in the light most favorable to the

14   government, we don't believe a reasonable jury would convict on

15   the facts as presented.

16           THE COURT:  That motion is denied as well.

17           Now, is Ms. Otero here?

18           MS. BAHARANYI:  She is.

19           THE COURT:  Okay.  So we need to get her in now.  I

20   will inquire more formally of the defendant after we excuse the

21   jury, but tell me now whether he is going to take the stand or

22   not?

23           MS. BAHARANYI:  "No" is the answer.  I do want to

24   still speak with him one more time.

25           THE COURT:  Yes.  So, we'll give you that opportunity

N8UAAPER3                    Gutierrez – Direct

1    but let's get Ms. Otero on the stand and that's, other than the

2    defendant, that's your only other witness, right?

3              MS. BAHARANYI:  That's right.

4              THE COURT:  We'll get that done, excuse the jury for

5    lunch, we'll inquire of the defendant and then we'll be ready

6    for summations this afternoon.

7              MS. BAHARANYI:  Understood.

8              (Continued on next page)

1           (In Open Court)

2           THE COURT:  So, ladies and gentlemen, the defense is

3     not required to call any witnesses.  The burden of proof is, as

4     I've told you now several times, remains always with the

5     government.  The government has a burden of proving one or both

6     of the charges beyond a reasonable doubt.  But the defense is

7     given the opportunity, if they want, to present evidence.  They

8     are going to call one witness, who I understand is ready to be

9     called right now.

10          MS. BAHARANYI:  That's correct, your Honor.  Our

11    paralegal specialist is getting her from the lobby.

12          THE COURT:  Very good.

13     MARIA OTERO,

14        called as a witness by the Defendant,

15        having been duly sworn, testified as follows:

16          COURTROOM DEPUTY:  Please state your name slowly and

17    spell it for the record.

18          THE WITNESS:  My name is Maria Otero, M-a-r-i-a,

19    O-t-e-r-o.

20    DIRECT EXAMINATION

21    BY MS. BAHARANYI:

22    Q.  Good afternoon, Ms. Otero.

23          Ms. Otero, please tell us where you live?

24    A.  Bronx, New York.

25    Q.  What part of the Bronx?

N8UAAPER3                       Otero - Direct

1   A.  Mosholu Parkway.

2   Q.  How long have you lived in the Bronx?

3   A.  All my life.

4   Q.  Ms. Otero, I want to turn to this case.  Do you know the

5   person seated next to my colleague at defense counsel table?

6   A.  Yes, I do.

7   Q.  What name do you know this person by?

8   A.  His mother named him "Steven".  He goes by "Lucha".  I

9   accept him by "Lucha".

10  Q.  And when you say Steven -- Steven Perez, is that right?

11  A.  Yes, ma'am.

12  Q.  And we'll refer to him as "Lucha" for the rest of this

13  proceeding.

14          How do you know Lucha?

15  A.  He's my cousin.

16  Q.  How are you and Lucha cousins?

17  A.  My grandmother and his great grandma are sisters.

18  Q.  What are their names?

19  A.  Patricia Vasquez is my grandma and his great grandma is

20  Macelina Baez.

21  Q.  Ms. Otero, how long have you known Lucha?

22  A.  All his life.

23  Q.  And about how many years would that be?

24  A.  33.

25  Q.  Do you know where Lucha grew up?

```
 1   A.  In the Bronx.

 2   Q.  What part of the Bronx?

 3   A.  Morrisania section of the Bronx.

 4   Q.  Can you explain to the jury what section that might be.  Is

 5   that south Bronx, north Bronx?

 6   A.  That would be east Bronx.

 7   Q.  How do you know where Lucha grew up?

 8   A.  I lived with his grandma.

 9   Q.  And how does that give you information about where Lucha

10   grew up?

11   A.  His mother lived in the next building.  We share the same

12   rooftop.

13   Q.  Did you spend any time with Lucha when he was a child?

14   A.  Yes.

15   Q.  Ms. Otero, do you know someone by the name of Keith Vereen?

16   A.  Yes, I do.

17   Q.  How do you know Keith Vereen?

18   A.  He's my cousin.

19   Q.  Can you explain how you and Mr. Vereen are related?

20   A.  My grandmother and his great grandma are sisters.

21   Q.  So is this with Patricia Vasquez?

22   A.  Yes, ma'am.

23   Q.  How long have you known Keith Vereen?

24   A.  All his life.

25   Q.  Ms. Otero, do you know if Keith Vereen and Lucha are
```

N8UAAPER3                    Otero - Direct

1    related?

2    A.  Yes, I do.

3    Q.  And how are they related?

4    A.  Their grandmothers are sisters.

5    Q.  Can you share with us their grandmothers' names?

6    A.  Amina Nunez and Carmen Baez.

7    Q.  Do you happen to know where Keith Vereen grew up?

8    A.  In the Bronx.

9    Q.  What part of the Bronx?

10   A.  Courtlandt Avenue, South Bronx.

11   Q.  South Bronx.  Now, how far away is the part of the Bronx

12   that Keith Vereen grew up from where Lucha grew up?

13   A.  A bus ride, maybe 40 minutes, 30 to 40 minutes.

14   Q.  Do you know if Keith Vereen and Lucha have ever spent time

15   together?

16   A.  I'm pretty sure they did.

17   Q.  When you say "pretty sure", is there any occasion you are

18   thinking of?

19            MS. NICHOLAS:  Objection.

20            THE COURT:  I'll allow it.

21   Q.  When you say "pretty sure" is there any occasion that you

22   are thinking of?

23   A.  I saw them in a barbecue that I went to.  It was a family

24   barbecue.

25   Q.  And about how long ago was that?

1    A.  That was 2018.

2              MS. BAHARANYI:  Sarah, can you please show just the

3    witness, Ms. Otero, what's been marked for identification as

4    Defense Exhibit C1.

5              (Pause)

6    Q.  Ms. Otero, are you able to see a photograph on your screen?

7    A.  Yes, I do.

8    Q.  And without going into too much detail, what is this a

9    picture of?

10   A.  Family, men.

11   Q.  Do you know who is in this picture?

12   A.  Yes.

13   Q.  Do you recognize Keith Vereen in this picture?

14             MS. NICHOLAS:  Objection.

15             THE COURT:  Overruled.

16   Q.  Do you recognize Keith Vereen in this picture?

17   A.  Yes, I do.

18   Q.  Do you recognize Lucha El in this picture?

19   A.  Yes, I do.

20   Q.  Can you describe an article of clothing that Keith Vereen

21   is wearing?

22             MS. NICHOLAS:  Objection.

23             Your Honor, this is not in evidence.

24             THE COURT:  Excuse me.

25             MS. NICHOLAS:  This photograph is not in evidence,

1    your Honor.

2              THE COURT:  Well, I agree with that.

3              MS. BAHARANYI:  Let me back up one step, your Honor.

4              THE COURT:  Yes.

5    Q.  Is this a fair and accurate representation of both Keith

6    Vereen and Lucha El at a family event that you were describing?

7    A.  Yes.

8              MS. BAHARANYI:  Your Honor, at this time we would move

9    to admit Defense Exhibit C1.

10             THE COURT:  Any objection.

11             MS. NICHOLAS:  No objection.

12             THE COURT:  Received.

13             (Defendant's Exhibit C1 received in evidence)

14             MS. BAHARANYI:  Sarah, can you publish this for the

15   jury.

16             (Pause)

17   Q.  Ms. Otero, I want to turn back to this photograph.  Can you

18   please describe an article of clothing that Keith Vereen is

19   wearing?

20   A.  White T-shirt and back shorts with black sneakers.

21   Q.  And can you describe an article of clothing being worn by

22   Lucha in this photograph?

23   A.  A red hat, white tank top, blue jeans, white sneakers.

24   Q.  Where in the photograph is Keith Vereen located, just

25   moving from left to right?  And by that I mean is he the first,

N8UAAPER3                          Otero - Direct

1   second, third person?

2   A.  He's on the left side next to Lucha's father in between the

3   father and the brother.

4   Q.  When you say "in between the father and brother", you are

5   talking about Lucha's father?

6   A.  His father and his brother.

7   Q.  And where in this photograph is Lucha's father?

8               MS. NICHOLAS:  Objection.

9               THE COURT:  No.  Overruled.

10  Q.  Where in the photograph is Lucha's father?

11  A.  The far end of the left behind Keith.

12  Q.  Where in this photograph is Lucha's brother?

13  A.  Right next to Keith.

14  Q.  And does that put Keith in the middle of the two?

15  A.  Yes.

16  Q.  Were you also present at this celebration?

17  A.  Yes, I was.

18  Q.  And what was the nature of this celebration?

19              MS. NICHOLAS:  Objection.

20              THE COURT:  Sustained.

21  Q.  The individuals in the photograph are these individuals

22  that you're related to?

23  A.  Yes.

24  Q.  Ms. Otero, how often do these family gatherings take place?

25              MS. NICHOLAS:  Objection.

1              THE COURT:  As phrased, sustained.  Although I think

2    there is a possible question that could be put there.  I'll put

3    it.

4              Do you have a specific memory of seeing Lucha and

5    Keith Vereen together on any occasion other than the one that

6    we've just looked at?

7              THE WITNESS:  No.

8              THE COURT:  Okay.  Very good.

9    Q.  As for this family gatherings, you did see Lucha and Keith

10   Vereen together, right?

11   A.  Yes.

12             MS. BAHARANYI:  Your Honor, no further questions.

13             THE COURT:  Okay.  Cross-examination?

14             MS. NICHOLAS:  Briefly, your Honor.

15   CROSS-EXAMINATION

16   BY MS. NICHOLAS:

17   Q.  Good afternoon, Ms. Otero.

18   A.  Good afternoon.

19   Q.  Ms. Otero, you weren't with Keith Vereen on September 14th

20   of 2020, were you?

21   A.  No.

22   Q.  You weren't with Steven Perez on September 14th of 2020,

23   correct?

24   A.  No.

25   Q.  You weren't with Keith Vereen or Steven Perez on September

N8UAAPER3                      Otero - Cross

1    16th of 2020, were you?

2    A.  No.

3    Q.  You weren't with Keith Vereen and Steven Perez on October

4    3rd of 2020, were you?

5    A.  No.

6    Q.  Specifically, you weren't with them at three in the

7    morning, right?

8    A.  No.

9    Q.  You weren't with Keith Vereen and Steven Perez on October

10   4th of 2020, were you?

11   A.  No.

12   Q.  You weren't with Keith Vereen and Steven Perez on October

13   22nd of 2020, were you?

14   A.  No.

15   Q.  You weren't with Keith Vereen and Steven Perez on November

16   1st of 2020, were you?

17   A.  No.

18          MS. NICHOLAS:  Thank you.

19          THE COURT:  Anything else?

20          MS. BAHARANYI:  No, your Honor.

21          THE COURT:  Thank you, so much.  You may step down.

22          (Witness excused)

23          THE COURT:  All right.  Subject to the one matter that

24   we'll take up after the jury goes to lunch, does the defense

25   rest?

N8UAAPER3                        Otero - Cross

1              MS. BAHARANYI:  We do, your Honor.

2              THE COURT:  Okay.  Very good.

3              So, ladies and gentlemen, I have one question for you.

4    I'd like to give you till two o'clock for your lunch so I can

5    take up some matters with counsel.  But the summations will

6    take as much as but no more than two and a half hours.  If we

7    take a 15-minute break midafternoon, that would put us at 4:45

8    rather than 4:30.  Is going to 4:45 a problem for anyone?

9              Very good.  Okay.  Have a good lunch and we'll see you

10   at two o'clock.

11             (Jury not present)

12             THE COURT:  Please, be seated.

13             Defense counsel wanted to discuss one last time with

14   her client whether or not he wants to take the stand.  So, go

15   ahead.

16             MS. BAHARANYI:  Thank you, your Honor.

17             (Pause)

18             MS. BAHARANYI:  Thank you for that indulgence, your

19   Honor.  At this time -- not at this time.  Lucha will not be

20   testifying.

21             THE COURT:  Mr. Perez, do you confirm that that is

22   your decision?  That your decision is not to testify?

23             THE DEFENDANT:  That is my decision, sir, but I would

24   rather go by "Lucha El".

25             THE COURT:  I'm sorry.  So, Lucha El, is that your

N8UAAPER3                        Otero - Cross

1    decision not to testify?

2              THE DEFENDANT:  It is.

3              THE COURT:  Very good.  All right.  Now, I will get

4    you -- my law clerk is almost finished, I think, putting in my

5    edits -- my charge.  You can look it over before you give your

6    summations.

7              There are three things I want to mention.  One is I've

8    decided not to give the aiding and abetting charge that the

9    government requested.  I really think the substantive count

10   here doesn't, really has not been argued on an aiding and

11   abetting basis and I think it would be more confusing to the

12   jury than helpful to have the aiding and abetting charge.

13             I should mention that -- Well --

14             Second, I am tentatively of the view not to give the

15   good faith charge but I am willing to hear briefly any further

16   argument.  Here is the reason, some of which we discussed last

17   night.  To the extent that the good faith charge is based on,

18   and this also applies to the defense's theory of the case which

19   was identical.  To the extent that the claim is that the

20   defendant believed that these laws were unconstitutional

21   because he had an unfettered constitutional right to receive an

22   out-of-state gun or whatever, that argument cannot be made and

23   must not be made to the jury.  It's precluded by Cheek.

24             To the extent he is arguing that he did not, that he

25   was familiar with the underlying laws but did not for whatever

N8UAAPER3                    Otero - Cross

1    reason believe they applied to him or something like that, a

2    mistake of law defense that is precluded by Bryan.

3         So, I'm not sure what's left of the good faith

4    defense.  If there is something left I would probably charge it

5    but I'm not sure what is left.  So let me hear from defense

6    counsel.

