O185elS

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,              New York, N.Y.

4            v.                            22 Cr. 644 (JSR)

5   STEVEN PEREZ, a/k/a "Lucha",

6            Defendant.

7   ------------------------------x

8                                         January 8, 2024
                                          4:15 p.m.
9

10  Before:

11                   HON. JED S. RAKOFF,

12                                         U.S. District Judge

13

14                   APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    BY:  ASHLEY C. NICOLAS
17       MADISON SMYSER
         Assistant United States Attorneys
18
    FEDERAL DEFENDERS OF NEW YORK
19       Attorneys for Defendant
    BY:  ZAWADI BAHARANYI
20

21

22

23

24

25
```

O185elS

1              (Case called)

2              THE DEPUTY CLERK:  Will the parties please identify

3     themselves for the record?

4              MS. NICOLAS:  Good afternoon, your Honor.  Ashley

5     Nicolas and Madison Smyser for the government.

6              THE COURT:  Good afternoon.

7              MS. BAHARANYI:  Good afternoon, your Honor.  Zawadi

8     Baharanyi with the Federal Defenders.  I am here on behalf of

9     Lucha El, who is being brought out now.

10             THE COURT:  Good afternoon.

11             So, we are here for sentencing.  The first item is the

12    calculation of the guidelines, even though I will say, as I now

13    say at all sentences, that the federal sentencing guidelines

14    are completely irrational and will have no bearing on my

15    sentence.  This is just another case where that is

16    demonstrated.

17             There is all this controversy, which we will get to in

18    a moment, of how many guns this defendant was involved with and

19    if it's three guns he gets two extra points, if it is eight

20    guns he gets four extra points.  I wonder how the brilliant

21    members of the Sentencing Commission came up with that.  Why

22    wasn't it one point?  Why wasn't it seven points?  Why wasn't

23    it three points?  This is all hocus-pocus, masquerading as

24    rationality.

25             So the guidelines are of no concern to me.  What, of

O185elS

1    course, is of concern to me, is the serious crime that was

2    committed and we will get to that later on.  But, since I have

3    to calculate the guidelines, the defense objects to the

4    government and the probation office's calculation which was a

5    total offense level of 20 and a Criminal History Category of I,

6    and therefore a guideline range of 33 to 41 months, a sentence

7    higher than any I am remotely contemplating in this case but

8    the defense objects to that calculation on two different

9    grounds.

10          First, the defense says that the four-level

11   enhancement for an offense involving 8 to 24 firearms was not

12   resolved by the jury -- I agree with that -- and is not

13   supported by the evidence and I am not so sure I agree with

14   that second part of the argument; and then the defense also

15   says that the guideline that says there should be another

16   four-level enhancement for the provision that says the

17   defendant used or possessed a firearm or ammunition in

18   connection with another felony offense really should not be

19   invoked on the other felony offense is simply, if you will, the

20   state parallel to the federal offense.

21          So, let me hear first from the government on those

22   objections and then I will turn to the defense.

23          MS. NICOLAS:  Thank you, your Honor.

24          I will start with the first which is under

25   2K2.1(b)(1), which is the number of guns involved in the

O185elS

offense.  I think your Honor already alluded to kind of the

touchpoint of the government's argument here, what was argued

before the jury is not the question.  It is actually quite a

low standard, it is what is reasonably foreseeable to the

defendant as a natural consequence of the unlawful agreement

proven by a preponderance.

         The government laid out, on page 7 of its sentencing

submission, while constraining ourselves only to the four trips

in which the defendant and Mr. Vereen, the straw purchaser,

were located together, that that results in 17 firearms right

there, if we only constrain ourselves to those four trips.

That is setting aside the firearms that are outside that time

span.  That also disregards the Glock, which is the additional

firearm that the defendant was arrested with, taking us to 18.

I think, based on the cell site information which was

Government Exhibit 901, was the presentation that supported

Mr. Peterson's testimony at trial, combined with the wire

transfer information both for the defendant and the

co-conspirator with whom he was arrested in Massachusetts,

establish by a preponderance that at least 18 firearms were

reasonably foreseeable to the defendant as a natural

consequence of the criminal agreement.

         I am happy to stop there.

         THE COURT:  Why don't you stop there and let's hear

from defense counsel.

O185elS

1          MS. BAHARANYI:  Your Honor, we do agree with the

2    government that the question is about reasonable

3    foreseeability.  There is a lot of speculation that is going

4    into the government's calculation that should be highlighted.

5          First, they've at least limited now from 24 to 17.

6    Kudos to them for recognizing that the number 24 was also quite

7    speculative.  But if we look at the four trips, what we know

8    from these trips is that there was a cell tower that

9    Mr. Vereen's phone pinged off of that Lucha El's phone also

10   pinged off of.  We know that there were other cell towers that

11   Mr. Vereen's phone pinged off of that weren't anywhere in the

12   vicinity of Lucha El.  That includes cell towers in upstate New

13   York, in New Jersey, in different parts of the Bronx.  This was

14   all part of our cross-examination with Mr. Peterson, the expert

15   witness called by the government.

16         What that tells us is that while there were these

17   interactions after certain firearm purchases between Mr. Vereen

18   and between Lucha, we cannot glean from these interactions that

19   all of the firearms that were purchased during this time frame

20   were destined to Lucha El's hands or individuals that were

21   known to him.

22         I think it might be helpful to think of this in the

23   context, perhaps an unsavory context of someone who is dealing

24   drugs.  Someone who is dealing drugs to one purchaser, one

25   person who is buying it.  That person who is buying from them

O185elS

in the moment may have no sense of how many other drugs the

person they're buying from is dealing.  They have no sense of

the overall conspiracy.  And what the government hasn't given

your Honor today or even at trial is any reason to fill in the

gaps in the way that they've proposed.  There are no

communications, text messages, wiretappings that would show

that Lucha El was aware of the grand scope of Mr. Vereen's

firearm dealings, and even the four dates that we have here,