7         MS. BAHARANYI:  Your Honor, for this moment we think

8    it's important to call in our expert on this, which is Kendra

9    Hutchinson from our office.

10        THE COURT:  Yes, who I had the pleasure of having

11   before me last night.  So I'm glad we are getting the world's

12   greatest living expert.

13        MS. HUTCHINSON:  Good afternoon.  Kendra Hutchinson.

14   I can pass my card afterwards.

15        I understand your Honor's position.  You know, we

16   discussed this yesterday about Cheek and Bryan.  We're posing a

17   challenge to Bryan's curtailment of this type of defense in

18   light of the change.

19        THE COURT:  I think that's a great issue for appeal

20   but of course I am bound by the decision.  As it stands, Bryan

21   has never been overruled.

22        MS. HUTCHINSON:  I understand that, your Honor, but we

23   would contend that to the extent that we've amended the charge

24   that we requested, I think your Honor probably noted that we

25   amended the good faith request.

1          THE COURT:  Yeah, but what I received last night --
2     and by the way, I thank both sides for the letters I received
3     at nine o'clock.  It was a wonderful evening.  My wife and I
4     did a very hot rumba and the Yankees won a game for a change
5     but best of all, of course, was receiving your respective
6     letters.
7          But what you asked for in that letter -- and by the
8     way, these letters have not yet been docketed.  Both sides
9     should docket them -- is that Lucha El contends that he
10    believed in good faith that his actions were lawful.  That's on
11    your good faith defense request.  And then under the theory of
12    defense "Here Lucha El contends that he believed in good faith
13    that his actions were lawful and that negates the willfulness
14    requirement."
15         So, my problem is if you are arguing that he believed
16    in good faith that his actions were lawful because the
17    Constitution overrules in effect of any restrictions that might
18    otherwise have existed, that's precluded by Cheek, that
19    argument.  To the extent if you are arguing that he didn't have
20    specific knowledge of this statute and therefore, may have
21    mistaken what the law said such as, for example, that he could
22    have believed an import are or something like that, that kind
23    of defense is precluded by Brian.
24         So, I'm not sure what's left that you can argue
25    because this general language doesn't specify.

1           MS. HUTCHINSON:  I think what I would turn to then,

2      judge, is the Doyle case that we cited.  The Second Circuit

3      case providing that good faith is a defense to willfulness.

4      That good faith is a defense to many specific crimes including

5      intent to fraud and the wire fraud statute, et cetera.  And so

6      I think that at a minimum, that would be warranted here.  I

7      understand --

8           THE COURT:  But the good faith that comes up as you

9      correctly say, for example, very often in fraud cases.  But the

10     context there is even though the government says this statement

11     was false I believed it was true and I in good faith believed

12     it was true and therefore, I'm not guilty of fraud.  That's the

13     situation.  The situation here is to the extent the argument is

14     I believed that any restrictions were unconstitutional or I in

15     good faith believed that the statute didn't apply to me, those

16     are both precluded by the two Supreme Court cases I mentioned.

17          MS. HUTCHINSON:  But referring back to the willfulness

18     instruction itself, your Honor, we don't know how your Honor is

19     going to charge it, but this is reading from Bryan which we

20     agree controls at least as to the willful element here.  And

21     there does have to be this bad purpose to disobey the law.

22          THE COURT:  Let me grab from my law clerk while he is

23     busy putting in my edits.  So, I'll tell you what I'm going to

24     charge on willfulness.

25          MS. HUTCHINSON:  Thank you, your Honor, very much.

1            (Pause)

2            THE COURT:  Okay.  This is under the third element,

3    substantive count and then it is picked up again as a

4    conspiracy count.

5            The third essential element the government must prove

6    beyond a reasonable doubt is that the defendant in receiving

7    out-of-state firearms into his state of residency, acted

8    knowingly and willfully -- and by the way, I previously defined

9    in the earlier receiving and transporting and all that stuff.

10   "Knowingly" means purposely rather than negligently or

11   accidently, but the defendant need not be aware of the specific

12   law that his conduct has violated.  Willfully means to act with

13   a bad purpose, an evil intent to act unlawfully even if the

14   defendant does not have specific knowledge of the particular

15   law he has violated.  That's it.  And if I weren't going to

16   insert, if there were a good faith defense, it would be the

17   next paragraph.  So that's what I'm going to charge.

18           That I think is exactly what Bryan says.  In fact it

19   may be a little bit better for you by using in addition to bad

20   purpose which Bryan uses.  I used evil intent straight out of

21   Blackstone.  So I think the defense is going to be able to

22   argue to the jury the government hasn't shown that he acted

23   with a bad purpose.  The government's failed to show that he

24   acted with evil intent, whatever you want to say in that regard

25   but, not the argument that he believed it was constitutional,

N8UAAPER3                    Otero - Cross

1   that he believed in good faith it was within the law, et

2   cetera, et cetera.

3           MS. HUTCHINSON:  Judge, we are not in our amended

4   charge for good faith defense, we're not asking for or that his

5   actions comply, were Constitutional any longer.  We amended it

6   in response to the Court's concerns and we ask that the Court

7   charge, a person does not act willfully if it believes good

8   faith that he is acting within the law or that his actions

9   comply with the law.  So we're not referencing the

10  Constitutionality or any specific legal provisions at all or

11  requiring the government to prove that he knew of a specific.

12          THE COURT:  What is the evidence?  Other than the

13  arguments that I say, you can't make for reasons discussed many

14  times that the defendant believed in good faith that he was

15  acting within the law, the sole thing that you pointed me to

16  yesterday was that his statement when he was approached in the

17  Massachusetts case about the Constitution, and that's not going

18  to do it for reasons we've already discussed.

19          So what other evidence do you have that he believed

20  what he was doing was lawful?

21          MS. HUTCHINSON:  Would my co-counsel like to?

22          MS. BAHARANYI:  On the facts I think the full extent

23  the body-worn camera captures his statements that "I didn't do

24  anything wrong".  So, in terms of his the evidence that he --

25          THE COURT:  But --

1          MS. BAHARANYI:  -- was acting in good faith, I think

2    that is evidence of that.  It is a reflection of his mens rea

3    in that moment.  He didn't think he was doing anything wrong.

4          MS. NICHOLAS:  -- cites the Constitution in that

5    statement, your Honor.  He is snaking that precluded --

6          THE COURT:  That is my recollection as well.  In clear

7    context in reference to the Constitution.

8          MS. NICHOLAS:  Is this case, your Honor, we are

9    sitting right now, your Honor, where the defendant did not

10   testify.  The government's position is that the willful

11   instruction captures this.  To add to the good faith

12   instruction is going to do nothing but confuse the jury.  The

13   willful instruction addresses this concern.

14         THE COURT:  Okay.  Well, defense has their many

15   excellent arguments but I am going to adhere to not giving a

16   good faith instruction.

17         Now the last question I had which is for the

18   government is you suggested language in your letter.  Let me

19   find it.  This is towards the bottom of page two of your letter

20   and so that I wouldn't miss it, it's all in both places.  "The

21   defendant does not have to himself purchase the firearms out of

22   state but it is enough to prove only that the defendant

23   received or accepted the guns in a state of residence."

24         That part I am going to give almost those exact words

25   slightly different.  But then you say "The government will have

N8UAAPER3                    Otero - Cross

been found to have satisfied this element if he caused an

agent, employee or other associate to bring the guns into his

state of residence.  A defendant who uses another person or

person to purchase the guns from out of state through the use

of -- statement other ways firearms under the law.  I'm not

going to give that second sentence, which is more I think in

the way of the very last of the sentences, more in the way of

summation for you to argue but not for me to state.  But in the

middle sentence the government will have been found to have

satisfied the elements -- into the state of residence.  Is that

a necessary element?

        MS. BAHARANYI:  Your Honor?

        THE COURT:  I am wondering whether the law isn't that

if you know the gun was purchased or obtained out of state and

then you receive it in your state of residency, that's a

different state; isn't that enough?

        MS. NICHOLAS:  I think that that is enough, your

Honor.  I think --

        MS. BAHARANYI:  Can I interrupt?  I'm so sorry, your

Honor.  Can we excuse Lucha?

        THE COURT:  Yes, absolutely.

        (Defendant not present)

        THE COURT:  Go ahead.

        MS. NICHOLAS:  To the extent the phrase "otherwise

obtained" needs to be defined, that's kind of the genesis of

1    the government's proposal here but the government is fine --

2                THE COURT:  I'm going to leave it the way I understand

3    the law to be which is that if you know it's coming to you from

4    out of state and it's not from the state of your residency,

5    then you violate the law if you receive it.

6                MS. NICHOLAS:  Understood.

7                THE COURT:  Okay.  All right.  Very good.  I will get

8    you those charges sometime in the next few minutes.  Let me

9    give the edits back to my law clerk.  And we'll see you at two

10   o'clock.  Oh, I'm sorry.  And I'll also get you -- although,

11   we'll have time later at the end of the day -- the verdict form

12   because I do want to hear whatever you have to say.

13               MS. NICHOLAS:  Your Honor, is it your Honor's

14   preference to send an exhibit list back to the jury?  And if

15   so, should we essentially sanitize that exhibit list?

16               THE COURT:  Yes.  You should prepare.  This is because

17   I don't want you to be spending tonight sleeping or anything

18   like that, tonight you need to prepare a joint exhibit list

19   although the government's part will be the larger part.  That

20   is basically a sanitized exhibit list, a number and brief

21   description of what it is and we are sending them all the

22   exhibits except instead of the videotapes.  We'll send them a

23   laptop and a thumb drive that they could play the videotapes on

24   and even that same thumb drive needs to be the Excel sheet so

25   is that they can access.

N8UAAPER3                        Otero – Cross

1             MS. NICHOLAS:  Thank you.

2             THE COURT:  We're not sending in the guns or

3    ammunition but they will be instructed if they want to see

4    them, they can.

5             MS. NICHOLAS:  Thank you.

6             (Luncheon recess)

7             (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N8UBPER4                        Summation - Ms. Smyser
                          AFTERNOON SESSION

1                                 2:00 p.m.

2

3          (Jury not present)

4          THE COURT:  By the way, I assume that the defense

5   counsel at the close of all the evidence renewed the motions,

6   and those motions are deemed renewed and are deemed denied

7   again.

8          MS. BAHARANYI:  Thank you, your Honor, yes.

9          THE DEPUTY CLERK:  Jury entering the courtroom.

10         (Jury present)

11         THE COURT:  Please be seated.  So, ladies and

12  gentlemen, we're about to hear closing arguments of counsel.  I

13  want to remind you, as I did before opening statements that

14  nothing that counsel says is evidence.  The evidence came from

15  the testimony, from the exhibits, and from the stipulations;

16  but it may be useful before you begin your deliberations to

17  hear what each side believes the evidence shows or fails to

18  show as the case may be.

19         So this is their opportunity to suggest to you what

20  they think the evidence has proved or failed to prove, and it's

21  because the government bears the burden of proof that the

22  government gets both an opening summation and a rebuttal

23  summation.  And in between that, we'll hear from defense

24  counsel, so we'll start with the government's opening

25  summation.

1          MS. SMYSER:  May I proceed, your Honor?

2          THE COURT:  Please.

3          MS. SMYSER:  "I don't need a permit.  A permit is a

4    permission."  Those are the words of a man who knew he was

5    violating the laws.  Laws that he decided did not apply to him,

6    and the evidence shows that he knew exactly what he was doing.

7    Let's listen to the defendant's own words.

8          (Media played)

9          (Media stopped)

10         MS. SMYSER:  Those words tell you exactly what you

11   need to know, that this man decided that the legalities and the

12   regulations and the mandates and all of that extra stuff, that

13   extra stuff designed to keep us safe did not apply to him.

14   That is a willful violation of the law.

15         Members of the jury, I'm now going to walk you through

16   the charges and the evidence in this case.  And as I do, I'll

17   show you how it all fits together.  And by the time I sit down,

18   you will know beyond a reasonable doubt that the defendant is

19   guilty.

20         First, we're going to discuss Count Two.  In that

21   count the defendant is charged with receiving the Canik or the

22   Yanik 9mm gun that you heard so much about.  He received this

23   Canik in his residence in New York, and he did so without a

24   license.  After that, we're going to discuss Count One.  His

25   agreement with others to transport and receive firearms

N8UBPER4                          Summation - Ms. Smyser

1    interstate without a license.  And as we walk through each one

2    of these charges, I'm going to talk with you about the evidence

3    that shows you that the defendant knew that he was acting with

4    a bad purpose; that is, that he was acting willfully.

5            So let's start with Count Two, receiving the Canik in

6    New York.  We'll discuss each one of the elements of the crime

7    that are on the screen here, that the defendant was not

8    licensed to deal in firearms, that he received the firearm in

9    his state of residence, which had been purchased outside of his

10   state of residence, and that he acted willfully.  And as we go

11   through each one of those elements, you'll see that there's

12   actually a lot that's not in dispute.

13           So what do the parties agree on?  For starters we

14   agree that the defendant was not a licensed importer, license

15   manufacturer, licensed dealer or licensed collector of

16   firearms -- not now, not ever.  And the parties agreed on that

17   in Government Exhibit 1001 which is on your screen.  You also

18   saw that in a blue ribbon certification from the ATF, it shows

19   that the defendant never applied for or was issued a license to

20   deal firearms.  That's element one.  The defendant was not

21   licensed to do this.

22           The next element involves the defendant's state of

23   residence, and here again the parties agree the defendant

24   resides in New York state.  The second part of this element

25   involves the defendant receiving the gun, that Canik in his

N8UBPER4                    Summation - Ms. Smyser

1   state of residence, New York.  There's also no serious dispute

2   here, but I'm going to walk you through this timeline that's on

3   the slide which shows you how you know that the defendant

4   received the Canik in New York.