for each of the wire transfers that the government has

highlighted, it certainly would not support the suggestion that

18 guns were purchased from about $1,000 worth of money

transferred.  That just does not compute.

        So, your Honor, I do think while the government,

again, kudos to them, has lowered their number, in reality what

we are dealing with is just truly a lack of information and

information they cannot provide by a preponderance of the

evidence to show that the number was anything from 2, 3, 10, 11

firearms.  They just don't have the ability to prove that and

it is their burden.

        THE COURT:  Before I hear from the government let me

make sure.  Are you asking for a Fatico hearing on this or are

you saying I can decide on the materials that both sides have

presented, but of course you interpret that as materials that

do not sufficiently support the government's burden.

        MS. BAHARANYI:  It is the latter, your Honor.

O185elS

1          THE COURT:  Same question to the government.  Are you

2    seeking a Fatico hearing?

3          MS. NICOLAS:  We are not, your Honor.

4          THE COURT:  OK.  So go ahead.

5          MS. NICOLAS:  Your Honor, I think we need to parse out

6    what defense counsel just said because I think there was some

7    mixing of standards.

8          The question is not whether or not 18 firearms ended

9    up in this defendant's hands.  The question is actually if we

10   get past the threshold of eight as part of a foreseeable

11   result, a natural consequence of the unlawful agreement in

12   which the defendant participated, we are talking about the

13   defendant with whom he was arrested in Massachusetts with

14   another person who sent money to Mr. Vereen and it is not just

15   the stand-alone cell site information, it is also the pattern

16   of communications, cell site information, gun purchases and

17   money transfers, and certainly this is not in evidence but the

18   government's closing slides laid that out quite clearly,

19   putting together all of that evidence -- the cell site, the

20   toll records.

21         THE COURT:  On this first point I agree with the

22   government.  I think the government's position is based on a

23   number of circumstantial inferences but, of course, those are

24   totally permissible to be drawn and the burden is only

25   preponderance and I think they have established that he

O185elS

1    reasonably foresaw that eight or more guns would be involved.

2           Let's now turn to the other enhancement.  The

3    government's position, while it may comport with the facial

4    language of the guideline and therefore satisfy the textualness

5    of the Supreme Court, seems kind of crazy.  It means that every

6    single time there is a parallel state statute, which is going

7    to be true in the many, many, many states, you are just going

8    to have an automatic enhancement.  That sounds awfully like

9    double punishment to me.

10          MS. NICOLAS:  Your Honor, I actually don't think that

11   is the relevant question in this case where the defendant was

12   charged with an offense relating to how he obtained the guns.

13   And I understand and acknowledge that it is a nuanced

14   difference, but any potential state case in New York related to

15   the firearm would be a possession offense, but even here it is

16   one step further in that there were other offenses, even if we

17   were to argue, which we are not, that that is the point of the

18   statute, the two possession enhancements can't exist together.

19   Here we have a body armor offense, we have an ammunition

20   offense, we have an offense relating to extended magazines, all

21   of which he was charged with in Massachusetts.  That's not even

22   the question.  The question is, is there another offense,

23   another felony offense that the defendant has committed in

24   connection with his acquisition of a firearm under which he was

25   convicted in the federal courts.

O185elS

1          THE COURT:  Well, one of the problems, many problems I

2   have with the guidelines but I don't want to spend the next

3   five hours going through them all, is very little legislative

4   history.  So, one would have thought that this might have been

5   intended to deal with situations where one obtained a gun

6   illegally in order to carry out a bank robbery or a violent

7   assault or something like that and none of the situations you

8   are positing are really like that.  It is more like, yes,

9   Massachusetts has a bunch of those, as does New York, a bunch

10  of laws relating to obtaining handling, so forth, illegal guns,

11  and so it is almost an automatic that in every case involving

12  the federal gun laws there is going to be the enhancement you

13  are referring to.  I get your point that went further here that

14  would narrow my hypothetical but I wonder if it is still the

15  same basic ball of wax.  But, let me hear from defense counsel.

16          MS. BAHARANYI:  Your Honor, that gets at exactly what

17  our issue is with this enhancement and I think the Court

18  actually does have power not to apply it here.

19          THE COURT:  I have the power not to consider the

20  guidelines at all and I am going to invoke that power.

21          MS. BAHARANYI:  Absolutely.

22          THE COURT:  Without any question.

23          MS. BAHARANYI:  I don't mean at all to limit,

24  especially given the direction we hope the Court goes and I

25  don't mean to limit the Court's discretion there but, again,

O185elS

```
1    the idea, if we get to the heart of what this enhancement is
2    supposed to be addressing is exactly that, firearms that are
3    possessed in connection with this other felony, conduct or
4    activity, firearm possessed with bank fraud or kidnapping.
5    Something that enhances the dangerousness of this other
6    felonious conduct.  Here, the other --
7             THE COURT:  Since there is no legislative history
8    maybe what I should do is have a Fatico hearing involving all
9    the members of the Sentencing Commission at the time they
10   enacted this, we could question them.  Maybe we won't do that.
11            MS. BAHARANYI:  That sounds potentially painful, your
12   Honor.
13            I think here what the Court should also focus on is
14   this guidance from the guidelines in the commentary that the
15   possession of a firearm in connection with the felony, another
16   felony offense, needs to be a firearm that's facilitating or
17   somehow making easier the commission of this other felony
18   offense, and simply possessing a firearm does not make easier
19   the possession of a firearm.  That's where I believe the Court
20   has room to certainly not apply the enhancement in this case.
21   It certainly is illogical and the guidelines, the commentary of
22   the guidelines at least does give us some area or room not to
23   apply it.
24            I would also note the government, in its letter,
25   mentioned that there are other felony offenses beyond
```

O185elS