5        Let's start with September 21, 2020.  On that day, the

6   defendant communicated with Vereen, Keith Vereen.  Before we

7   discuss the relevance of those communications and others, I

8   first just want to make crystal clear also there's no serious

9   dispute about this that Vereen and the defendant were the users

10  of the two relevant phones.  You know that Vereen was using the

11  device ending in 0166, the green device here which you heard

12  about from Mr. Petersohn, because he gave this phone number to

13  Western Union.  And you see those records in the upper

14  right-hand corner of the screen.

15       And Mr. Archuleta explained to you that Vereen would

16  have to use his ID and provide his information in order to pick

17  up money transfers from Western Union.  In addition, you know

18  that the 0166 number is Keith Anthony Vereen's phone number in

19  Cash App or block records, and those are in the bottom right of

20  your screen, Government Exhibit 801.  You also know that the

21  defendant is the user of the Steven Perez device ending in

22  1561.  Like Vereen, the defendant gave this number to Western

23  Union when he was sending money to Vereen.  And it is also

24  subscribed to him in T-Mobile records which you see in the

25  bottom right side of the screen.

N8UBPER4                         Summation - Ms. Smyser

1           The defendant and Vereen talked on September 21st

2      multiple times. This was a little over a week before Keith

3      Vereen purchased that Canik in South Carolina.  You saw

4      evidence of these communications in the call records or CDRs

5      that Mr. Petersohn discussed and which are shown on the screen

6      here.  These CDRs and the cell site analysis are contained in

7      Government Exhibit 901.  The calls from September 21st were

8      about Vereen buying a gun for the defendant.  And how do you

9      know?  Because the day after the defendant repeatedly talks to

10     Vereen on the phone, he sends Vereen money.

11          Members of the jury, you also know that the defendant

12     and Vereen are relatives, but that's not all they are.  They

13     are co-conspirators.  They are men working together to

14     transport and receive firearms.  Now, on September 22, the

15     defendant sent $350 to Vereen from a check cashing store in the

16     Bronx.  Vereen picked up this money at a store in South

17     Carolina, which you can see in the Western Union records.  That

18     money was for a gun.  You know this because a week later Vereen

19     went out and bought the Canik as well as other guns.

20          On October 1, 2020, Vereen walked into an FFL Dicks

21     Pawn Shop West in South Carolina.  You see that on the

22     right-hand side of the screen.  He filled out an ATF 4473 form

23     that shows that he was purchasing the 9mm Canik with serial

24     number 20CB25810.  He was purchasing this gun, this gun which

25     he then delivered to the defendant in New York.  When Vereen

N8UBPER4                          Summation - Ms. Smyser

1    bought this gun, he lied for the defendant.  As you can see in

2    the bottom box, Vereen attested under penalty of perjury that

3    he was not purchasing the firearm on behalf of another person.

4    He did this despite the bold warning on the bottom of the form

5    that says very simply that he could not purchase this on behalf

6    of someone else, someone like the defendant.

7         I want to pause for just a moment on Keith Vereen.

8    Vereen, like the defendant, did not have a license to deal in

9    firearms, and this is shown in the ATF blue ribbon

10   certification on the screen.  Yet, the defendant chose Vereen

11   who lived hundreds of miles away to buy him a gun and to bring

12   it to New York.  So Vereen lied and bought that gun on October

13   1st.  When did the defendant get it?  Just two days later on

14   October 3rd.  You saw this with Mr. Petersohn.  Mr. Petersohn

15   showed you that on October 2nd and October 3rd, Vereen traveled

16   from South Carolina where he lived and where he had bought that

17   gun up to New York.  He got there late, sometime before 2:12

18   a.m. as indicated in the box in the upper right-hand side of

19   the screen.

20        After Vereen got to New York, he went to the Bronx,

21   and he didn't go just anywhere in the Bronx.  He went to see

22   the defendant.  You see this in the cell site records and in

23   the call logs.  First starting at 2:31 a.m. right after he gets

24   to New York, Vereen called the defendant.  Indeed he called the

25   defendant multiple times.  And then around 3 a.m., the two

N8UBPER4                          Summation - Ms. Smyser

1    connected to the same cell site.  Why?  They were meeting.

2    They were exchanging guns and money at 3 a.m.

3              On October 6 Vereen is back in South Carolina.  As

4    we'll discuss later, this happens over and over again.  Vereen

5    buys guns.  He travels to New York.  He calls the defendant.

6    He meets with the defendant, and they exchange guns and money.

7    It's no secret what is happening here.  Each time Vereen was

8    buying guns in South Carolina and delivering them to the

9    defendant in New York.  Everything we've talked about so far is

10   sufficient to show you the defendant received the Canik in New

11   York.

12             But this is not the only evidence you have.  You have

13   the fact that the defendant was arrested in the Bronx in June

14   of 2021 with that gun.  This was the stop with Officer Smalls.

15   Officer Smalls was responding to a 911 call reporting that a

16   man had a firearm in the area of East Gun Hill Road and Perry

17   Avenue in the Bronx.  The radio transmission reported that the

18   man was Hispanic, 5'6, wearing a white T-shirt, black pants, a

19   blue purse, a black and white turban and that he went by the

20   name Lucha.  And when Officer Smalls responded, he saw the

21   defendant just as you see on the screen here.

22             Officer Smalls looked inside the defendant's bag and

23   he found the defendant's gun, the Canik, the gun that the

24   defendant had paid Vereen to purchase in South Carolina and

25   that the defendant got from Vereen on a trip to New York.  So

N8UBPER4                          Summation - Ms. Smyser

1    the defendant has not only clearly committed the first element

2    of this crime, but also the second.  He received in New York

3    his state of residence a Canik which Vereen had purchased out

4    of state.

5         The third and final element here is that the defendant

6    acted willfully, and I want to talk just a little bit about

7    willfulness.  Before I do, you should know that Judge Rakoff's

8    instructions of the law govern.  If I or any lawyer says

9    anything that is inconsistent with those instructions, you

10   should follow them.  But I expect that Judge Rakoff will

11   instruct you that willfulness does not require that the

12   defendant knew what specific law he was violating.  Instead, he

13   just needs to know that he was acting with a bad purpose.  And

14   although this seems to be the main dispute at this trial, it's

15   actually not a close call.  The evidence proves beyond a

16   reasonable doubt that the defendant was acting willfully, that

17   he acted with a bad purpose.

18        And I'm now going to walk you through the three ways

19   you know that the defendant was acting willfully.  First, the

20   defendant used a straw purchaser in South Carolina.  Why did he

21   do that?  Because he wanted guns in New York, but he had a

22   problem.  He didn't have a permit to purchase his own guns in

23   New York.  You can see that this is yet another point on which

24   the parties agree, that's Government Exhibit 1006, that the

25   defendant has never been granted a firearms license.  The

N8UBPER4                         Summation - Ms. Smyser

1   defendant's lack of a firearms permit is why he didn't just

2   walk into a gun store in the Bronx and buy a gun himself.  It's

3   why he sought the help of a straw purchaser living 600 miles

4   away to lie at gun stores to buy guns for him.  It's why the

5   defendant called Vereen.  It's why he paid Vereen, and it's why

6   they met in the middle of the night at 3 a.m.

7          Members of the jury, use your common sense.  You don't

8   meet in the middle of the night to get a gun that you think you

9   can have.  No.  You meet in the middle of the night so that you

10  can get an illegal gun without being detected.  You get someone

11  to travel hundreds of miles to see you.  That is how badly the

12  defendant wanted guns.

13         The second reason you know that the defendant was

14  acting willfully is how he reacted during his arrest in the

15  Bronx.  I want to take a moment to talk about that arrest.  As

16  we do, I want you to think about whether this is a man who had

17  no idea he was doing something unlawful.  The evidence shows

18  that the answer to that is no.  What is the first thing that

19  the defendant does when the officers approach, he tells them

20  not to go in his bag.

21         (Media played)

22         (Media stopped)

23         MS. SMYSER:  "Don't go in my bag, brother."  The

24  defendant does not want that officer in his bag.  Why?  Because

25  he knows he's possessing the Canik in New York was illegal and

N8UBPER4                    Summation – Ms. Smyser

1    he doesn't want to get arrested.  He doesn't say he has an arm

2    until he already knows that Officer Smalls has frisked his bag,

3    and he knows that he's been caught.  And what does he do next?

4    He lies about his address.

5             (Media played)

6             (Media stopped)

7             MS. SMYSER:  "What's this building I have no idea."

8    Did the defendant actually have no idea what this building was?

9    No.  This is the building where he lived, as you can see in his

10   DMV records Government Exhibit 601.  He was lying.  Why was he

11   lying?  He'd been caught, and he knew that he was breaking the

12   law.  To be clear, he was not bewildered or confused as to why

13   he was being arrested.  He knew exactly why he was being

14   arrested, and this video makes that clear.

15            (Media played)

16            (Media stopped)

17            MS. SMYSER:  Officer Smalls found the gun and asked

18   the defendant if he had a permit.  The defendant doesn't say,

19   What do you mean.  I had no idea I needed one.  Where do I get

20   one. What should I do.  No.  He says I don't need a permit.  A

21   permit is a permission, and I'll deal with this in court.

22            Now this is not an instance where the defendant just

23   didn't know the laws surrounding how you get guns.

24            (Media played)

25            (Media stopped)

N8UBPER4                        Summation - Ms. Smyser

1          MS. SMYSER:  "I'm not worried about a permission.  A

2     permit is a permission."  This is a man who knows about the laws

3     and has decided that they do not apply to him.  That is a

4     willful disregard of the law.  And I know you've seen this clip

5     already, but I want to watch it again because it shows a man

6     who knows exactly what he was doing.

7          (Media played)

8          (Media stopped)

9          MS. SMYSER:  The defendant here tells the officers

10    that they should learn.  They should learn not to uphold the

11    legalities and regulations and mandates and all of that extra

12    stuff.  He's not confused as to why he's being arrested.  He's

13    not trying to comply with the law.  No.  He's disregarding it

14    and telling the officers to do the same.  That is acting with a

15    bad purpose.

16          Third and finally, you know that the defendant knew he

17    was doing something wrong because after he was arrested in the

18    Bronx, he doubled down.  He was told he needed a permit.  His

19    gun was taken away, but he did not stop and think twice.  He

20    did not go out and try to get a gun permit.  He did not try to

21    do the right thing.  Instead, just two weeks later he packed up

22    his guns in the Bronx and he headed to Rhode Island with them

23    to meet his friends, the Rhode Island residents, and they

24    headed to Massachusetts.  And it was there that he was arrested

25    with his friends and with the guns.

N8UBPER4                          Summation - Ms. Smyser

1          We will talk a little bit about the details of that

2     arrest later, but for now it shows that all along the defendant

3     knew that he had been acting with a bad purpose.  These three

4     reasons:  That the defendant used a straw purchaser; his

5     reaction to the Bronx arrest; and the fact that he was arrested

6     in Massachusetts just two weeks later show you that the

7     defendant was not trying to lawfully get guns.  Instead, he was

8     choosing not to follow a law because he did not like it.  But

9     as Americans, we all have to live by the same laws, even if we

10    don't agree with some of them.  You don't get to decide which

11    laws apply to you.

12         So as we've discussed, the defendant was not a license

13    firearms dealer.  He received a firearm in New York that was

14    purchased outside of his state of residence, and he did so

15    willfully.  That is why the defendant is guilty of Count Two.

16         Now that you know that the defendant is guilty of

17    Count Two, I want to talk about Count One which is the

18    conspiracy charge.  As I expect Judge Rakoff will tell you, a

19    conspiracy is just an agreement, and here you know that the

20    defendant agreed to violate Section 922(a)(3) for the reasons

21    we've already walked through and more.  Let's focus on the

22    evidence that we've already seen.  We've already talked about

23    the fact that the defendant got the Canik from Vereen in New

24    York and that he did so willfully.

25         His relationship with Vereen is sufficient in and of

N8UBPER4                    Summation – Ms. Smyser

1    itself to convict on Count One.  The defendant agreed with

2    Vereen at minimum to transport and receive firearms from out of

3    state, but there is more to the defendant's conspiracy than

4    that.  You know, for example, that Vereen bought many more guns

5    than just the Canik, at least 24 guns in total to be exact. You

6    can see that in Government's Exhibit 902.  Many of those

7    purchases took place right before Vereen traveled to New York

8    and met with the defendant.  You can see that in the

9    highlighted rows on the screen.

10        But it's not just the defendant, these trips also took

11   please after the defendant's friends Jamil Bey and Ricardo

12   Rodriguez paid Vereen for guns.  Bey and Rodriguez are the

13   defendant's co-conspirators too.  They were paying Vereen for

14   guns that Vereen delivered to the Bronx.  Let's focus on Bey

15   for a moment.  Bey paid Vereen on September 12th.  He did not

16   have a gun license, as you can see in the bottom right-hand

17   side of the screen, and he lives in the Bronx.  His DMV and

18   Western Union records show that his address was 2759 Webster,

19   but his cell phone records also show a connection to 236 East

20   Gun Hill Road, which is an address that shows up in his DMV

21   history, and it's also an address where his cell phone

22   frequently is.

23        There's no question that the person who sent the money

24   to Vereen is Jamil Rasul Bey, the same Bey who was arrested

25   with the defendant in Massachusetts, which we'll talk about a

N8UBPER4                        Summation – Ms. Smyser

1    little bit in the bit.  The defendant is the link between Bey

2    and Vereen.  The defendant talked to Vereen almost 22 times

3    over this couple of month period and Bey almost 50 times, but

4    Bey and Vereen, they never called each other.  The defendant

5    was their go-between.  The defendant brought Bey into the

6    conspiracy and communicated on his behalf.  He linked Bey and

7    Vereen.

8           Let's talk next about Rodriguez.  The defendant is

9    also the link between Rodriguez and Vereen.  Like Bey,

10   Rodriguez paid Vereen on September 12, 2020.  He's from the

11   Bronx, and he didn't have a license to deal in firearms as you

12   can see here, and again the calls show that the defendant is

13   the link.  Rodriguez talked to Vereen just twice on September

14   14 and September 16 when Vereen is in New York after Rodriguez

15   had paid him for a gun.  But Rodriguez talked to the defendant

16   all the time, almost 200 times in three months.  The defendant

17   was Rodriguez's guy.  This all shows that the defendant is the

18   link to Vereen's guns.  He brought his friends Bey and

19   Rodriguez into the conspiracy, and he helped them get guns from

20   out of state.