```
1    possession of a firearm that were happening here.  Those felony
2    offenses, again, all relate to possession of ammunition or
3    other firearms or body armor which, again, if anything, body
4    armor potentially could facilitate the carrying of a firearm
5    but I don't think that goes in the reverse direction here, not
6    logically.
7              THE COURT:  Well, I'm going to cut this short only
8    because, as I said perhaps too often now, it is all an
9    irrelevancy to my sentence in any event, but I agree with
10   defense counsel.  I think I have some room so I'm going to deny
11   that enhancement, which means that the total offense level is
12   16, the Criminal History is I, and the guideline range is 21 to
13   27 months.
14             Now let's talk about what is of importance to the
15   Court which is the factors under Section 3553(a) of Title 18, a
16   statute I am very fond of because I think it sets forth all the
17   relevant factors to any Judge's sentencing.  And before I hear
18   from defense counsel and from government counsel and then from
19   the defendant, if he wishes to be heard, let me ask the
20   government what, to me, is an important question, which is
21   where do you rank this defendant in comparison with Mr. Vereen.
22             MS. NICOLAS:  It is a difficult question, your Honor,
23   because their conduct is quite different from one another.  As
24   it relates to the offense itself, on its face, I certainly
25   think that this defendant maybe is a little less culpable in
```

O185elS

1    terms of he is not necessarily in the gun store at every

2    transaction but in other ways that Mr. Vereen presented

3    mitigating factors:  His employment, his service record,

4    otherwise lack of criminal history, general showing of remorse.

5    I don't necessarily think we have that with this defendant so,

6    in some senses, this defendant almost has a more aggravating

7    position which I will talk about more, but I do think it is a

8    difficult one-to-one comparison.

9          THE COURT:  OK.  That's fair enough.  Now let me hear

10    on all issues first from defense counsel, then from government

11    counsel and then from the defendant, if he wishes to be heard.

12          MS. BAHARANYI:  Thank you, your Honor.

13          Before I begin, I do want to take a moment to

14    introduce some of the many family members and community members

15    who are here in support of Lucha.

16          THE COURT:  Yes.  And I should mention I have received

17    and carefully read some very excellent letters on his behalf

18    from friends and family members.

19          MS. BAHARANYI:  And of those, his brother Israel

20    Perez, who wrote a letter to the Court, is present.  His

21    mother, Maria Gonzalez, is also present who also wrote a letter

22    to the Court, as is Jacqueline Jimenez and Sheryl Jones or

23    "CJ", as she is affectionately known in the community.

24          Your Honor, I do want to also note that at the end of

25    my presentation, as I included in my sentencing submission, I

O185elS

```
 1    request the opportunity for Ms. Jimenez -- Jackie Jimenez, who

 2    is here, to be able to share a bit more on Lucha El's specific

 3    connection to his community and why his absence or the loss of

 4    him in the community has been a hardship that extends beyond

 5    his family.

 6              THE COURT:  I'm happy to hear, as long as it is a

 7    reasonably brief presentation.

 8              MS. BAHARANYI:  Absolutely, your Honor.

 9              Every single person behind me, your Honor, is here

10    because they know who Lucha El Libertard truly is.  They know

11    his heart, they know his actions, they know that he is not the

12    radical, violent, government-hating militia member that the

13    government has made him out to be, not just I anticipate at

14    today's sentencing, but at trial.