21          Both Bey and Rodriguez like the defendant are

22   residents of New York and didn't have firearm licenses to

23   lawfully get guns from out of state, yet they did it anyway

24   together.  In other words, they're in a conspiracy.  I want to

25   briefly walk through Vereen's trips which are one of the

N8UBPER4                    Summation - Ms. Smyser

1    powerful pieces of evidence of the defendant's conspiracy.  As

2    you heard in this trial, Vereen took four trips to New York

3    from September 2020 through November 2020.  The first trip is

4    September 14th.  The next is October 3rd.  The third is October

5    22nd, and finally November 1st.  We'll walk through each of

6    these starting with the first.

7              On September 12, Bey and Rodriguez paid Vereen.  That

8    day and the next Vereen bought seven guns, and you see those

9    gun purchases here, six guns from three FFLs all in South

10   Carolina.  After Vereen bought those guns, he took a trip to

11   New York.  He first traveled up to New York.  And after a call

12   with Rodriguez and the defendant, he met with the defendant.

13   And two days later, he met with all of them before heading back

14   home, delivering guns, getting paid and going home.

15             Trip two is more of the same.  I'm not going to dwell

16   on it since we've already discussed it, but on October 1st and

17   2nd Vereen bought four guns in South Carolina, including the

18   Canik.  You can see those purchases here.  As I said, he bought

19   four guns plus the Canik.  He then traveled and met with all

20   these co-conspirators again.  You know that he met with the

21   defendant on October 3rd at 3 a.m., and the next day he's in

22   the same vicinity as the defendant and Bey and Rodriguez

23   delivering guns getting paid, going home.  A few weeks later,

24   Vereen and the defendant did it again.  Vereen bought guns in

25   South Carolina, three guns to be exact, which you can see here.

N8UBPER4                    Summation - Ms. Smyser

1    He then traveled to New York and he met with the defendant.

2          Here he is traveling up, meeting with the defendant,

3    and heading back home less than 12 hours in the Bronx

4    delivering guns, getting paid, heading home.  Finally, Vereen

5    did it one more time.  He bought two guns in South Carolina.

6    He traveled to New York.  Here he is going up, delivering the

7    guns to the defendant, getting paid, going home.

8          Members of the jury, these are Vereen's only trips to

9    New York over that nine month period from September 2020

10   through July 2021.  These trips happen only after Vereen

11   purchases guns in South Carolina, talks to the defendant and

12   then meets with the defendant, and sometimes he meets with the

13   defendant's co-conspirators too.  This is not a situation where

14   Vereen is just traveling to New York to see his family or his

15   friends or celebrate a holiday.  He's coming for quick trips to

16   see the defendant and deliver guns.  Sometimes staying for only

17   a few hours.

18         Use your common sense.  This is not a coincidence.

19   Again, this is all you need to convict on Count One.  You have

20   the defendant.  You have Vereen.  You have Bey.  You have

21   Rodriguez all in conspiracy together, agreeing to purchase guns

22   from outside their state of residence without licenses.  But

23   again, that is not all the evidence you have about the

24   conspiracy.  You have the Massachusetts arrest.  You know that

25   Vereen bought a gun, a Glock on July 23, 2020, which is

N8UBPER4                    Summation - Ms. Smyser

1    highlighted here.

2            The defendant and Jamil Bey and others were then

3    arrested on July 3, 2021.  This group of men was arrested with

4    the Glock and with many other guns.  They were all part of a

5    conspiracy to transport and receive guns from out of state

6    without the proper licenses.  How do you know?  Let's start

7    with the defendant and with Bey.  This is from Government

8    Exhibit 330C, Jamal Latimer's body worn camera.  On that camera

9    you see the defendant on the right wearing body armor.  The

10   parties have agreed on that, and he is standing right next to

11   Jamil Bey whom he helped get guns from Vereen.  Let's watch

12   this.

13           (Media played)

14           (Media stopped)

15           MS. SMYSER:  Latimer, the leader asked twice, nothing

16   is stolen, right.  Nothing is stolen, right.  And Bey says,

17   nah, nah, hell nah.  And as Bey is answering, the defendant,

18   who's the man in the upper right-hand corner of the screen is

19   standing next to him shaking his head no confirming that those

20   guns were not stolen.

21           Watch this again and pay careful attention to the

22   defendant's head shake as Latimer ask if the guns are stolen.

23           (Media played)

24           (Media stopped)

25           MS. SMYSER:  The defendant knows that these guns

N8UBPER4                           Summation – Ms. Smyser

aren't stolen. How does he know that? Because he and Bey are

the ones who brought the guns from New York to Rhode Island to

Massachusetts. They're the ones who are legally supplied the

guns for the group, only two weeks after the defendant's arrest

for illegally possessing a firearm in the Bronx.

          Let's step back for a second and talk about this group

and who they are and why they wanted guns. First, let's focus

on Jamal Latimer. He was the leader and spokesperson for the

group that you saw on Trooper Casey's body camera. He was

arrested that day as you see here on the screen, and he is a

Rhode Island resident, which you see in his DMV records,

Government Exhibit 605. He also does not have a license to

deal firearms. This is the other individual who's featured in

that body worn camera clip which Latimer is asking if the guns

are stolen. This individual is sitting in the car when Latimer

is asking that question. The defendant is confirming that

they're not stolen.

          This is Aaron Jiminez, Alban El Curragh, he is a New

York resident, and he also does not have a license to deal in

firearms, and DMV records show that at least one point in time

he was the defendant's neighbor and they were living at the

same address. One question you might have is why. Why are the

defendants and Bey and all these other men agreeing to

illegally transport firearms from out of state? Because they

are part of a so-called militia who wants to train with their

N8UBPER4                     Summation - Ms. Smyser

1    weapons.  And that training as Jamil Bey tells the defendant

2    here on the screen starts on July 3rd, 2021, the day they are

3    arrested in Massachusetts.  When they are arrested, they are

4    headed to operation Fountain Head which is led by Jamal

5    Latimer, the commander of operations as you see here.  Latimer

6    sends a packing list to a group chat with many of the people

7    who were arrested.  That packing list has a lot of military

8    equipment on it, but it also has firearms at the very top.

9         Latimer wants to use this equipment to train.  You see

10   here he says he wants blanks to practice firing and ambushes

11   and assault fighting positions, etc.  Essentially Latimer wants

12   them to be a military unit.  We could have five platoons with

13   the amount of people in this group.  That's damn near a company

14   he says.  And a man named Quinn responds in the bottom

15   right-hand corner of the screen, Quinn is Quinn Cumberlander,

16   one of the people who was arrested.  Quinn, like Latimer, is a

17   Rhode Island resident and does not have a license to deal

18   firearms.  You see that here on Rhode Island residency in

19   Government Exhibit 606.

20        Now, the defendant is not part of that group chat that

21   we were talking about, but it's very clear that he knows what's

22   going on.  This makes sense because his friend Jamil Rasul Bey

23   is in that group chat.  You could see that here, as is Aaron

24   Jiminez, his friend and old neighbor.  And as you see here on

25   June 21st, Latimer sends out the packing list to the group,

N8UBPER4                          Summation - Ms. Smyser

which includes a daypack in addition to firearms.  That same

day just a few hours later Jiminez ask the defendant if the

defendant needs a daypack, and the defendant responds that he

already has one.

     You also know that the defendant knew what was going

on in this group chat because the next day he is starting to

text other people about it.  You should come to the three day

training.  He's texting on Signal, this unsent message. Signal

as you heard was an encrypted messaging application which is

more private.  The text messages and the group chat also show

that the defendant is a trusted member of this group.  When the

defendant was arrested in the Bronx, Jamil Bey informed the

group of that arrest.  More precisely he said that the

defendant had been abducted.  The group sprung into action.

They offered thoughts, and they asked for updates.  And just a

few days later Jamal Latimer even sends a text saying countless

members of their group, including the defendant included, are

in jail.  And these repeated arrests of their group members

show that they know that they are violating the law and they

are just choosing to ignore it.

     The defendant gets out of jail in time to go to that

training on July 3rd.  The group had a plan.  They would travel

from out of state, including the Bronx members, to meet in

Rhode Island where Latimer lives, their leader.  That's also

where another co-conspirator Quinn Cumberlander lived.  And

N8UBPER4                        Summation - Ms. Smyser

1    from there, they would drive from Massachusetts and other

2    states to Maine. They were going to travel in two cars which

3    were loaded with firearms supplied at least in part from the

4    defendant and Bey who came from New York, and those cars also

5    had a lot of ammunition. Latimer explain this plan to Trooper

6    Casey who comes across the group around 1 a.m. on the 4th of

7    July weekend.

8                    (Media played)

9                    (Media stopped)

10          MS. SMYSER:  They are a militia decked out in AR-15

11   and military fatigues heading to Maine to train.  The defendant

12   who was helping to get guns for the group knows what's going

13   on.  Which guns is he getting?  He's getting these guns.

14          MS. BAHARANYI:  Objection, your Honor.

15          THE COURT:  Overruled.

16          MS. SMYSER:  One of these guns was purchased by

17   Vereen.  It is a Glock with serial number AELY222.  It's this

18   gun right here purchased by Vereen in South Carolina brought to

19   the defendant in New York.  But that is not the only gun that

20   the defendant is tied to during this stop.

21                   (Media played)

22                   (Media stopped)

23          MS. SMYSER:  In this video the defendant is holding

24   what appears to be an AR-15 for Latimer.  That is the photo on

25   the left.  In that video he also appears to have a firearm

N8UBPER4                         Summation - Ms. Smyser

1   strapped across his chest that's sitting on his hip.  You see

2   that here in the middle of the screen.  Plus there is the gun

3   purchased by Vereen, the defendant's straw purchaser.  And

4   these guns are passed around between the group members because

5   they are group guns, guns that this group wanted to transport

6   interstate without a license.

7          Based on all of this evidence, you know that the

8   defendant was in a conspiracy to transport and receive firearms

9   into the state of residence of the ultimate receiver.  The

10  Massachusetts arrest as I mentioned earlier also provides

11  strong evidence of this group's willfulness.  Why?  Remember

12  that this arrest came two weeks after the defendant's arrest,

13  two weeks after the group learned about the defendant's arrest.

14  They had plenty of notice that they were probably doing

15  something unlawful.

16         But on July 3rd when the police calmly asked them to

17  put their guns away, they refused.  They refused to put away

18  their guns.  They passed around their guns, including to the

19  defendant.  They had their guns and their ammunition and their

20  magazines at the ready, specifically they had nine guns,

21  including assault rifles, over a thousand rounds of ammunition

22  and almost 20 magazines.  This arsenal shows that they planned

23  this.  They needed to transport guns interstate in order to

24  make this happen.  The Massachusetts arrest tells you what was

25  in the defendant's mind.  It shows you that the defendant knew

N8UBPER4                          Summation - Ms. Smyser

1   that he was acting with a bad purpose, just two weeks before

2   he'd been arrested in the Bronx, informed that he needed a

3   permit for the gun.

4          And two weeks later what is he doing, he's not trying

5   to comply with the law.  Instead, he's moving guns from New

6   York to Rhode Island, including to residents of that state, and

7   to Massachusetts and they plan to go to Maine for a military

8   training exercise.  He knows exactly what he is doing.  Now

9   that you've seen the evidence, you know that the defendant and

10  others agreed to violate the law.  You know they didn't have

11  gun licenses.  You know that they transported and received

12  firearms in their states of residence like New York and Rhode

13  Island, and you know that the defendant acted willfully.

14         Members of the jury, this is not a man who received a

15  gun once.  This is not a one-off thing.  It is not a mistake.

16  The defendant is a man who disregards the laws that he doesn't

17  like, laws that are designed to keep everyone safe.  He is a

18  man who thinks he is above the law.  That should end today

19  cause when you consider all of the evidence and when you use

20  your common sense, you will come to the only conclusion that's

21  consistent with the evidence and the law, that the defendant is

22  guilty.

23         THE COURT:  Thank you very much.  Now we'll hear from

24  defense counsel.

25         MS. BAHARANYI:  Your Honor, before we begin, is it

N8UBPER4                      Summation - Ms. Smyser

1   possible to take a brief break.

2              THE COURT:  All right.  I'm going to give you a longer

3   break later this afternoon, but we'll take a five-minute break

4   at this time.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N8UBPER4                        Summation - Ms. Smyser

1                  (Jury not present)

2                  THE COURT:  Please be seated.  Let me just mention in

3        the final instructions that I sent you earlier today, there

4        were a couple of typos on page 21.  In the last sentence

5        "willfully" means to act with bad purpose and evil intent,

6        there should be no comma after intent, to act unlawfully even

7        if the defendant does not know the specific law he is

8        violating.

9                  On page 23 in the third sentence there should be more

10       plural, so it should read in Count One, The unlawful purpose

11       alleged to be the object of the conspiracy is an agreement to

12       transport firearms that were obtained outside the states of

13       residency of the eventual receivers into the states of

14       residency of the receivers.  I've also change slightly, but not

15       in any substantive way, the next sentence, and I'll get you all

16       this before I give the jury the charge tomorrow.  But the

17       sentence beginning the gist of, it now reads, The conspiracy

18       here charged is that several persons, including the defendant,

19       agreed to a plan to commit the same kind of substantive

20       violations.