15              After our own lengthy amount of time with Lucha El

16    during trial and preparation, we have come to know the same as

17    well.  He is someone who cares deeply for his community, for

18    his family.  He is someone who loves infinitely, somehow,

19    despite challenging circumstances that have existed since his

20    childbirth.  But we are obviously here because he is also

21    someone who made a mistake.  The Court knows that in 2020 and

22    2021 there were decisions that Lucha El made in the middle of a

23    global health pandemic, in the middle of time that brought

24    about extreme uncertainty and lack of security to many, but

25    decisions that led him here.
```

O185elS

1        For Lucha El, he is from -- well, grew up for decades

2   in a community in Norwood Bronx around Perry Avenue, and in

3   COVID he saw that community suffering in ways that Officer

4   Smalls took to the stand and described:  Gang violence,

5   robberies, rampant shootings, just truly a chaotic almost

6   desperate environment that was brought on by the desperation of

7   an unprecedented pandemic, and at that time Lucha El was a

8   father to a 3-year-old, Hayden, someone who is his child who is

9   truly his love and his joy, and he felt the desire and the need

10  to be a protector.  He felt the desire and need to be able to

11  protect him as he has done for so many family members since he

12  was a child.  And that happened to coincide with him learning

13  about the Moors, that happened to coincide with him learning

14  about the Second Amendment, and he developed views on what the

15  Second Amendment meant to him.

16       He made the decision, your Honor, to carry a firearm

17  in 2021.  The Court now is very well aware of the circumstances

18  of him carrying that firearm.  On two occasions, in the Bronx

19  and in Massachusetts, he was arrested in possession of

20  firearms, and immediately after his Massachusetts arrest he

21  went to jail.  That's critical here.  He spent eight months in

22  custody away from his son, eight months in custody away from

23  his family in a jail far off in Massachusetts that was, itself,

24  suffering from the rampant -- the onslaught of COVID-19.  This

25  was a time of immense suffering but also of immense reflection.

O185elS

Eight months -- eight months and three weeks specifically, your Honor, was punishing and was more than sufficient punishment. And after that time he has not carried a gun since.  So, eight months and three weeks in jail was exactly the course correction that I think Courts try to impose in cases like this often.

THE COURT:  I'm not sure that I have any reason to believe he really changed his mind.  We have some evidence that he retained his absurd views of what the law permitted and didn't permit.

MS. BAHARANYI:  Your Honor, I'm quite happy you raised that because I think that has been so much of the focus of our time in this courtroom, is what he believes, what he feels, what his views are on the law, and we have lost focus on his ability to actually abide by the law.

Many Courts, I think, think of sometimes jail as being an opportunity for a taste of punishment, something to course correct.  And I think in his case he got more than a taste, he got, quite frankly, a meal, because he got punishment during the darkest time to be incarcerated and that, in fact, changed his actions.

His views, his opinions, what he believes the Second Amendment means to others, what he believes the Second Amendment should be or could be, does not change the fact that he is able to abide by the law as it is and we saw that.  We

O185elS

saw that after eight months and three weeks in jail, that he came back into the community, no more contact, no more police contact, no more firearms, no more incidents of misconduct in the community.  He focused in on supporting those who he loves, those who have stood by him from day one.  He focused in on his son, on his son Hayden.  He focused in on what matters most. The community that he was concerned about, he dedicated his time to that community, he did not dedicate his time to carrying around firearms or facilitating others carrying firearms.

I guess what I am trying to convey to the Court is that that time worked, and yet that time was not all that he has now faced.  So beyond those nearly nine months in custody, he has now spent another four months at the MDC Brooklyn.

THE COURT:  Yes.  Of course, he gets credit for that on any sentence I impose.

MS. BAHARANYI:  He gets credit for that time.  He doesn't technically get any credit for the Massachusetts time but, again, this is all happening -- the arrest occurs in 2021 and all of this has happened after, so it is not as though he was arrested and decided again to carry another firearm after these eight months.  No.  The arrest happened, his incarceration happened, his conduct has been changed.  This venue, the criminal justice system, is not here to change people's opinions on what the law should be, that's not what we

O185elS

```
1    are doing here.  It is here to ensure that people can abide by
2    the law and can go out into the world and live in that world
3    safely and Lucha El has done that.  I think the Court -- not I
4    think, I know the Court has certainly been inundated with his
5    views and opinions on the law in ways that weren't always
6    welcome and he addressed that in his letter to the Court.
7            THE COURT:  I have long since forgotten and put out of
8    my mind his thoughts in that regard.
9            MS. BAHARANYI:  But during his time on pretrial
10   release, despite those communications, he was in fact
11   compliant.  He was someone who was in his home during his
12   curfew as he was required to do, he worked odd jobs in the
13   community to support different community members including a
14   neighbor of his who was renovating his home.  He spent eight
15   months outside showing the Court that he is able to, again, be
16   in the community under the supervision without committing
17   crimes, without carrying firearms, without posing a danger.
18           I think what has been lost in this case is something
19   that we truly must focus on here, the conduct and the actions
20   and not his views or opinions because that is certainly not
21   what this space is designed to change.
22           THE COURT:  I totally agree that he should not, and I
23   don't think his sentence should reflect in any way his opinions
24   of the law, misguided though they may be, but I think your more
25   fundamental point, which I think you agree with is if he has
```

O185elS

1    got a bunch of silly opinions, well, sobeit, he shouldn't be

2    punished for that.  But, of course, I haven't heard much though

3    from you about the fact that at the very time when, as you say,

4    because of the pandemic there was terrible situations in his

5    community, what did he do?  I'm not talking about opinions now,

6    I am talking about what he did.  He went out and got --

7    illegally -- some guns, for whatever purpose.  So he

8    contributed to that violent atmosphere that you have so well

9    described.

10         MS. BAHARANYI:  Lucha was not engaging in any violence

11    in the community and --

12         THE COURT:  You thought he got a gun not to use it?

13         MS. BAHARANYI:  Your Honor, as many in this country

14    do.  He got a gun for protection.  He got it illegally and that

15    is why we are here, but he did not get a gun to commit --

16         THE COURT:  By which you mean that if he had felt

17    someone was threatening him or his child he would have used the

18    gun.

19         MS. BAHARANYI:  Your Honor, as many people do, he got

20    a gun for his own sense of security and protection, not to go

21    out and assault, harass.

22         THE COURT:  I don't understand that argument.  Maybe I

23    am missing something here.

24         MS. BAHARANYI:  It is the basis of the Second

25    Amendment.

O185elS

1          THE COURT:  So you go out, you are confronted with a

2     violent situation on your account, you fear for the safety of

3     yourself or others close to you, and you then go out and

4     illegally get a gun and it is not for the purpose of, if

5     threatened, you will resort to it, it is just so you can keep

6     it in your basement and feel a better sense of security?  That

7     doesn't make much sense to me.

8          MS. BAHARANYI:  Your Honor, I think it is completely

9     appropriate and fair to have very different views on how the

10    Second Amendment functions in practice and how people feel.

11         THE COURT:  I'm not talking about the Second

12    Amendment.  He can hold whatever it is he wants with the Second

13    Amendment.  I'm talking about what is the logical inference on

14    your account of why he got a gun.  On your account he got it so

15    he could protect either himself or those he loved and how would

16    that work if he didn't use it?

17         MS. BAHARANYI:  Your Honor, again, we understand why

18    we are here.  He received it in a way he should not have but he

19    did not receive it with the intent of going out and committing

20    acts of violence.  He received it with the idea that this is a

21    part of how he -- self-defense, how one protects themselves if

22    violence is brought on to them.

23         THE COURT:  In which case he would use it.

24         MS. BAHARANYI:  Your Honor, again --

25         THE COURT:  I agree that's a hypothetical but you are

O185elS

asking me to credit your hypothetical about what his intentions

were and I am just trying to figure out that the extent it is

relevant at all, which it may not be.

MS. BAHARANYI: His intentions weren't to violate the

law and I think even the law creates protections for those who

defend themselves, either with a firearm or with their fists.

There are exceptions in the law.

THE COURT: Quite limited. Quite limited.

MS. BAHARANYI: Quite limited, right; but again

limited, but they exist and they exist for a reason.

THE COURT: All right.

MS. BAHARANYI: I think what is important to remember

here is this is a person who has no violent history, has never

assaulted, attacked, shot, done anything of violence to another

individual, and in 2020 and 2021 he had no intention nor did he

do violence to other individuals.

THE COURT: What was him going up to Massachusets?

MS. BAHARANYI: That was intended as a, I guess, a

practice on how to safely use firearms and camping in Maine on

private land that the leader of that group had organized.

THE COURT: I'm never going to use this firearm, I

just want it for protection, but I better figure out how I can

go with my friends and learn how to use it. Is that what you

are saying?

MS. BAHARANYI: I feel much safer in this world if

O185elS