21                 The previous sentence had referred back to Count Two.

22       And finally the next sentence -- and please bear in mind I

23       added I've slight few words there.  Please bear in mind the

24       conspiracy is an entirely distinct and separate offense from

25       the particular substantive crime charged in Count Two of the

N8UBPER4                          Summation – Ms. Smyser

1    defendant actually receiving a specific out of state firearm in

2    the defendant's state of residence.

3           Finally, with apologies to Blackstone, I think the

4    word "evil" should be taken out of the instruction on page 21.

5    So in addition to the typos I previously corrected, I'm

6    correcting it by deleting the word "evil." So it now reads,

7    willfully means to act with a bad purpose and intent to act

8    unlawfully, even if the defendant does not know the specific

9    law he is violating.  Okay.

10          Defense counsel is ready, we'll bring in the jury.

11          MS. BAHARANYI:  I am, your Honor.

12          THE COURT:  Very good.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

N8UAAPER5                    Closing Statement – Ms. Baharanyi

1          (Jury present)

2          THE COURT:  Please be seated.

3          Okay, counsel.

4          MS. BAHARANYI:  Yes, your Honor.

5          "That's my arm, sir.  It is my constitutional right to

6     have it.  I'm not doing anything wrong."

7          When Lucha El was surrounded by officers outside of

8     his home, he didn't know why they were approaching him.  He had

9     been listening to music, chatting with his favorite neighbors,

10    minding his own business on a warm summer night.  He had no

11    idea why they approached him.  He had no idea why they

12    surrounded him.  He had no idea why they were grabbing his bag

13    and he certainly did not understand why he was being arrested

14    or grabbing his arm and his bag.  Lucha El, did not believe

15    that he was doing anything wrong in carrying a firearm.  And he

16    certainly did not believe he was doing anything wrong in

17    receiving a firearm from a different safe.

18         Your role as a jury is not to decide whether Lucha El

19    was mistaken.  Your role is not to decide whether he was wrong

20    on the law.  The question for you to decide are whether the

21    government proved beyond a reasonable doubt that Lucha El

22    unlawfully received a handgun from someone that he knew, from a

23    family member and whether the government's proven beyond a

24    reasonable doubt that Lucha El agreed or conspired with others

25    to unlawfully receive a handgun.  Those are the questions.

1    Based on what Lucha El says, you know the answer's no.  Based

2    on what Lucha El does, you know the answer is no.  Based on

3    what he believes, you know the answer is no.

4            The government wants you to convict Lucha based on the

5    places that he's been, the people that he knows, the guns

6    gathered by those other people without Lucha's involvement.

7    They have weaved together a complicated tale of twists and

8    turns based on what they believe.  But the truth is simple.

9    Lucha El had no intent to break the law in receiving a firearm

10   from out of state.  He'd made no agreements with other people

11   to unlawfully receive or transport firearms.  He had no bad

12   purpose.  He did not act with bad intent.  And so he is not

13   guilty.

14           So then what is this case about?  Why are we talking

15   about militias in Massachusetts when we're here in federal

16   courthouse in New York City?  Who are those people he made

17   agreements with and where are those agreements to receive

18   firearms?  Where are the messages, the communications that show

19   you that he is receiving firearms unlawfully?

20           The government, the confusion you might feel based off

21   of what you heard over the past two and a half days, three

22   days, is a product of the government's misdirection.  The

23   government's waived other people in front of you, other places,

24   other agreements to distract you from the truth that was in

25   Lucha's mind, that he was doing nothing wrong.  And as my

1    colleague explained in opening, what is in Lucha's mind was

2    what's matters.  That is what distinguishes unlawful conduct

3    from lawful conduct.

4            I'll talk briefly about the law.  The judge will

5    instruct you that the government, the government alone has an

6    extremely high burden of proving that Lucha is guilty beyond a

7    reasonable doubt on two counts.  In Count One Lucha is charged

8    with conspiracy to unlawfully transport firearms out of state

9    and into the state of residency of the receiver.  In Count Two

10   Lucha El is charged with unlawfully receiving or transporting

11   an out of state firearm into his state of residence, New York.

12           To prove Count One the government would have to prove

13   beyond a reasonable doubt that Lucha and at least one other

14   person specifically agreed to willfully receive or transport

15   firearms into their states of residence.

16           The government would have to prove for Count Two

17   beyond a reasonable doubt that Lucha willfully received a Canic

18   or Janic TP 9 firearm from out of state into New York.

19           For both of those counts willfulness matters.  What

20   was in his mind matters.

21           Now the concept of willfulness is simple and will be

22   explained by the judge when he gives you his instructions but I

23   expect the judge to say, a person acts willfully when they do

24   something, when they act with a bad purpose.  A person acts

25   willfully when they act with a bad purpose in their mind.  In

1    short, to prove Count One the government must prove that there

2    was some unlawful agreement and bad purpose.  And to prove

3    Count Two, the government must also prove that there was bad

4    purpose.  His mind matters.  What was in his head matters.  And

5    the government fell far short of proving these two counts,

6    proving willfulness beyond a reasonable doubt.  And for that

7    Lucha El is not guilty.

8            Now a couple of days ago the government opened with a

9    story.  They opened with a story about Lucha coordinating

10   purchases with the straw purchaser far off over 60 miles away

11   and coordinating these purchases for a group that Lucha was a

12   member of.

13           From the beginning this story has never made sense.

14   On the screen you can see the Western Union payment between

15   Lucha and Keith Vereen.  This was a payment sent using Lucha's

16   biological name, his address, his phone number.  Nothing was

17   hidden.  And this is the payment that the government says was

18   for the purchase of the firearm that is described in Government

19   Exhibit 430.

20           Look at the price of that firearm, $495.  Lucha sent

21   $350 over a week before this firearm was purchased.  What straw

22   purchaser or gun trafficker buys a gun at a financial loss?  At

23   a $150 loss?  That's not something that a straw purchaser does.

24   That is something that your family might do.

25           Maria Otero took the stand for her cousin, Lucha.  She

1    took the stand to explain to you the real relationship between

2    Lucha and Vereen.  Not the straw purchaser straw, purchase

3    relation that was presented to you in openings.  No.  Lucha's

4    grandmother and Keith's grandmother are sisters.  They both

5    grew up in the Bronx.  They've attended family functions

6    together.  Defense Exhibit C1, you can see Lucha surrounded by

7    family and Keith Vereen surrounded by Lucha's brother and

8    Lucha's father.  This is not a straw purchaser relationship.

9    This is family.  And from family Lucha accepted a handgun, a

10   handgun that had been purchased in a gun store, an FFL, a

11   handgun with a serial intact written on its side, a handgun

12   with all the appropriate markings, the manufacturer number, the

13   make, the model, the importer.  Lucha did not believe that he

14   was doing anything wrong in receiving a handgun for self

15   protection in an increasingly dangerous neighborhood.

16           And Officer Smalls told you exactly what the

17   neighborhood that Lucha El was like is from.  He told you

18   exactly what Lucha El's neighborhood is like, gang violence,

19   assaults, robberies.  Lucha El received this handgun for his

20   own self protection.  He didn't intend to disobey the law in

21   receiving a handgun.  He did not act with bad purpose.  He

22   accepted this from family.

23           But how will you know that Lucha did not have bad

24   purpose in his mind when you received this firearm?  How will

25   you know?  Well, we spoke a little bit earlier about the

1    firearm but take a look at this.  You can see clearly the

2    details on this firearm.  As I mentioned, the manufacturer, the

3    model, the importer and ATF Agent Lennea Gordon got on the

4    stand.  She explained that these markings on a firearm, they

5    are important.  They are the way that the ATF can trace a

6    firearm, the way that the ATF can determine who purchased a

7    firearm, who bought a firearm.  And without this information

8    without the manufacturer, without the serial number, without

9    the model, tracing these guns are almost impossible.

10         Lucha did not file off the serial number.  You can see

11   it right there in front of your face.  Lucha El did not remove

12   or hammer it off.  He did not remove what is the easiest way to

13   prove where a gun came from and who purchased it and he didn't

14   do that.  He didn't remove that because he did not believe that

15   receiving a firearm from his cousin was somehow unlawful.

16         How else will you know is that Lucha did not act with

17   bad purpose in his mind?  The proof is on the video.

18         (Video playing)

19         MS. BAHARANYI:  Officers approached Lucha, surrounded

20   him.  He never tries to run away.  He never tries to fight the

21   officers.  In fact, he gives the officers his ID card with his

22   address, the address that he is standing in front of, 3318

23   Perry Avenue.  He hands that to officers during this

24   interaction.  He explains to officers why he believes he has a

25   right to carry that firearm.  He tells them, "It's my

N8UAAPER5                    Closing Statement – Ms. Baharanyi

1    constitutional right".

2            Now, if you are sitting there and you are thinking
3    everybody knows you can't have a gun in New York City, if
4    that's going through your mind, I want you to acknowledge it.
5    I want you to take those beliefs, those preconceived notions
6    and I want you to leave them outside the deliberation room.
7    Your job today is to consider the facts and evidence, the facts
8    that were presented and decide if the government's met their
9    burden, their heavy burden.  And from the facts that are in
10   evidence here in this courtroom, the facts about Lucha's
11   actions about his words, about his beliefs, you'll know he did
12   not act with a bad purpose in his mind.

13           The government spent a lot of time talking about Keith
14   Vereen and Keith Vereen's trips up and down the Atlantic coast
15   in the fall of 2020.  These trips are not proof of Lucha El's
16   role in the conspiracy.  They're not proof of Lucha El's state
17   of mind when receiving a firearm from Keith.  These trips are
18   distractions.  Over dozens of slides and nearly two hours of
19   testimony from Mr. Petersohn, you did not hear any reliable
20   information on the location of the four devices that
21   Mr. Petersohn reviewed and analyzed.  Mr. Petersohn, who is the
22   government's frequently used and very well paid expert or cell
23   site location consultant testified at length about cell site
24   location information.  But his testimony made clear that he
25   can't pin a cellphone to a particular location.  And his

1    testimony made clear that the general vicinity, his estimate

2    about a phone being in the general vicinity is based on the

3    assumption that a cellphone connects to the closest tower.

4    That's an assumption you heard him say he didn't test.  He

5    didn't go to the neighborhood at east Gun Hill Road in

6    Bainbridge.  He didn't drive to the Bronx to check out the

7    towers that he was testifying about.  He didn't do those drive

8    tests that can provide concrete information on the signal

9    strength of a tower.  He provided conclusions to you, the jury,

10   without proof to back it up.  But even if you were to set aside

11   our concerns about the reliability of Mr. Petersohn's

12   testimony, the reliability of his conclusions about the Bey

13   device, Lucha's device, Rodriguez's device, Vereen's device,

14   even if you set that aside and you accept his conclusions, this

15   does not mean that Lucha El was part of any elicit conspiracy

16   to deal in firearms, receive firearms, transport firearms.

17           As you know from Ms. Otero, Keith Vereen is from the

18   Bronx.  he grew up in the Bronx.  He has a family still living

19   in the Bronx, Maria, Lucha, all of the men in the family that

20   you saw in those photographs.  He has ties here in the Bronx

21   and a community in the Bronx and all of that location

22   information could each suggest is that when he comes to town he

23   visits family.  He visits his community.

24           And Mr. Petersohn was clear when I asked him, the call

25   detail records don't tell you what phone calls were about.

1    Text messages, the content of text messages aren't recorded on

2    call detail records.  So anything the government has to say

3    about what was said to whom or when or where, all of that is

4    speculation.  They don't know.  They're guessing.  But you

5    shouldn't.

6            We also know from Mr. Petersohn from his

7    cross-examination that he didn't include all the towers, the

8    cell site, location towers that Vereen used when he traveled

9    between September and November 2020.  What that means is he

10   didn't include all the towers that he says can help determine

11   or give a general vicinity of where a cellphone is located and

12   that's no fault to Mr. Petersohn.  The government told

13   Mr. Petersohn what areas to focus on.  The government gave

14   Mr. Petersohn the particular call detail record they wanted him

15   to review.  The government told Mr. Petersohn, here is the

16   limits.

17           We took the time to go through the records for Keith

18   Vereen's phone.  We didn't limit ourselves.  We didn't limit

19   ourselves to the location or to the particular people the

20   government wants to focus on, and what we found was telling.

21   Towers and different parts of the Bronx that Vereen used that

22   weren't used by Lucha, the tower at 815 Gerard Avenue and the

23   tower at 643 Tinton Avenue used multiple times during this same

24   time period that did not show up on Mr. Petersohn's maps.

25           Towers in different cities that Vereen passed through

1    that he used while he is on his trips, a tower in Ramsey, New

2    Jersey, these locations weren't provided to you.  Neither were

3    the different phone numbers, phone numbers other than the

4    numbers provided by the government.  Phone numbers that did not

5    show up in Mr. Petersohn's direct testimony.  But there are

6    different phone numbers that the Vereen device called multiple

7    times over and over during the months of September, October and

8    November 2020.

9          We spoke at length about one of these numbers,

10   9178038650.  That number showed up over 100 times over 100 on

11   Vereen's device during this timeframe.  That number was not

12   part of his presentation and that number certainly didn't

13   belong to Lucha.

14         All of this matters because Lucha El had one firearm,

15   one firearm from his cousin.  Yet the government wants you to

16   believe that Lucha El is somehow connected to 23 other

17   firearms.  And this isn't based on any communications that the

18   government has.  This isn't based on any video surveillance

19   footage that the government has.  This is not based on any

20   trail of money payments.  It's not based in fact.  It's

21   speculation.  And the call detail records show that this

22   speculation is unwarranted.  Especially when there are other

23   people that Vereen contacted other places that Vereen went.