```
1    people, who possess firearms legally, do actually know how to

2    use them.

3              THE COURT:  OK.

4              MS. BAHARANYI:  And I think that's why gun ranges

5    exist, your Honor.  But I think we are stepping away from what

6    I do think is kind of the most critical and compelling,

7    mitigating factor behind Lucha and his story.

8              The government mentioned that there are all of these

9    aggravating factors and they exist but glossed over the

10   importance that Lucha has to his community and the community

11   that he was in fact still giving back to in 2020 and 2021.  The

12   different ways he was giving to that community have been

13   outlined in some of the letters of support that we gave to the

14   Court but I don't think necessarily I'm the best speaker on

15   that as someone who is not from that same community, which is

16   why I have asked Ms. Jimenez, someone who has known Lucha El

17   for two decades at this point.

18             THE COURT:  I am more than happy to hear from her and

19   will do that now, but I want to just raise one thing for you

20   before we do that.  So, I am frequently confronted with the

21   argument:  *Judge, Mr. Hypothetical defendant* -- I'm not talking

22   about this defendant but a defendant just in general -- *Judge,*

23   *he is a good family man, has been wonderful to his children,*

24   *they need him, his neighbors speak highly of him, and therefore*

25   *you should, in effect, give him a break.*  And what I always
```

O185elS

wonder when I hear that argument is who brought this on his

neighbors?  Who deprived them of his help, of his love, of his

contribution?  It was he, when he decided to commit a crime.

They are his victims in that sense.  Now, I don't mean to

overstate it but I do think that it is a little ironic that in

case after case I'm told, *Oh, Judge, he loves his family and we*

*can show how deeply he has loved them.*  If he really, really

loved his family, why would he go out and commit a crime and

deprive them of his help?

MS. BAHARANYI:  Your Honor, I think from the letters

of support there is no question that he loves his family and

his community.  He is also someone that the Court has

recognized has made a mistake and those two things just aren't

mutually exclusive.  What Lucha El means to his community is

something that we want to speak more to the Court about but the

reason why we want to make sure your Honor understands this is

because I'm asking for him to go back to the community after he

has already faced serious punishment for his conduct.  So this

isn't a request to have him go back and time-served because he

hasn't spent any time in jail.  No.  He has spent eight months

and three weeks, another four months at the MDC, he has been

seriously punished for his actions in 2020 and 2021, and now I

ask the Court to give him the opportunity to go back to the

space and the people who do mourn his absence, who do love him,

and who he loves and he has supported for several years, not in

O185elS