24   There were other recipients of those 23 guns.

25         Now, how else do we know that Lucha was only involved

1    in receiving that one firearm, that one from his cousin?  The

2    call detail record do show a pattern.  The records show that

3    before Keith Vereen took his trip to New York on August --

4    excuse me -- October 1, 2020?  Before that trip he spoke to

5    Lucha multiple times.  There are five calls between Vereen and

6    Lucha before that trip.  Again, this trip where Keith Vereen

7    purchased the firearm that was given to Lucha, the one, these

8    communications with Vereen coordinating with Lucha before

9    leaving South Carolina and before arriving in New York.  But

10   for every other trip discussed by the government, Vereen's

11   device only communicates with Lucha when Vereen is already in

12   New York City.  He is already in town.  There's no coordination

13   beforehand.  For his trip -- excuse me -- for the purchase of a

14   gun in South Carolina on September 12 and September 13 Keith

15   Vereen's device connected with Lucha only after Vereen was

16   already in New York.  There is no coordination.  There is no --

17   arrangements.  For the gun purchased on October 21, 2020 and

18   then the trip that Vereen took after that gun purchase, there

19   were no phone calls between Lucha, Lucha El and Keith Vereen,

20   none, no coordination, no planning, nothing.

21           And finally, for that last trip that was discussed,

22   the gun was purchased on October 31st.  Vereen's trip was from

23   October 31st to November 1st.  His device didn't connect to

24   Lucha's a single time.  No communications.  No arrangements.

25   No coordination.  The pattern of these communications was

N8UAAPER5                    Closing Statement – Ms. Baharanyi

1    September 14 through October 21st, for October 31 is consistent
2    with Vereen saying hey, cousin, I'm in town, when he shows up.
3    It is not consistent with Lucha coordinating gun purchases.  If
4    Lucha were working with Vereen to coordinate the purchase of
5    nearly two dozen firearms worth thousands of dollars for
6    himself or for anyone else, you'd see proof of that.  You'd see
7    a conversation.  A message, arrangements, phone calls at the
8    time of purchase or before the purchase.  There is nothing like
9    that here and there is nothing like that because Lucha did not
10   receive or conspire with anyone else or Keith Vereen to receive
11   23 firearms.  Lucha had one gun.  And for that one gun he
12   accepted it from his cousin without knowing that he did
13   anything wrong.
14           Now, the government does claim that Lucha, the
15   government claims that Lucha coordinated purchases of firearms
16   for a group, a group that he had joined and a group that is
17   planning to go camping and conduct firearms training in Maine.
18   The government told you in openings that Lucha El wasn't only
19   charged with the important task of coordinating firearm
20   purchases for the group but he was a trusted member of their
21   inner circle.  From the two and a half days of testimony that
22   you heard you now know this story was another distraction.  The
23   only thing that the government got right about Lucha El and his
24   membership or relationship to that group is they planned to
25   learn and train with firearms and camp out in July 3, 2021,

1    that group.  And there's no question that Lucha El knows

2    members in this group.  But Lucha was not a trusted member of

3    the inner circle responsible for receiving or transporting

4    firearms.  He was not involved in the planning of this training

5    in July 2021.  And he certainly did not coordinate with others

6    receiving or transporting firearms for this training.

7            This afternoon we spent a long time on text messages

8    and group chats a couple of hours.  This particular group chat

9    which is Government Exhibit 1202A involves dozens of Moors and

10   was created by Mr. Abdullah Bey, the owner of the chat.  And,

11   yes, in this chat there is conversation about a training in

12   July 2021.  But look closely at the numbers.  The phone numbers

13   and the people who were involved in this group chat.  Lucha

14   El's not one of them.  He's not a member of this group.  We

15   spent hours talking about text after text, group chats, duo

16   chats that Lucha was not part of:  Lucha's name and his number

17   was not part of this thread because he is not part of this

18   conversation.  Lucha did not receive any firearm packing list.

19   He did not receive new firearms, packing lists from this group

20   thread.  Again, he was not in this conversation.  He's not a

21   trusted member of this inner circle.  He isn't the middleman

22   for firearms.  He want even in the group chat.

23           Not a single one of the messages that you saw today

24   during the government's last witness involves Lucha discussing

25   firearms.  There is not a single text with Lucha discussing how

1    to obtain firearms, send firearms, transport them across state

2    lines, coordinate the purchases of firearms for other people,

3    nothing.  No text.  No communication.  That's because Lucha had

4    nothing to do with obtaining firearms for this group.

5         And with this particular group the absence of text is

6    not out of a fear of detection.  They are not trying to hide

7    how much they valued the second amendment.  They are not trying

8    to hide how much they, how proud they are to possess firearms.

9    They have no problem discussing plans with firearms by text

10   message.

11        You can see on the screen this is one of the messages

12   shared in the group.  This message discussed Marine Corp, the

13   use of different maneuvers, the use of close combat.  These are

14   not individuals who are afraid of firearms or anything in that

15   realm and is not afraid of putting it in writing.

16        Lucha is not in any of these texts because he never

17   agreed to transport or receive anyone's state of residence a

18   firearm.  These messages are sent in group chats and group

19   texts without Lucha by people who are not Lucha and have

20   nothing to do with Lucha.

21        The government's own theory about why Lucha would have

22   been gathering or helping others gather firearms for a July

23   2021 training makes no sense chronologically.  You see from the

24   messages Lucha is told about this training in May 2021.  Those

25   told about this training by someone named Jamil Bey.  The

1    government's story is that Lucha worked to purchase or

2    coordinate purchases with Keith Vereen in September and

3    October, November 2020 for a training that he hadn't even been

4    invited to until May 2021.  That doesn't make sense.  The

5    chronology doesn't make sense.  The timeline doesn't make sense

6    and that's because Lucha was not coordinating with anyone to

7    receive or transport firearms out of state.

8         A lot was made, a big deal was made out of Lucha's

9    arrest in Massachusetts.  This arrest in Massachusetts with

10   other members of this training group is not proof that he was

11   part of a federal conspiracy to receive firearms into his state

12   of residence.  It is just a final distraction.  That's it.

13        And how do you know this is a distraction?  Well, you

14   saw the DMV record for different people that the government

15   believes were involved in this conspiracy.  No one's state of

16   residence?  Massachusetts.  Not a single person lives there.

17   Massachusetts is not the state of residence for any of people,

18   any of the other people mentioned this case, not a single

19   person could be found guilty for receiving a firearm into the

20   state of Massachusetts because they don't live there.

21        But beyond the problem, the geography for the

22   government Lucha doesn't say or do anything in this arrest that

23   proves his membership in is conspiracy.  His membership in a

24   conspiracy to receive guns into states of residence.  He was

25   not the leader of this group.  He was not the spokesperson for

N8UAAPER5                    Closing Statement – Ms. Baharanyi

1    this group.  You heard Trooper Casey testify that he couldn't

2    really recall ever interacting with Lucha in Massachusetts.

3         The government made a very big deal about what a

4    headshake meant during this Massachusetts arrest.  I want us to

5    take a look at that again.

6         (Video played)

7         MS. BAHARANYI:  Stop there.

8         The government asks you to assume from that clip those

9    few seconds that Lucha's headshake meant that he knew the guns

10   were not stolen, that he new where the guns came from, that he

11   somehow agreed with other people to transport guns into

12   Massachusetts or into other states of residence.  They asked

13   you to make layers and layers of assumptions about what this

14   head shake meant.

15        So use your common sense.  There is only one right

16   answer when the leader of your group approaches you and another

17   individual, asks you are any of these firearms stolen right

18   before you are about to get arrested by the police.  A

19   headshake.  That headshake says nothing about the origins of

20   the guns.  That headshake says nothing about whether the guns

21   were received into states of residence and that headshake is

22   truly just a headshake in a moment where Lucha appeared

23   bewildered was largely silent and panicked.

24        There were guns found inside of the cars in

25   Massachusetts.  Now I want to take a moment to discuss those

1    guns.  The government has asserted claims that Lucha somehow

2    brought these guns or coordinated with others to bring these

3    guns from New York to Rhode Island to Massachusetts.  But of

4    the nine guns that were inside of those cars, zero had any

5    connection to Lucha.  One was purchased by Keith Vereen.  The

6    other eight don't even show up on the list of purchases that

7    Vereen made.  And for the single gun that shows up in those

8    cars that's connected to Keith Vereen, Lucha didn't send any

9    money to Keith for that gun.  There aren't messages between

10   Keith Vereen and Lucha about this gun.  And Lucha was certainly

11   not stopped in Massachusetts holding this gun.  That's because

12   Lucha never possessed this firearm.  He was in no way connected

13   to it.  And the government's claim that Lucha brought,

14   tailgated with these guns from New York to Rhode Island to

15   Massachusetts is a statement and claim that you've seen

16   absolutely no fact or evidence to support and that's because it

17   didn't happen.

18          So really, why did you hear so much about

19   Massachusetts from two different witnesses?  Why were you shown

20   photographs of big guns that Lucha never touched and Lucha

21   never bought and never brought?  Why has the government spent

22   so much time talking about other people and other places?  The

23   reason is because the government does not have proof that Lucha

24   willfully disobeyed the law.  And that is because Lucha did not

25   violate the law.  He did not know that he was doing anything

1    wrong or unlawful.  He did not form any agreements with other

2    people to do anything wrong or unlawful, to receive firearms

3    into other states of residence.  He had no bad purpose in his

4    mind.  He formed no bad agreements and that's the simple truth.

5    And fortunately for Lucha, the government has not find a word

6    on this.  There are important legal principles that protect

7    Lucha El and there is you, the jury.

8            Judge Rakoff will tell you in a few moments or perhaps

9    tomorrow that there are two fundamental protections that exist

10   for people in Lucha's position, people accused of crimes that

11   they did not commit.  The first, the presumption innocence.

12   The second, reasonable doubt.  These protections are put in

13   place to make sure that we don't wrongfully convict people.

14   Make sure we don't wrongfully convict innocent people like

15   Lucha El.

16           These principles protect Lucha today just as they

17   would protect any of you sitting in those chairs.  The

18   presumption of innocence means that we presume that Lucha is

19   innocent and that can be very easy to say.  But it can

20   sometimes be hard to do.  So here's a good way to think about

21   it.

22           Think of someone you admire, you respect, maybe a

23   sibling, a parent, a close friendly.  Now imagine you get a

24   call one day and you are told that this person that you admire,

25   this person you respect, this person that you trust committed a

1    serious crime like the one Lucha El is charged with.  Imagine
2    how you would feel, the shock, the disbelief.  No way.  That
3    feeling is the presumption of innocence.  That is the way that
4    the law requires you to feel about Lucha El.  You must presume
5    that Lucha did not act willfully or with bad purpose to violate
6    the law when he received a firearm from his cousin.  You must
7    presume that Lucha did not agree with other people to violate
8    the law, to unlawfully receive firearms into their states of
9    residence.  That's what the presumption of innocence requires
10   in that case.
11           Now the second fundamental protection that's in place
12   for all of us is reasonable doubt.  Before the government can
13   convict someone convict, a person of a serious crime they have
14   to prove their case beyond a reasonable doubt.  The judge will
15   instruct you in a moment on what that means as well.  And I
16   expect he will tell you that reasonable doubt is doubt that
17   would cause a reasonable person to hesitate to act in a matter
18   of importance in their life.
19           Proof beyond a reasonable doubt is so convincing that
20   you would not hesitate to rely on it in your important affairs.
21   This is a high burden.  This is an extremely high burden,
22   higher than what it takes for the state to take someone's child
23   away, and it has to be high.
24           Proof beyond a reasonable doubt is what protects
25   innocent people like Lucha El from wrongful conviction.  Only

N8UAAPER5                    Closing Statement – Ms. Baharanyi

1    if the government satisfies its burden, proves its case beyond

2    a reasonable doubt, can you convict Lucha.  But they can't in

3    this case because he did not act unlawfully.  He did not act

4    with bad purpose.  And if you are left with any questions about

5    what Lucha El really intended when he received a firearm from

6    his cousin, then you have reasonable doubt and the government

7    has not proved its case

8            MS. SMYSER:  Objection.

9            THE COURT:  Well, I will give you tomorrow morning the

10   exact definition of reasonable doubt and that will be what

11   governs.

12           MS. BAHARANYI:  If you are having trouble

13   understanding how Lucha fits into that conspiracy with people

14   he's never spoken to about firearms, he's never communicated

15   with about firearms, people who have their own group chats,

16   their own conversations and their own agreements, if you are

17   having trouble connecting those dots, that is reasonable doubt.

18           And if you have lingering questions about Lucha El's

19   state of mind or lingering questions about the conspiracy

20   because of all the people you did not hear from, then again,

21   the government has not met its burden.  You have another reason

22   to doubt.

23           And of course, if based on all of the evidence and the

24   lack of evidence, you conclude that Lucha El never unlawfully

25   received or agreed with others to unlawfully receive firearms

1  into their states, then you must find Lucha, Lucha El not

2  guilty.

3          In Spanish, "Lucha El Por Libertad" means quite simply

4  "the struggle for freedom".  And throughout this case we asked

5  you to focus on Lucha.  We've asked you to call him by his

6  right name to honor him.  And even as the government dangles

7  distraction after distraction in front of you and even when

8  they stand back up after me to remind you of those

9  distractions, what matters is what Lucha El intended, what was

10  in his mind.  He did not receive a firearm into New York with

11  the intent to violate the law.  And he never agreed with others

12  to unlawfully receive firearms into their states of residence.

13          Lucha El Por Libertad should not be sitting in that

14  chair.  Like I said, "Lucha El Por Libertad" means "the

15  struggle for freedom".  And, jury, today you have the power.

16  You have the ability and you have the duty to help him in that

17  struggle.  When you finished what is a very heavy

18  responsibility of deliberating in this case I will ask you to

19  return the only just verdict, not guilty.

20          THE COURT:  Thank you very much.

21          All right.  Ladies and gentlemen, I will give you a

22  15-minute break at this time.