```
 1    my own words, in my own opinion, but in the words and opinions
 2    of those very community members.
 3                THE COURT:  All right.  Well, let me hear from
 4    Ms. Jimenez.
 5                MS. BAHARANYI:  One moment, your Honor.  Logistically,
 6    Judge, I should have asked if you would you like for her to
 7    stand at the podium?
 8                THE COURT:  Yes.
 9                MS. JIMENEZ:  Good afternoon.
10                THE COURT:  Good afternoon.
11                MS. JIMENEZ:  Thank you for giving me the opportunity
12    to speak this afternoon.
13                My name is Jacqueline Jimenez.  I have known Lucha for
14    most of his life.  We have been neighbors in the same
15    community, the same building, watched him grow up.  I am a
16    little older than he is so he grew up mostly with my son and a
17    lot of the other youth in the building.
18                I am currently working in social services, I am
19    pursuing a masters in social work in grad school at Hunter
20    College, and I currently volunteer with a friend who has a
21    foundation called Uplife, which I intend to involve Lucha in
22    when he does come home.  We service the community by giving out
23    food, back to school events for children, just a number of
24    things.
25                I guess my reason for wanting to talk is to, I guess,
```

O185elS

help you see something beyond what you are reading on paper.

And I am hearing what you are saying, I am trying to digest

what you are saying but I feel like it is important for you to

know that who you are seeing here is not a violent man.  And,

you know, you spoke of people's acts and how they affect the

family and the people that they love and you are right, yes, it

has affected us all deeply, but I don't think we consider

ourselves victims of his crime, we just -- you know, he made

mistakes and we still love him even though he made those

mistakes.  But beyond the mistakes, he is a man with many

different facets.  He helps the community, he is passionate,

not violent.  He is always, you see him around the community,

he's helping somebody, helping unload boxes at a store or

helping someone paint their apartment, helping as -- cliche as

it sounds -- helping the old lady across the street and with

her bags.  Like, you can always find him in a heated

conversation, in a debate, but positive things.  You know?

Like telling children to go back to school.  Come off the

corner, let's go play basketball at our local park.

        You know, from myself, aside from seeing him grow up,

he was always involved in sports, he was an athlete.  We have a

common love of boxing and, most recently, I am really grateful

for him because he helped my son go through a very challenging

time.  My son is one of the people that wrote letters, his name

is Donald, and he helped him through a very challenging time.

O185elS

1    He was the guy that came and knocked on my door every single

2    morning to make my son get up out of bed and go play basketball

3    or do some type of activity.

4            So, I don't know.  I just -- I don't know if I can say

5    enough about him but I just really would like you to maybe

6    reflect a little bit more on the fact that he is not a violent

7    person, he is not the words that you -- the charges that are

8    being brought upon him.  He is more than that.  We are all more

9    than our mistakes.  You know?  We are not just -- we are not

10   just our mistakes, we are more than that, and we deserve the

11   opportunity to redeem ourselves and I feel like he has shown

12   that during his time after being incarcerated.

13           While he has been home I have spent many hours talking

14   to him about his plans and his life.  I see how he is with his

15   child.  I don't consider myself a victim of his crime, I am

16   honored to know him as a person.  I think anyone who knows him

17   is deeply affected by him in a positive way, regardless if you

18   agree with his opinions, to say the least.  You know, I don't

19   have to agree with him to know that he is a thinker, he is a

20   good man, and he is brave to go against the grain of things

21   that maybe people don't normally speak about.

22           Do you have any questions for me?

23           THE COURT:  No.  It is very helpful and I much

24   appreciate hearing from you.

25           MS. JIMENEZ:  Thank you for your time.

O185elS

1          THE COURT:  Thank you.

2          MS. BAHARANYI:  Thank you, Ms. Jimenez.

3          Your Honor, thank you for giving us that opportunity

4     for having someone from his community address the Court.  And I

5     will close with this:  He is facing the harshest of conditions

6     now.  As the Court is aware from the exhibit we provided

7     showing Judge Furman's latest order about the conditions at

8     MDC, this has been his reality, a space where he isn't

9     connected to his community.  He can rarely, if ever, speak to

10    his family.  His ability to practice his religion has been

11    severely limited because of the chaos at the MDC Brooklyn.  And

12    this, coupled with the significant time he spent in

13    Massachusetts and the additional time he faces because he has

14    to go and face the resolution of those charges and faces

15    another two to four years, but all of that together is more

16    than sufficient punishment with the request that we have made

17    for five months, especially for someone who is not the gun

18    trafficker in this scenario.  He is not someone who obstructed

19    justice.  And he is someone who has shown he can abide by the

20    law.

21          THE COURT:  Thank you very much.

22          Let me hear from the government.

23          MS. NICOLAS:  Thank you, your Honor.

24          Defense counsel referred to the heart of the Second

25    Amendment and I want to be really clear about what the heart of

O185elS

the Second Amendment is and why that is not what we saw here.
The heart of the Second Amendment is lawfully obtaining a
firearm to have in your own home for your own protection.  It
is not unlawfully obtaining multiple firearms, so that in one
instance you can stand on the street with the gun in the same
bag as your personal use narcotics and on another occasion
transport that firearm with your militia on the way up to some
kind of unregulated land in Maine that you are going to go fire
off live rounds on for whatever purpose that is.

         What the defendant did is not the heart of the Second
Amendment, he is not being punished because of his words.  He
was charged with crimes because there are federal regulations,
there are federal laws that governs the way in which firearms
are sold and possessed and regulated to keep everyone safe.
They're not just laws that exist for fun, they're not
frivolous, they're not -- you know, the defendant referred to
them as mandates and legalities and all that other stuff.  That
could not be further from the truth.  They exist because
they're important.  Because without people like the defendant,
there is no way to lawfully get a firearm in New York City.
The defendant invited those guns into the same community that
he is standing here today telling us he cares so deeply about.
That's reality.  This is not a man who walked into a gun store