23          (Recess)

24          (Continued on next page)

25

N8UBPER6                    Rebuttal – Ms. Nicholas

1          THE DEPUTY CLERK:  Jury entering the courtroom.

2          (Jury present)

3          THE COURT:  Please be seated.  All right.  Now we'll

4    hear rebuttal from the government.

5          MS. NICHOLAS:  Your Honor, may I proceed?

6          THE COURT:  Please.

7          MS. NICHOLAS:  Ladies and gentlemen, I'm not going to

8    respond to everything you just heard because I don't need to.

9    You sat through this trial.  You know that a lot of what you

10   heard just doesn't make any sense.  A little over an hour ago,

11   my colleague Ms. Smyser walked you through the evidence in this

12   case.  She took you through step by step each part of the proof

13   that shows the defendant is guilty.  I'm not going to redo that

14   now, but there are a few points that were brought up by defense

15   counsel that I do want to respond to, and those are points that

16   have very little to do with the evidence in the case; things

17   that are intended to distract you.  Because when you look at

18   the evidence, when you closely examine the government's

19   exhibits, when you think about the testimony you heard from the

20   witnesses that sat on that stand under oath, you will come to

21   the only conclusion that's consistent with that proof that the

22   defendant is guilty.

23          Now before I go any further, I want to talk about the

24   burden that the government bears in a criminal case.  I told

25   you in my opening statement that the government would prove its

N8UBPER6                        Rebuttal - Ms. Nicholas

case beyond a reasonable doubt.  The defense talked about that

burden.  They refer to it as a heavy, heavy burden, and it is,

and we embrace it.  We don't run from it.  Of course that's the

standard.  We embrace it, but it's not a magical standard.

It's the standard that's guided by common sense, and it's not

insurmountable.  It's the standard that's been used in every

criminal case in the history of this country.  It's been met

before, and we've met it here.

        I want to be clear that the defense has no burden.  We

embrace the burden that sits on the government's table and

never leaves.  But when a defendant through their counsel

decides to make arguments, you should scrutinize those

arguments just like you do any other piece of evidence.  So

let's talk about some of those arguments.  Defense counsel

invited you to make your decisions in deliberation based on

what the defendant said and what the defendant did.  So let's

talk about what the defendant said.

        When the defendant is standing on the sidewalk in the

Bronx after having just been placed under arrest for possessing

a gun, his response is not confusion.  It's not a desire to do

the right thing, to make sure he's in compliance with the law.

His response is to say, I'm not worried about a permission.  A

permit is permission.  I'm not giving my right away.  I'm not

going to do it because I am above the law and I can do what I

want.

N8UBPER6                         Rebuttal – Ms. Nicholas

1        Let's keep going.  Same interaction.  Starting at line

2   18.  "Telling me I need a permit.  I don't need a permit.  A

3   permit is permission.  You should learn that.  You guys take

4   your oaths to uphold the Constitution, not to uphold legalities

5   and regulations and mandates and all that extra stuff.  You

6   took your oaths to uphold the Constitution."

7        What he's saying there?  I know there are laws.  I know

8   there are rules.  There are legalities and regulations and

9   mandates, all that extra stuff.  I know.  But you guys should

10  ignore it because that's what I'm doing.  It doesn't apply to

11  me.  I can do what I want.  That's what he says.  And what does

12  he do?  He gets arrested.  Officer Smalls tells him he needs a

13  permit.  Does he go apply for a permit?  Does he try to make

14  sure that he gets in compliance with the law because he

15  respects these gun laws and he wants to make sure he's done the

16  right thing.  Absolutely not.  He packs his guns in his car in

17  the Bronx and he heads to Rhode Island.  He heads to Rhode

18  Island where he gets arrested again with guns.  And we're going

19  to talk more about that arrest.

20        Defense counsel said that none of those guns had any

21  connection to Lucha.  One of those connections is the man on

22  the right, Jamal Latimer.  Ladies and gentlemen, what the

23  defendant says to the police in the Bronx, "We could argue this

24  in court.  I'd deal with this in court.  I don't need a permit

25  for that.  It's my constitutional."  That should sound familiar

N8UBPER6                    Rebuttal – Ms. Nicholas

because it's the same thing Jamal Latimer says in

Massachusetts.  "Of Course, so here's the thing.  It's already

going to court.  I already know it's going to court."  That's

not a firmly held belief.  It's a script.  These guys know

they're going to court.  They know they're going to court

because they know they're breaking the law.  And here we are.

We are in court.  We have seen the evidence.

        Why did they think they were ending up in court?

Because they knew about the legalities.  They knew about the

mandates.  They knew about the regulations, and they decided to

ignore it because they're above the law.  They knew all those

gun laws existed.  They didn't like them, so they didn't follow

them.  He thought he could do whatever he wanted and get away

with it.  Not anymore.  Now, the defense knows that the

evidence here is overwhelming, so the best thing they can try

to do is distract you.  They can try to persuade you to care

about things that don't actually matter in the case, and they

offered a lot of distractions hoping that you'd mistake those

distractions for reasonable doubt.

        We saw some slides.  One of those slides the defense

showed you had a bunch of names and places on it, things they

said were the government's attempts at distraction.  But let's

stop and scrutinize exactly what the defense just tried to

characterize as distractions.  One of the things on that list

was Keith Vereen.  Far from a distraction.  Keith Vereen is the

N8UBPER6                    Rebuttal - Ms. Nicholas

1    straw purchaser that the defendant used to avoid having to

2    follow the gun laws.  Another thing on that list, Myrtle Beach,

3    South Carolina, where Keith Vereen bought the guns for the

4    defendant.

5        Another name on that list, Jamil Abdullah Bey, Jamal

6    Latimer, the leader of the group.  We're going to come back to

7    him in a second.  On that list Wakefield, Massachusetts where

8    they get arrested with all of these guns.  Another name on that

9    list, Jamil Bey.  Not only is he there in Massachusetts, but

10   you also know he sent a wire payment from a Western Union in

11   the Bronx to Keith Vereen in South Carolina.  Another name on

12   that list, Ricardo Rodriguez, also sent a wire payment from the

13   Bronx to Keith Vereen in South Carolina.  Far from

14   distractions.  These are essential elements of the case.  These

15   are the facts that prove to you beyond a reasonable doubt the

16   defendant was working with other people to acquire guns from

17   out of state and have them brought to his state of residency.

18       Let's talk about some things that are actually

19   distractions.  The fact that the defendant and Keith Vereen are

20   cousins.  That makes sense.  Keith Vereen committed a federal

21   crime for the defendant.  He lied on forms under which he had

22   an obligation to be truthful.  That's a big risk for somebody

23   you don't really know, but maybe that's a risk you're willing

24   to take for a member of your family.  That makes sense.

25   There's nothing mysterious about that.  And I want to stay on

N8UBPER6                        Rebuttal - Ms. Nicholas

1    that for a second to talk about just how absurd it is to think

2    that a relationship with your cousin could explain what was

3    going on between these two people.  A lot of people have

4    cousins that live out of town.  Those cousins may very well

5    travel into town to visit them.  They may come at the holidays.

6    They may stay for a few days, maybe they bring flowers, maybe

7    they make a stop, get a nice bottle of wine before they get to

8    the apartment.  What they don't do is drive directly to your

9    apartment from a gun store.  They don't bring handguns with

10   them.  They don't just swing by at three in the morning almost

11   directly from a gun store.  They don't just come to town for

12   about 12 hours right from the gun store and head back to South

13   Carolina.  That's not consistent with a social relationship.

14           What is that consistent with?  That's the relationship

15   between co-conspirators.  These men weren't just cousins.  They

16   were men who were working together to break the law.  Western

17   Union.  A few points on Western Union.  First, the defense

18   tried to suggest that it's only a single payment so you should

19   ignore it.  Of course it's a single payment.  We're talking

20   about committing serious federal crimes.  You heard a witness

21   sit on that stand for almost 30 minutes and explain to you in

22   detail all the information that Western Union records when you

23   come and you use their service.  They write down your name,

24   your phone number, your address.  They maintain all of that

25   information.  You're committing a crime, and you do that once.

N8UBPER6                    Rebuttal - Ms. Nicholas

1    You may realize it's a pretty bad idea, maybe we shouldn't do

2    it again.  Maybe going forward, I'll just pay cash.

3            Let's talk about the amount of cash.  Defense counsel

4    seem to suggest that the fact that a $350 payment is less than

5    the particular price for a particular gun is somehow persuasive

6    evidence that that wasn't a firearm purchase.  I think defense

7    counsel said something to the effect of what kind of gun

8    trafficker accepts partial payment. Well, what kind of out of

9    state firearms recipient make a full payment before they have

10   the gun in their hand.  It's a down payment.  I'll send you the

11   350 now. You go buy the gun.  And then when I see you in New

12   York when you put the gun in my hand, I'll hand you the rest of

13   the cash.  There's nothing nefarious about that.  That's

14   exactly what they're doing.  It's not a mystery.  It's not a

15   partial payment.  It's a down payment, a down payment between

16   co-conspirators.

17           Now defense counsel ask you to leave your preconceived

18   notions at the door.  That's not actually what they're asking

19   you to do. What they're actually asking you to do is leave your

20   common sense at the door, because when we really look at the

21   evidence in this case and use our common sense, it's very clear

22   what was going on here.  You don't need to know what was said

23   in the phone calls to understand what was happening in these

24   communications.  And this is important because the evidence in

25   this case came in, in pieces, and each piece of that evidence

N8UBPER6                    Rebuttal - Ms. Nicholas

is like a puzzle piece.  None of it tells the whole story by

itself.  Put it altogether, and that's what Ms. Smyser did for

you in her closing.  She explained to you how all these things

fit together, which is why it's such a problem that defense

counsel kept one of those pieces from you when they tried to

suggest that there wasn't a pattern.

Defense counsel told you, look, on September 21 there

were five phone calls.  And then time goes by, and then there

is a gun purchase on October 1st.  That's the only time they

talked between gun purchase.  That's the only time there's

communication before a gun purchase.  That one shows you

there's nothing to worry about here.  Ladies and gentlemen, the

Western Union payment from the defendant to Keith Vereen was on

September 22nd.  So it's not September 21st silence, gun buy.

It's September 21st, set up the payment, talk about how to get

this done.  September 22, Western Union payment, then gun buy.

Every single piece of this puzzle is critical in understanding

how this story fits together.  It's not a complicated tale like

defense counsel called it.  It's quite simple.  It's quite

simple.

Now, the pattern of those purchases is obviously

important.  Communications, gun buy, travel, meeting; but so is

the fact that the defendant was arrested twice with the guns

bought by Keith Vereen.  It's not some random pattern the

government cobbled together.  It's a clear pattern shows how

N8UBPER6                    Rebuttal - Ms. Nicholas

1    those two guns ended up in his hands.  You also heard testimony

2    about encrypted messaging applications, Signal, What'sApp.  The

3    defendant learned his lesson at Western Union, don't leave a

4    paper trail, don't give up all your information.  We saw a text

5    from one of the defendant's co-conspirators, you, download

6    Signal.  It's more private.  I want to talk about text for a

7    couple of minutes because defense counsel really focused on

8    this group chat.  You heard that Lucha's name doesn't come up

9    anywhere in the thread.  That's just not true.

10              MS. BAHARANYI:  Objection, your Honor.

11              THE COURT:  Overruled.

12              MS. NICHOLAS:  Lucha has been abducted on weapon

13   charges, not sure what the PC on why they even stopped him.

14   The response. Nobody responds, who's Lucha.  What are you guys

15   talking about.  The response is all about getting bail money.

16   There's concern. They're asking for updates.  This isn't just

17   some random person they reported has been arrested.  This is a

18   member of their group.  They're worried about him. They're

19   getting ready to go for training, training with guns.  They're

20   concerned about somebody in their group getting arrested with a

21   gun.

22              There's also suggestion that the packing list never

23   made it to the defendant, that he's not really part of this

24   group.  Ladies and gentlemen, you saw the videos.  He got the

25   packet list.  He's got body armor on.  He's got gloves on.

N8UBPER6                        Rebuttal - Ms. Nicholas

1    He's wearing his BDUs.  He's in camo, his hat.  He's got the

2    whole thing going.  He knew exactly what he was suppose to be

3    wearing when he went to this training.  He got the packing

4    list.  He got the message, and he got the other message.  We're

5    above the law.  We do what we want.  We like guns.  We like

6    traveling with our guns.  We're going to get them regardless of

7    what the law says about it.

8              Now, there's an important moment in one of those

9    videos that both parties have talked a lot about, and over the

10   course of the case, ladies and gentlemen, there's often little

11   moments that tell you everything you need to know.  Let's watch

12   this video.

13             (Media played)

14             (Media stopped)

15             MS. NICHOLAS:  Let's put this in context.  The leader

16   of the group, Jamal Latimer, he is trying to figure out whether

17   or not the weapons that his men, those are his words, my men.

18   He's trying to figure out if the weapons that his men are

19   carrying are stolen.  He wants to know what's the status of

20   these guns.  In that moment, who does he go talk to?  All those

21   people you saw on the list that were arrested that day when

22   Latimer wants to know what's the status of my guns, he talks to

23   the defendant and he talks to Jamil Bey, two men that you know

24   sent wire payments from New York to South Carolina.

25             And in that moment when he's approached by the leader

N8UBPER6                       Rebuttal - Ms. Nicholas

1    of the group, what does he do?  He tells the truth.  He shakes

2    his head.  They're not stolen.  The only way he could say that,

3    the only way he could indicate to the leader of his group,

4    we're good, they're not stolen, is if he knew where the guns

5    came from.  And he wasn't worried, ladies and gentlemen,

6    because he thought he outsmarted the law.  He was using a straw

7    purchaser.  He was having his cousin walk into gun stores and

8    lie for him.  He thought the paperwork looked good.  He thought

9    he'd outsmarted the system.  So as long as the cops don't think

10   these guns are stolen, we're good, because I made sure the

11   paperwork was clean because I knew what I needed to do was get

12   guns from out of state.  I knew I needed to get these guns

13   unlawfully.  That's exactly what he did.