and made some kind of administrative mistake and accidentally
got a gun.

O185elS

1    The jury found he willfully violated the law --

2    willfully -- violated the law. And I think part of the

3    timeline here is pretty disturbing and one we need to keep in

4    the forefront of our mind when we talk about specific

5    deterrence and the sincerity of any kind of acceptance of

6    responsibility that the defendant might have now and that is

7    the timeline from the Bronx arrest to the Massachusetts arrest.

8    The defendant gets arrested by the NYPD possessing a

9    firearm in the Bronx. At the time of that arrest he is told

10   you need a permit for this. He is told this is not something

11   you can do. And he tells the officers, sorry, disagree, I get

12   to decide what laws apply to me, I don't need it, I don't need

13   a permit, a permit is permission, I don't need permission.

14   Two weeks later he is with a convoy in Massachusetts;

15   it is a two-car convoy. It is a convoy. It is guys dressed

16   like they're going into battle and they're not carrying rubber

17   bullets, they're carrying thousands of rounds of real

18   ammunition, over 20 magazines, run magazines, with huge

19   capacities; semi-automatic long gun rifles, of which the

20   defendant was wearing one and at another point holding another.

21   He didn't make a single mistake on a form. That is

22   not what we are talking about. He didn't make a single mistake

23   when he got a gun from someone. He made the same, quote

24   unquote, mistake over and over and over again because he

25   decided he didn't want to abide by laws that he didn't like.

O185elS

That is not how society works.  There is of course of general

deterrence issue here.  There is a specific deterrence issue

here.  This defendant has made clear these laws don't apply to

him, he is not going to do it.

I also want to talk about COVID for a second because,

again, timing is important.

While we are supposed to be hearing about COVID being

difficult and making everyone's lives difficult and there is no

denying that was reality, we all lived it, the defendant was

loading up his convoy with his friends to go drive to Maine to

go shoot some guns.  He was moving interstate, freely, on 4th

of July weekend, while we are supposed to think that he was

desperate and this was a mistake that he made out of

desperation during COVID.  The reality is quite clear, he was

getting guns to do whatever he wanted because that's how he

views the law, it doesn't apply to him.

That's why gun ranges exist.  That's another thing I

heard.  This wasn't a gun range.  This wasn't harmless,

innocent activity.  This defendant invited guns into his

community, he did it over and over again when he knew what he

was doing was wrong, your Honor, and for that reason a

substantial period of incarceration is appropriate here.

THE COURT:  Let me ask you one more particularized

question which is should I give him, in your view, a credit,

since it won't be credited as a technical matter, for the time

O185elS

1    he spent in jail in Massachusetts as opposed to time he spent

2    here which will be credited?

3        MS. NICOLAS:  I certainly think that's a relevant

4    3553(a) factor for your Honor.  What I will say about that is

5    the defendant's pretrial detention in Massachusetts was also,

6    in part, predicated on his refusal to identify himself, his

7    refusal to comply with booking procedures.  So, I do think that

8    that pretrial detention took, in effect, factors that are not

9    relevant to what we are here for today.

10        I will also note he is getting ready to stand trial in

11   February on that Massachusetts case which, I imagine, will be

12   putting before the judge a lot more than was put before the

13   Court here as it related to the details of that traffic stop.

14   So while it is relevant, your Honor, I don't think it is

15   tremendously mitigating.

16        THE COURT:  Let me hear from defense counsel and then

17   from the defendant, if he wishes to be heard.

18        MS. BAHARANYI:  Thank you, your Honor.  Just briefly.

19        The government's very, very impassioned speech here

20   feels misplaced.  If this were a conversation, a sentencing

21   that were taking place after his arrest in 2021, fair game;

22   there needs to be punishment, there needs to be consequence,

23   there is a need for specific and general deterrence.  But, in

24   fact, we are having this conversation about appropriate

25   punishment after he has already been seriously and sufficiently

O185elS

1    punished, your Honor, and that's what has been lost sight of.

2    We are having this conversation about whether jail is necessary

3    to course correct or correct his conduct in the future after

4    jail has already been imposed in his life and after it has

5    already, in fact, changed his conduct and changed his actions.

6        THE COURT:  Well, of course that is highly relevant to

7    one factor, namely specific deterrence.  It doesn't really go

8    to most of the other factors.

9        MS. BAHARANYI:  Your Honor, I do think it speaks to

10   general deterrence as well.  The credibility of the system is

11   not just about whether people are punished for doing bad

12   things, for breaking the law, but it's about whether that

13   punishment is in fact proportional.  That's how it has any

14   credence, any credibility with any community that might learn

15   about this case.  And if the Court were to impose --

16       THE COURT:  I don't know how you come to that.  It is

17   rare that anyone who is considering a future crime gets into

18   detailed analysis of why Mr. Jones received X months and

19   Mr. Smith received Y months.  What is relevant for someone who

20   is thinking about committing a crime is, oh, the people who

21   committed that crime got serious time.  I really think it is --

22   I don't know of anywhere in the criminological literature where

23   it has been shown that defendants who are considering future

24   crimes -- that's what general deterrence is all about -- get

25   into an analysis of, oh, he got a lower sentence but that was

O185elS

because he had learned his lesson or anything like that. That

is highly relevant for specific deterrence but I don't see how

it is relevant for general deterrence.

MS. BAHARANYI: Your Honor, if we are focusing on

statistics then, truly, what has been proven to be most

effective or effective when it comes to general deterrence

isn't at all the length or severity of punishment that someone

received, but is, in fact, the fact that someone has been

arrest and about been punished.

THE COURT: That's the biggest factor but that is only

factor. That factor we have known for about a hundred years,

well-documented, and I agree with you, that's the single most

established factor in general deterrence but it is, by far,

from the only factor.

MS. BAHARANYI: I think if we are to assume that if we

step beyond what has been proven in the science and we are now

a little bit speculating on what will affect the community and

what they will believe or how they will be affected by

someone's sentence, then I do think it is completely fair to

believe the community, like the community here, will have the