14          Now there's only a few more points I want to make.

15   They're really all related.  And what they are things that are

16   just not defenses in this case, things that defense counsel

17   asked you to think about which are simply not relevant.  The

18   fact that the defendant lived in the Bronx and felt like he

19   needed a gun for safety is not relevant.  Just because you want

20   a gun or feel like you need a gun doesn't mean you get to make

21   little exceptions to use for yourself for gun laws.  There are

22   properly and legal ways to do things, and then there's

23   violating the law.  The defendant decided that the law that

24   applies to everyone didn't apply to him.  The fact that his

25   straw purchaser was his cousin, not a defense as we talked

N8UBPER6                    Rebuttal – Ms. Nicholas

1   about, just explains why they trusted one another.  And the

2   fact that he's not a leader in the conspiracy, doesn't mean

3   he's not in the conspiracy.

4           In fact, I expect that when Judge Rakoff instructs you

5   on the law, he's going to tell you that the defendant not

6   necessarily need to be fully informed of all the details of the

7   conspiracy in order to justify an inference of membership.

8   He's obviously part of this conspiracy.  He's sending money.

9   He's making phone calls.  He's showing up.  He's showing up

10  with guns.

11          Ladies and gentlemen, very shortly Judge Rakoff is

12  going to instruct you that what I say is not evidence, nor is

13  anything else that any of the lawyers have said.  You, the

14  jury, are entrusted with finding the facts in this case.  When

15  you do that, look pass all of the distractions.  Look at the

16  evidence, scrutinize the evidence, put the puzzle pieces

17  together.  Members of the jury, it's clear what happened here.

18  The defendant lived in New York.  He got guns from South

19  Carolina.  He knew what he was doing, and he knew it was

20  against the law.  Members of the jury, the defendant is guilty.

21          THE COURT:  Thank you very much.  All right.  Ladies

22  and gentlemen, even though you were kind enough to agree to

23  stay till 4:45 if necessary, turns out not to be necessary, so

24  tomorrow we will begin promptly at 9:30.  First order of

25  business will be for me to give you my instructions of law, and

N8UBPER6                    Rebuttal - Ms. Nicholas

1    I'll take about a half hour and then the case will be yours to

2    deliberate.  So to prepare for that, don't even think about the

3    case tonight.  Don't discuss it with anyone.  I don't know if

4    the Yankees are playing tonight.  They played last night and

5    they won and that was so amazing to me to see.  I was in pure

6    ecstasy.  In any event, don't even think about this case, but

7    tomorrow it will be yours to deliberate after I give you your

8    instructions.  Have a very good evening, and we'll see you at

9    9:30.

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N8UBPER6                        Rebuttal - Ms. Nicholas

1              (Jury not present)

2              THE COURT:  Please be seated.  So the only thing that

3       remains is the verdict.  I just sent you a tiny revision of it,

4       but it's essentially what you've seen previously.  Any

5       objections to the verdict from the government?

6              MS. SMYSER:  No objections from the government.

7              THE COURT:  Any from the defense?

8              MS. BAHARANYI:  Your Honor, I think we did request a

9       special verdict form.

10             THE COURT:  You did and I considered that.  I almost

11      never do that except when the Second Circuit has expressly

12      stated that it wants a special verdict.  And the reason is that

13      after more than 300 jury trials, it seems to me clear from

14      talking to the jurors afterwards that the important part of

15      jury service is the jury's overall feeling about the case based

16      on the evidence and based on the instructions of law.  The main

17      advantage of a special verdict is to make it easier for the

18      Second Circuit.  Rather than having to send back a case if they

19      think there's been some question raised, they say, oh, we got a

20      special verdict, and now we know whether that question was

21      resolved or not by the jury.  I have nothing but admiration for

22      the folks in the Second Circuit.  They have their job and I

23      have mine, so I will not give a special verdict in this case.

24             MS. BAHARANYI:  Your Honor, no further objections on

25      that then.  On the jury charge briefly, not to take up too much

N8UBPER6                        Rebuttal - Ms. Nicholas

1    time.

2          THE COURT:  Go ahead.

3          MS. BAHARANYI:  But we have received the Court's final

4    instructions, and I think we object to the Court not accepting

5    our versions of the --

6          THE COURT:  I should make clear on the record that all

7    previously raised objections to the charge are fully preserved

8    for purposes of the appeal.

9          MS. BAHARANYI:  The only additional one was for the

10   conspiracy, the first element.  We raise an objection to that

11   as well regarding the wording of that charge, that it seems

12   like it might marshal a bit of the government's evidence or

13   case.

14         THE COURT:  In what respect?  Some of the things they

15   asked for would have done that, but I rejected their proposals.

16         MS. BAHARANYI:  We're grateful for that, your Honor.

17   This is just on that first paragraph.

18         THE COURT:  I left my copy downstairs.  Let me get it.

19   Which page?

20         MS. BAHARANYI:  On page 23, the wording of this

21   particular instruction, the last sentence in that about, The

22   gist of the conspiracy here charged is that several persons,

23   including the defendant agreed to obtain and transport several

24   out of state firearms in order to enable the conspirators to

25   receive these firearms in their state of residency.  In reading

N8UBPER6                        Rebuttal - Ms. Nicholas

1    that it seems like there is some sort of leaning towards the

2    government's sort of fact pattern and evidence there.

3          THE COURT:  All I'm saying is that's what's charged.

4    This is in -- just so the record is clear -- the paragraph

5    reads "Starting with the first essential element, what is a

6    conspiracy.  Conspiracy is an treatment or an understanding of

7    two or more persons to accomplish by concerted action one or

8    more unlawful purposes, known as the object or objects of the

9    conspiracy.  In Count One, the unlawful purpose alleged to be

10   the object of the conspiracy is an agreement to transport

11   firearms that were obtained outside the state of residency of

12   the eventual receiver into the state of residency of the

13   receiver.  I have already instructed you on the essential

14   elements of that underlying crime when I instructed you on

15   Count Two.  The gist of the conspiracy here charged is that

16   several persons, including the defendant, agreed to obtain and

17   transport several out of state firearms in order to enable the

18   conspirators to receive the firearms in states of their

19   residency."

20         I'm not understanding what you think is more than a

21   fairly straightforward statement of what the charge is.

22         MS. BAHARANYI:  For one example, conspiracy only

23   requires one other person.  It's certainly the government's

24   view that this was a conspiracy involving several individuals.

25         THE COURT:  Do you want me to change -- several of

N8UBPER6                    Rebuttal - Ms. Nicholas

1    course could include two, but do you want me to change several

2    to one or more?

3            MS. BAHARANYI:  One moment, your Honor.  There's a

4    reason why we consult experts. I'm going to withdraw that

5    particular objection.

6            THE COURT:  Very good.

7            MS. BAHARANYI:  I think the Court may have already

8    addressed this yesterday, but we do maintain our objection to

9    the Court not charging the good faith defense theory defense.

10            THE COURT:  I think that has been the heart of many of

11   your objections right now, and it's fully preserved for

12   purposes of appeal.

13            MS. BAHARANYI:  And then our very last piece on this,

14   this is outside of the jury instructions, your Honor.  But

15   regarding the slides that were used in the government's

16   presentation of its summation, we do believe that there -- the

17   slides were prejudicial, particularly the one that I objected

18   to with respect to the firearms in combination with the

19   government's comment that, These guns came from Lucha.  And

20   it's a level of prejudice that warrants a mistrial in this

21   case, so that we would be moving for a mistrial on the basis of

22   this prejudicial presentation or slide show that was presented

23   with their summation.

24            THE COURT:  Let me make sure I understand your

25   argument.  You previously made the argument which I rejected

N8UBPER6                    Rebuttal - Ms. Nicholas

1    that those, for lack of a better word, bigger guns were

2    prejudicial.  And I have rejected that because I think it was

3    part of the evidence of the conspiracy.

4            So what further objection -- that objection is fully

5    preserved.  Is there anything more that you were objecting to?

6            MS. BAHARANYI:  I think there is just the added level

7    of prejudice we believe comes with including those images

8    again, and all of the things that came in about Massachusetts,

9    we would move for a mistrial.  We understand the Court may not

10   grant it.

11           THE COURT:  Yes.  That motion is denied.

12   Notwithstanding your apparent view that Massachusetts is a

13   foreign country far removed from the Southern District of New

14   York, last I checked federal law applies to the entire United

15   States, and that includes conspiracies that occur anywhere in

16   the United States, as long as some act occurs in the venue.  So

17   that objection is denied.

18           MS. BAHARANYI:  I think just to preserve that issue

19   for our sake, your Honor, we'd ask to have the exhibits -- not

20   the exhibits, the presentation used to support summation moved

21   I guess -- excuse me.  It's been a long day.

22           THE COURT:  I know.

23           MS. BAHARANYI:  Entered as Court exhibits.

24           THE COURT:  How is the Court of Appeals going to be

25   able to view that?

N8UBPER6                      Rebuttal – Ms. Nicholas

1          MS. BAHARANYI:  Right.

2          THE COURT:  I think that all the videotapes are in

3    evidence.

4          MS. BAHARANYI:  I think for the language and the

5    presentations, that's not going to be actually part of the

6    record.

7          THE COURT:  On appeal you can say, in their summation

8    on page 75, at lines three and four, they referred again to

9    this highly -- in your view, highly prejudicial image and said

10   the following.  And attached to our brief is a photograph of

11   the image that they put on the -- the Court of Appeals will

12   allow that.  I don't think they will even count it against your

13   25 pages.

14         MS. BAHARANYI:  I'm not the expert on that, but I do

15   think we just want to make the record clear about what was

16   presented to the jury.

17         THE COURT:  Okay.  Very good.  Thank you very much.  I

18   have another matter so if you can all clear out and we'll see

19   you tomorrow at 9:30.

20         MS. SMYSER:  Your Honor, we have two brief things we

21   want to raise.

22         THE COURT:  Go ahead.

23         MS. SMYSER:  The first is on this sentence on the gist

24   of the conspiracy that we were just talking about. I do think

25   that --

N8UBPER6                    Rebuttal - Ms. Nicholas

1          THE COURT:  The next case is, by the way, mostly about

2     Maryland, which is even more remote than Massachusetts.

3          MS. SMYSER:  This sentence makes a reference and says

4     that the conspiracy was to transport several out of state

5     firearms in order to enable the co-conspirators to receive the

6     firearms.  Our view is that that should be transport any

7     firearms, because one firearm is sufficient for a conspiracy.

8          THE COURT:  So you think that the language that they

9     were objecting to and then withdrew their objection, you now

10    think is too favorable to them, and that makes me think I got

11    it right.  No, this is just the gist of what you argued.  I

12    make clear elsewhere that you only need one conspirator.  I'm

13    very clear on that in the instruction that you only need one

14    firearm.  That's all contained elsewhere in the instructions.

15    But my effort in all of this as was pointed out the other day

16    is to present the jury with something that is simple English

17    that corresponds to what they've just heard and seen and I

18    think that sentence really is consistent with that, so I will

19    leave it as is.

20         MS. SMYSER:  Understood.  Finally, the government

21    wanted to bring up is that defense counsel in her closing

22    statement made several mentions of this case being about

23    Lucha's belief followed by a statement about his Constitutional

24    beliefs.

25         THE COURT:  Well, I think mostly just at the very

N8UBPER6                        Rebuttal – Ms. Nicholas

1    beginning.

2            MS. SMYSER:  At the beginning, there were several.

3            THE COURT:  And I was waiting for you to stand up and

4    object because given our entire discussion previously, that was

5    the time to object.  But you decided to sit on your derrière,

6    and I think it's much too late now to raise that objection.  My

7    own view is, although she came awfully close to the line that I

8    had forbidden, I'm not sure she went over that line.  She was

9    careful.  So, anyway, I don't think she went over that line.

10   But in any event, the objection was waived by not making it at

11   the time.

12           MS. SMYSER:  Understood, your Honor. We just ask for

13   the record, making a request for a curative instruction based

14   on --

15           THE COURT:  We can have a curative instruction right

16   after we have the new trial because of the mistrial that your

17   adversary wants.  All denied.

18           MS. SMYSER:  Understood.

19           THE COURT:  Very good.  Okay.  Anything else?

20           MS. SMYSER:  No, your Honor.

21           THE COURT:  Very good.  We'll see you all tomorrow at

22   9:30.

23           (Adjourned to August 31, 2023, at 9:30 a.m.)

24

25

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                              Page

 3    JULIA GUTIERREZ

 4   Direct By Ms. Nicholas . . . . . . . . . . . 370

 5   Cross By Ms. Baharanyi . . . . . . . . . . . 431

 6    MARIA OTERO

 7   Direct By Ms. Baharanyi  . . . . . . . . . . 437

 8   Cross By Ms. Nicholas  . . . . . . . . . . . 444

 9                       GOVERNMENT EXHIBITS

10   Exhibit No.                              Received

11    532A and 533A  . . . . . . . . . . . . . . 365

12    532 and 533  . . . . . . . . . . . . . . . 367

13    902  . . . . . . . . . . . . . . . . . . . 390

14    1201, 1202A, 1202B, 1202B1, 1202B2, . . . . 407

15            1202B3, 1202C, 1202D, 1202E,

16            1202F, 1202I, 1202J, 1204,

17            1207A, and 1208

18    1301, 1302A, 1303A, 1303B and 1303C  . . . . 425

19    1402A  . . . . . . . . . . . . . . . . . . . 428

20    1008  . . . . . . . . . . . . . . . . . . . 433

21                       DEFENDANT EXHIBITS

22   Exhibit No.                              Received

23    C1  . . . . . . . . . . . . . . . . . . . . 442

24

25
```