capacity to understand the difference between excessive

punishment and the right punishment, just punishment.

THE COURT: All right.

MS. BAHARANYI: And what we have asked for, your

Honor, truly is the just punishment given the totality of the

O185elS

1    circumstances of his overall punishment here during COVID, in

2    MDC when it is at its worse.  Anything beyond the five months I

3    have asked would be beyond what is necessary and no longer

4    carries the deterrent weight or effect that I believe the Court

5    is concerned about.

6         THE COURT:  Let me hear from the defendant, if he

7    wishes to be heard.

8         MS. BAHARANYI:  Your Honor has received a letter from

9    Lucha and he does not wish to make any further statements

10   beyond what he provided to the Court in his letter.

11        THE COURT:  OK.  That's fine.

12        So, on the one hand I think I take his criminal

13   activity to be considerably more serious than the defense is

14   arguing.  I think the government is absolutely right and,

15   indeed, the jury found that this defendant intentionally,

16   willfully engaged in this misconduct, blatantly in violation of

17   the law and as part of an ongoing relation with others who were

18   doing the same.  And where, at the end of the story, I think

19   the factors under Section 3553(a) would all counsel a sentence

20   not unlike the two years I gave to Mr. Vereen, there are,

21   however, I think two mitigating factors that warrant a lesser

22   sentence.  The first is the time he has already spent in jail

23   in Massachusetts, which will not be credited against this

24   sentence unlike the time he spent in federal custody but which

25   is nevertheless real punishment for activity very closely

O185elS

related to what the defendant stands accused of here.  Not

identical, but related.  And while I am not particularly

convinced that this defendant learned his lesson from that

incarceration, I think that is much too simplistic when you are

dealing with someone as complicated as this defendant.  But I

think some credit should be given for that.

The much bigger factor is the numerous people, many of

whom are here today, who have supported him and told me of his

good side, of his good nature.  My own view of sentencing,

which is part of Section 3553(a) but seems to me to be

especially important, is that a person at this moment of

sentence be judged by the entire character he has demonstrated

and not just by his mistakes.  I thought Ms. Jimenez made that

point quite eloquently and the fact that there are all of these

people who have not only written to me but are here today to

say that this defendant has a good side that they recognize,

that they've experienced, that they have seen, is quite

important to me.

So I'm going to give a lesser sentence than the one I

contemplated.  It is nothing like the sentence that defense

counsel asks for because I think that grossly understates both

the crime itself, its potential for violence, and the

defendant's involvement with a different kind of community, if

you will, a community dedicated to the illegal possession of

guns and the seeming preparation to use them.

O185elS

         Putting all of these factors together, the sentence of
the Court is that the defendant is sentenced to 16 months in
prison, that's on each count, concurrently, and similarly, to
three years of supervised release, concurrent on each of the
counts.

         No fine will be imposed because the Court makes a
finding that this defendant is not in a position to pay any
meaningful fine now or in the foreseeable future.  There is,
however, a $200 mandatory special assessment that must be paid.

         The terms of supervised release are, first, mandatory
conditions that the defendant not commit any other federal,
state or local crime; that he not unlawfully possess a
controlled substance; that he cooperate in the collection of
DNA; and that within 15 days of his release from prison he
submit to one drug test to be followed by two periodic drug
tests thereafter, as determined by the probation officer.

         There will also be imposed standard conditions 1
through 12.  They appear on the face of the judgment but also
will be gone over with the defendant when he begins his period
of supervised release, which he will do by reporting to the
nearest probation office within 72 hours of his release from
prison.

         And finally, there are the special conditions:

         First, the defendant will participate in an outpatient
treatment program for drugs and alcohol under standard terms;

O185elS

1    and secondly, that he will be supervised by the district of his

2    residence.

3          Now, before I advise the defendant of his right of

4    appeal, let me ask counsel for both sides whether there is

5    anything else we needed to take up.

6          Anything further from the government?

7          MS. NICOLAS:  Your Honor, just a couple of

8    housekeeping matters.

9          First, we would ask that the Court adopt the factual

10   findings that are set forth in the presentence report.  There

11   is no objections from the government on that.

12         THE COURT:  Yes.  I adopt the presentence report other

13   than I disagree with the calculation, as previously indicated.

14         MS. NICOLAS:  The other matter, your Honor, is that

15   the government would ask that the forfeiture order be made

16   final as to the firearms in the case.  There is no money

17   judgment but it is the firearm.

18         THE COURT:  Any objection to that?

19         MS. BAHARANYI:  No objection, your Honor.

20         THE COURT:  So ordered.

21         MS. BAHARANYI:  Your Honor, on the special conditions,

22   probation recommended outpatient drug treatment.  I don't

23   believe that is an appropriate condition in this case because

24   Lucha El has no history of abusing illegal substances.  The one

25   reason for this recommendation is because of his prior use of

O185elS

```
1    marijuana and that was before he was on pretrial supervision.
2              THE COURT:  I wondered about that myself.  I will
3    withdraw that special condition.
4              MS. BAHARANYI:  Thank you.  That's all on our behalf.
5              THE COURT:  Did you want to make any recommendation as
6    to where he should be housed?
7              MS. BAHARANYI:  Absolutely, your Honor.  We do ask he
8    be housed as close to New York City as possible.
9              THE COURT:  I will make that recommendation.  I can't
10   order it, as you know, but I will recommend it.
11             So, speaking to the defendant, let me advise you,
12   first, that you have a right to appeal the sentence.
13             Do you understand that?
14             THE DEFENDANT:  Yes.
15             THE COURT:  If you can't afford counsel for the
16   appeal, the Court will appoint one for you free of charge.
17             Do you understand that?
18             THE DEFENDANT:  Yes.
19             THE COURT:  That concludes --
20             MS. NICOLAS:  Your Honor, the government now moves to
21   dismiss the underlying indictment.
22             THE COURT:  Yes.  Thank you very much.  That motion is
23   granted.
24             Very good.  Thanks a lot.
25                              o0o
```